# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LEADER TECHNOLOGIES, INC., a
Delaware corporation

      Plaintiff and Counterdefendant,

      v.

FACEBOOK, INC., a Delaware
corporation

      Defendant and Counterclaimant.

Civil Action No. 1:08-cv-00862-JJF

## COMPENDIUM OF UNREPORTED CASES CITED IN BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION AND FIRST SET OF INTERROGATORIES

Dated: May 18, 2009

OF COUNSEL:

Heidi L. Keefe (*pro hac vice*)
Mark R. Weinstein (*pro hac vice*)
Craig W. Clark (*pro hac vice*)
Melissa H. Keyes (*pro hac vice*)
**WHITE & CASE LLP**
3000 El Camino Real
5 Palo Alto Square, 9th Floor
Palo Alto, CA 94306

Thomas P. Preston (DE Bar #2548)
Steven L. Caponi (DE Bar #3484)
**BLANK ROME LLP**
1201 N. Market Street
Wilmington, DE 19801
302-425-6400
Fax: 302-425-6464

*Attorneys for Defendant and
Counterclaimant Facebook, Inc.*

# TABLE OF CONTENTS

Tab

*3Com Corp. v. D-Link Sys., Inc.,*
    No. C 03-277-VRW, 2007 WL 949596 (N.D. Cal. Mar. 27, 2007) ...........................1

*CIF Licensing, LLC v. Agere System, Inc.,*
    No. 07-170-JJF, 2008 WL 2019492 ......................................................................2

*Cross Atlantic Capital Partners v. Facebook, Inc.,*
    No. 07-02768 (E.D. Pa. Feb. 29, 2008)) ..............................................................3

*Cross Atlantic Capital Partners v. Facebook, Inc.,*
    No. 07-2768 (E.D. Pa. Aug. 18, 2008) ................................................................4

*King Pharm., Inc. v. EON Laboratories, Inc.,*
    No. 04-CV-5540, 2008 WL 2788199 (E.D.N.Y. Jul. 15, 2008).............................5

*Network Caching Tech. v. Novell, Inc.,*
    C-01-2079-VRW, 2003 WL 21699799 (N.D. Cal. March 21, 2003).....................6

*New York University v. E. Piphany, Inc.,*
    No 05-1929, 2006 WL 559573 (S.D.N.Y., March 6, 2006) ...................................7

*Rates Tech. Inc. v. Mediatrix Telcom, Inc.,*
    No. 05-2755, 2007 WL 2581777 *3 (E.D.N.Y. Sept 5, 2007) ...............................8

# EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 949596 (N.D.Cal.)
(Cite as: 2007 WL 949596 (N.D.Cal.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
3COM CORP., Plaintiff,
v.
D-LINK SYSTEMS, INC., Defendant,
Realtek Semiconductor Corp, Intervenor.
No. C 03-2177 VRW.

March 27, 2007.

Jeffrey E. Ostrow, Simpson Thacher & Bartlett
LLP, Palo Alto, CA, Henry B. Gutman, Amanda G.
Motsinger, Brian P. McCloskey, Jeremy S. Pitcock,
Justin S. Stern, Kerry L. Konrad, Marsha Johnson,
Simpson Thacher & Bartlett LLP, Victor Cole, New
York, NY, for Plaintiff.

ORDER

VAUGHN R. WALKER, United States District
Chief Judge.

*1 Plaintiff 3Com Corporation (3Com) brought this
suit alleging that two products of defendant D-Link
Systems, Inc (D-Link) infringe three of 3Com's pat-
ents: United States patents 5,434,872, 5,732,094
and 5,307,459. Doc # 1, ¶ 10. Realtek Semicon-
ductor Corporation (Realtek) later intervened. Doc
# 108.3Com also alleges that Realtek infringes sev-
en 3Com patents including the patents asserted
against D-Link as well as United States patents
6,115,776, 6,327,625, 6,526,446 and 6,570,884.
Docs108, 120. United States patent 6,115,776 was
subsequently dropped from this case. 3Com and D-
Link have since settled claims in this action, leav-
ing Realtek as the sole defendant. Doc # 108. D-
Link remains a party to the 05-0098 case.

Here, the court addresses four discovery disputes
between 3Com and Realtek raised by 3Com in its

letter brief of February 15, 2007. Doc # 378.

I

Every patent in this litigation relates to network in-
terface technology, which facilitates the transfer of
data between a host device (such as a personal com-
puter) and a network. Data transferred between the
host and a network must first be formatted into data
"packets" or "frames," which are bits of data that
have been packaged for transmission according to
standardized network protocols. Network interface
devices that are the subject of the patents contain
buffer memory for temporarily storing packets that
are being received from the host and transmitted to
a network (or vice versa). Realtek designs chips
which are used in certain network interface cards.
As the court writes principally for the parties, it
will not further discuss the details of the inventions.

As a preliminary matter, Realtek's position in a pre-
vious motion was that only five products (the
products accused in the January 14, 2005 PICs)
were properly in the case and that the court should
strike 3Com's amended PICs, which accuse new
products. Doc # 295. The court has since denied
Realtek's motion to strike. Doc # 390. In several of
the disputes below, Realtek has not produced in-
formation related to-or its Rule 30(b)(6) witnesses
were not prepared to testify about-all the products
accused in the amended PICs. Accordingly, to the
extent that Realtek has not produced the requested
information for all accused products, and instead
limited its production to the five products originally
accused, the court ORDERS Realtek to produce in-
formation for the additional products.

II

The court visits the remaining issues in turn. First,
3Com asserts that Realtek has not produced all ver-
sions of the relevant source code. Doc # 378 at 1-3.
Second, 3Com asserts that Realtek has not pro-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 949596 (N.D.Cal.)
**(Cite as: 2007 WL 949596 (N.D.Cal.))**

duced technical information related to the internal design of Realtek's chips. *Id* at 3-4.Third, 3Com seeks Realtek's financial information in a more detailed form than Realtek has thus far provided. *Id* at 4-8.Fourth, 3Com complains that Realtek's 30(b)(6) witnesses were inadequate and seeks sanctions. *Id* at 8-10.Realtek opposes 3Com's requests. Doc # 383.

**\*2** Relevancy, for the purposes of discovery, is defined broadly, although it is not without "ultimate and necessary boundaries." *Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947)."Once an objection to the relevance of the information sought is raised, the burden shifts to the party seeking the information to demonstrate that the requests are relevant to the subject matter involved in the pending action." *Allen v. Howmedica Leibinger, Inc.,* 190 F.R.D. 518, 522 (W.D.Tenn.1999), citing *Andritz Sprout-Bauer, Inc. v. Beazer East, Inc.,* 174 F.R.D. 609, 631 (M.D.Pa.1997). Appropriate discovery includes, of course, inspection of "any designated documents * * * which are in the possession, custody or control of the party upon whom the request is served."See FRCP 34(a)(1). With these basic and well-known tenets in mind, the court addresses 3Com's specific discovery requests.

A

*Source Code*

On February 14, 2006, the undersigned ordered Realtek to produce source code for the Realtek products at issue. Doc # 320. Realtek produced several versions of source code shortly thereafter. Docs378, 383. During the week of February 20, 2006, 3Com deposed Realtek's Rule 30(b)(6) witnesses. One such witness stated that the source code produced was current code, which may have been modified within the preceding three weeks. Doc # 378 Ex A at 55-59. Further, the witness could not explain what modifications were made and could

not explain the differences between the produced codes and earlier, unproduced versions. *Id.* After the Rule 30(b)(6) deposition, Realtek produced additional code.

Realtek maintains that it "has now produced all the versions it maintains."Doc # 383 at 1. 3Com contends it "has good reason to believe that at least some versions of the source code have not yet been produced."Doc # 378 at 3. According to 3Com, there were many versions of generation 3.xx produced, but there were no versions (or very limited versions) of generations 4.xx, 5.xx and 6.xx. Doc # 378 at 3. Realtek does not contest this; rather Realtek merely states "[t]here can be many explanations for skipping a number when multiple versions of the code are created."Doc # 383 at 1. Realtek stops there, however, and does not offer any "explanations." Given the many version numbers in one generation of code, the near absence of all other versions of code and lack of explanation by Realtek, the court agrees that 3Com is entitled to the code to the extent it exists or, alternatively, is entitled to an explanation.

Accordingly, the court ORDERS Realtek to produce all missing versions of the source code that it maintains. If Realtek cannot produce additional versions, the court ORDERS Realtek to declare so by way of a statement under penalty of perjury of both a Realtek officer, director or managing agent *and* its counsel at bar. This admission must identify the versions of the source code that may have once existed and must explain their disappearance.

B

*Technical Information*

**\*3** 3Com requests that Realtek produce technical information related to the internal design and operation of the accused products. Doc # 378 at 4. 3Com seeks the technical information because the court's claim construction further defined physical

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 949596 (N.D.Cal.)
**(Cite as: 2007 WL 949596 (N.D.Cal.))**

design elements of an infringing product. See Doc # 375. Realtek responds that the "netlist codes" already produced identify all components in the accused products and therefore, it argues, it should not be required to produce the additional technical information. Doc # 383 at 1-2.

Parties may not meet their obligations by pointing out that the portion of materials thus far produced obviates the need for production of the remaining items in the requested category. See FRCP 34(a)(1) (requiring production of "any [relevant] documents" designated by discovering party); *Buycks-Roberson v. Citibank Fed. Sav. Bank,* 162 F.R.D. 338, 341-42 (N.D.Ill.1995). Here, Realtek does not dispute the fundamental relevance of the VHDL code, "netlist codes" and the related technical information detailing the internal design and operation of the accused chips. Accordingly, Realtek's argument that partial production demonstrates irrelevance of further production misses the mark.

If Realtek sought to avoid what it considered to be an unreasonable burden, it could have applied for leave to file a motion for protective order under FRCP 26(c). Instead, Realtek apparently decided it would be okay to produce just a subset of all the relevant documents and code. 3Com should not have to rely on Realtek's selective representations to determine the physical location of design elements as required by the patents-in-suit.

Accordingly, the court ORDERS Realtek to produce VHDL code, "netlist codes" and the related technical information detailing the internal design and operation of the accused chips.

### C

#### *Financial Information*

3Com seeks discovery on financial information, namely worldwide sales and profits, for all versions of all accused products from 1994 to present. Doc # 378 at 4. Realtek contends that 3Com is not entitled to worldwide sales and profits, that 3Com is not entitled to any financial information from before the statutory period for damages and that Realtek does not maintain the specific records that 3Com requests. Doc # 383 at 2.

Without saying as much, Realtek is essentially arguing that worldwide sales and profits are not relevant. The court disagrees.

First, Realtek's worldwide sales are reasonably calculated to lead to the discovery of admissible evidence because the worldwide sales relate to 3Com's claim of direct infringement. The court agrees with 3Com that it is entitled to discovery concerning Realtek's customers and sales to determine the extent to which those customers sold the accused products into the United States.

Second, Realtek's worldwide sales are reasonably calculated to lead to the discovery of relevant evidence because the worldwide sales relate to 3Com's claim of inducing infringement. 3Com is not required to prove its inducing infringement theory to be entitled to discovery of such information. See *Murata Mfg. Co., Ltd. v. Bel Fuse, Inc.,* 422 F Supp 2d 934, 944-46 (N.D.Ill.2006).

*4 Third, worldwide profits and sales are relevant to a reasonable royalty calculation. See *Bose Corp. v. JBL, Inc.,* 112 F Supp 2d 138, 168 n. 20 (D.Mass.2000). For example, the worldwide profit margin may be indicative of a ceiling amount for a reasonable royalty. Worldwide sales and profits are also relevant to Realtek's financial condition generally.

Fourth, worldwide sales and profits are relevant to the affirmative defense of obviousness. That is, the greater the commercial success worldwide, the more likely the patent is not obvious. Realtek argues that "[e]ven if the worldwide sales were tangentially relevant to the issue of obviousness * * *, 3Com would have to prove that any sales of Realtek's products are attributable to the inventions in

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 949596 (N.D.Cal.)
**(Cite as: 2007 WL 949596 (N.D.Cal.))**

the patents-in-suit."Doc # 383 at 2. Realtek does not address the relevance of worldwide sales and profits. Rather, Realtek merely states 3Com would have to show a nexus between the commercial success and the invention to rebut a prima facie showing of obviousness by Realtek. The court finds Realtek's argument unpersuasive. The existence of one element (i e, the nexus between commercial success and the invention in patent-in-suit) does nothing to narrow the scope of discovery on an entirely separate element (i e, whether the product embodying the invention enjoyed commercial success).

For at least these reasons, 3Com's request for worldwide sales and profits is within the broad scope of discovery.

Regarding the time period of discoverable financial information, as discussed above, worldwide sales and profits generally may be relevant to direct infringement, inducing infringement, determining a reasonable royalty and rebutting a prima facie showing of obviousness. Similarly, worldwide sales and profits before 1998 are reasonably calculated to lead to the discovery of relevant evidence. For example here, worldwide sales and profits before the statutory damages period may be relevant to Realtek's assertion that it sold accused products bound for the United States to a single agent/distributor over a nearly ten year period. Further, the amount of sales and profits before the statutory damages period may be relevant to showing D-Link's intent under an active inducement theory. Finally, discovery of a defendant's financial situation may facilitate settlement of the action, which is one of the purposes behind the broad federal discovery rules. *Oakes v. Halvorsen Marine Ltd.,* 179 F.R.D. 281, 286 (C.D.Cal.1998). Accordingly, D-Link cannot dispose of its discovery obligations on its own by unilaterally calculating the time period to which it believes plaintiff is entitled to recover damages. 3Com may discover all information regarding defendant's worldwide sales and profits to determine the potential scope of damages and viable infringement theories.

Having determined that all worldwide sales and profits of all the accused products are within the scope of discovery, the court must examine Realtek's present ability to produce this information. Realtek claims that it has produced the "best information" it has on which equipment manufacturers ultimately buy the accused products from the agents and distributors. Doc # 383 at 2. Realtek sells to agents and distributors, and it asserts that it does not know with certainty how many chips bought by these agents and distributors are sold or to whom it sold them. *Id.*

**\*5** The excerpted transcript of the Tseng depositions (Doc # 378 Exs C, F) indicates that there is a database system that Realtek has maintained since 1999. That database contains information such as worldwide sales by product and profits by product. Realtek does not reconcile the Tseng deposition with its statement "Realtek does not calculate [worldwide sales totals for each accused product]." Doc # 383 at 2. For the reasons discussed above, worldwide sales and profits are within the scope of discovery and 3Com is entitled to such information.

Additionally, while Realtek mentions in passing that producing such financial information would be "unduly burdensome," it does not substantiate its claim. In light of the relevance of the materials 3Com seeks, the court is not convinced that the requests are unduly burdensome. The relevance of 3Com's discovery requests outweighs the burden on the defendant.

Accordingly, the court ORDERS Realtek to produce the worldwide sales and profits for each accused product from 1994 to present. For any otherwise discoverable financial information that Realtek does not possess, Realtek is ordered to identify this information by way of formal admission under penalty of perjury, including an explanation why it is unable to produce such information.

D

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 949596 (N.D.Cal.)
(Cite as: 2007 WL 949596 (N.D.Cal.))

*Additional 30(b)(6) Depositions*

It is necessary to conduct additional and continued Rule 30(b) (6) depositions for at least the following reasons. First, the court has now clarified which accused products are properly in this suit. Realtek must produce Rule 30(b)(6) witnesses to testify on all the accused products. Second, Realtek's designee on financial issues was unprepared to testify about Realtek's worldwide sales and profits. Because the court finds this information discoverable, Realtek must produce a designee to testify on these related topics as outlined above.

Third, at the time of the Rule 30(b)(6) depositions, Realtek had not yet produced all versions of the source code that it maintained for the accused products. For this reason alone, the court finds it appropriate to order continued examination of Realtek's software designee. On continued deposition, while Realtek's software designee need not compare and contrast each and every version of the source code, he or she must be prepared to explain significant changes or modifications in the source code that occurred. This will obviously require reviewing, and being informed about, more than the most recent version of the code. Similarly, the hardware and design designee should be prepared to address significant changes in the hardware and design throughout the product development process for all accused products.

For the reasons stated above, the court ORDERS Realtek to produce Rule 30(b)(6) designees to be deposed on all accused products, financial information that the court above deems discoverable and modifications to the source code and accused products' design.

3Com also seeks sanctions against Realtek in the amount of reimbursement for the costs and expenses 3Com incurred in sending its counsel and support personnel to Taiwan to depose Realtek's Rule 30(b)(6) witnesses. Doc # 378 at 10. 3Com contends that Realtek's three Rule 30(b)(6) witnesses were "woefully unprepared" even for the five products Realtek contended were properly in the case. Doc # 378 at 8. 3Com requests that the court order Realtek to produce these three witnesses for continued examination. Further, 3Com asks the court to order these depositions take place in the United States.

*6 A court's decision to impose sanctions and the choice of an appropriate sanction are discretionary. See *Nat'l Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639, 642, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). The court cannot conclude that Realtek has acted willfully or in bad faith. Realtek may very well have erroneously believed that it had acted properly. In addition, there is no doubt that Realtek has expended significant effort in complying with its discovery obligation, which perhaps explains its refusal to do more at this point. Accordingly, the court finds that the sanctions sought by 3Com are unwarranted at this juncture.

The court does find, however, that it would be inappropriate to force 3Com to incur these costs again and ORDERS Realtek to produce its Rule 30(b)(6) witnesses for continued deposition in the United States. Realtek presumably is now mindful of its legal responsibilities and self-interest in discharging its discovery obligations even at the risk of inconvenience to its employees. 3Com's request for sanctions is DENIED.

### III

In sum, to the extent Realtek only produced the information related to the five products originally accused and did not produce information related to all products accused in the amended preliminary infringement contentions, the court ORDERS Realtek to produce such information for all products presently in this case. The court additionally ORDERS Realtek to produce: (1) all versions of missing source code for all accused products; (2) VHDL, "netlist codes" and related technical information detailing the internal design and opera-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 949596 (N.D.Cal.)
**(Cite as: 2007 WL 949596 (N.D.Cal.))**

tion of the accused chips; (3) financial information, including worldwide sales and profits, from the period 1994 to present; and (4) Rule 30(b)(6) witnesses to testify on the subjects outlined above and continued examination of the original Rule 30(b)(6) witnesses, such depositions to occur in the United States. Finally, the court DENIES 3Com's request for sanctions.

IT IS SO ORDERED.

N.D.Cal.,2007.
3Com Corp. v. D-Link Systems, Inc.
Not Reported in F.Supp.2d, 2007 WL 949596 (N.D.Cal.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 2

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 2019492 (D.Del.)
(Cite as: 2008 WL 2019492 (D.Del.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
CIF LICENSING, LLC, d/b/a G.E. Licensing,
Plaintiff,
v.
AGERE SYSTEMS, INC., Defendant.
Civil Action No. 07-170-JJF.

May 9, 2008.

Philip A. Rovner, Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE, Brian E. Ferguson, Pro Hac Vice, Joel M. Freed, Pro Hac Vice, Michael W. Connelly, Pro Hac Vice, for Plaintiff.

Jeffrey Thomas Castellano, Josy W. Ingersoll, John W. Shaw, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Chad E. King, Pro Hac Vice, David E. Sipiora, Pro Hac Vice, Ian L. Saffer, Pro Hac Vice, for Defendant.

### *MEMORANDUM ORDER*

JOSEPH J. FARNAN, JR., District Judge.

*1 The following motions are pending before the Court: Defendant's Motion for Leave to File a Second Amended Answer and Counterclaims (D.I.56), Plaintiff's Motion to Compel Production and Responses (D.I.65), Plaintiff's Motion to Compel Production and Responses (D.I.71), and Defendant's Motion to Compel Discovery (D.I.74.).

### 1. Defendant's Motion for Leave to File Second Amended Answer and Counterclaims (D.I.56)

Pursuant to its Motion, Defendant moves for leave to file a second amended answer and counterclaims, specifically an affirmative defense and counterclaim for declaratory judgment for unenforceability relating to inequitable conduct before the U.S. Patent and Trademark Office.

In light of the liberal pleading rules, the Court will grant Defendant's Motion. Defendant's Motion was filed within the deadline set by the Scheduling Order governing the action, and Defendant's proposed defense and counterclaim are sufficiently specific to give Plaintiff notice of the misconduct alleged.

Plaintiff contends that if Defendant's amendment is allowed, Plaintiff should be entitled to additional written discovery. Defendant contends that at issue "is a Motorola patent purchased by GE," and so Defendant has "no documentary evidence of any kind relating to the alleged act of inequitable conduct (other than the publically available file wrapper for the patent and the reference itself-which has been provided during discovery."(D.I. 62 at 3.) If Defendant's contention that it has no discoverable documentary evidence relating to its new defense and counterclaim is accurate, any harm arising out of allowing Plaintiff to propound written discovery on this issue would be minimal. Accordingly, the Court will allow Plaintiff to propound written discovery requests regarding Defendant's newly added defense and counterclaim.

### 2. Plaintiff's Motion to Compel Production and Responses from Defendant (D.I.65)

Pursuant to its Motion to Compel Production and Responses from Defendant (D.I.65), Plaintiff requests that the Court order Defendant to provide complete and responsive answers and documents to its supplemental interrogatory request no. 44, and requests for production nos. 46-61 issued on February 7, 2008 ("the February requests").

The Court finds that neither party has been straightforward throughout the discovery process. While Plaintiff's February requests were not timely, the requests are relevant and the Court finds that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 2019492 (D.Del.)
**(Cite as: 2008 WL 2019492 (D.Del.))**

Plaintiff is entitled to this information. Accordingly, the Court will grant Plaintiff's Motion (D.I.65).

### 3. Plaintiff's Motion to Compel Production and Responses from Defendant (D.I.71)

Pursuant to its second Motion to Compel, Plaintiff contends that Defendant is "hid[ing] the ball" and enumerates several alleged deficiencies in Defendant's production of documents and information. (D.I. 71 at 1.) Plaintiff contends that Defendant has failed to produce relevant discovery relating to infringement (including design, development, product and marketing data), damages (including sales, revenue and financial data) and defenses (prior litigation and licenses).

*2 The Court concludes that the specificity of Plaintiff's requests make it clear that Plaintiff is not engaging in a fishing expedition, and that there are aspects of Defendant's production that require supplementation, or identification within Defendant's voluminous document production.

### 4. Defendant's Motion to Compel Discovery (D.I.74)

Defendant asks the Court to compel Plaintiff to provide complete responses to its interrogatories regarding the basis for Plaintiff's willful infringement claim, and identification of all accused products and a mapping of the asserted claims to the accused products.

Through the filing of multiple discovery motions, Plaintiff has objected to what it characterizes as Defendant's incomplete discovery responses. According to Plaintiff, the information Plaintiff has unsuccessfully sought to obtain from Defendant is necessary for Plaintiff to adequately respond to Defendant's interrogatories. Defendant contends, however, that it has produced all responsive non-privileged documents. The Court has already determined that there are aspects of Defendant's production that re-

quire supplementation. Once Defendant has supplemented its production, Plaintiff should adequately respond to Defendant's interrogatories. Defendant is entitled to this information, and, as Defendant aptly points out, discovery obligations are not conditional.

The Court notes that the parties' discovery disputes have continued to evolve while the parties were filing their briefing on Plaintiff's Motion to Compel Production and Responses from Defendant (D.I.71), and Defendant's Motion to Compel Discovery (D.I.74). The Court finds that both parties' efforts to reach agreement regarding their discovery obligations were insufficient, and accordingly, the Court will deny both Motions.

Instead, the Court will order the parties to meet and confer in order to reach agreement on each parties' outstanding discovery obligations. The Court will allow the parties ten (10) days from the date this Order is entered to reach agreement. If the parties are unable to do so, they shall file a joint letter with the Court that succinctly depicts those issues on which they are unable to reach agreement. The Court will resolve any remaining disputes, or will refer them to a Special Master.

NOW THEREFORE IT IS HEREBY ORDERED:

1. Defendant's Motion for Leave to File Second Amended Answer and Counterclaims (D.I.56) is **GRANTED.** The Court will allow Plaintiff to propound written discovery requests regarding Defendant's newly added defense and counterclaim.

2. Plaintiff's Motion to Compel Production and Responses from Defendant (D.I.65) is **GRANTED.**

3. Plaintiff's Motion to Compel Production and Responses from Defendant (D.I.71) and Defendant's Motion to Compel Discovery (D.I.74) are **DENIED.**

4. The Parties shall meet and confer, to attempt to reach agreement as to each Parties' outstanding discovery obligations. The parties shall have **ten (10)**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 2019492 (D.Del.)
**(Cite as: 2008 WL 2019492 (D.Del.))**

**days** from the date this Order is entered to reach agreement. If the parties are unable to do so, they will file a joint letter with the Court that succinctly depicts those issues on which they are unable to reach agreement. The Court will resolve any remaining disputes, or refer them to a Special Master.

D.Del.,2008.
CIF Licensing, LLC v. Agere Systems, Inc.
Not Reported in F.Supp.2d, 2008 WL 2019492 (D.Del.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 3



**CROSS ATLANTIC CAPITAL PARTNERS, INC., v. FACEBOOK, INC., and THE FACEBOOK, LLC**

**CIVIL ACTION NO. 07-2768**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2008 U.S. Dist. LEXIS 15862*

**February 29, 2008, Decided**
**February 29, 2008, Filed; March 3, 2008, Entered**

**SUBSEQUENT HISTORY:** Stay granted by *Cross Atl. Capital Partners., Inc. v. Facebook, Inc., 2008 U.S. Dist. LEXIS 62869 (E.D. Pa., Aug. 18, 2008)*

**COUNSEL:** [*1] For CROSS ATLANTIC CAPITAL PARTNERS, INC., Plaintiff: FREDERICK A. TECCE, LEAD ATTORNEY, MCSHEA TECCE PC, PHILADELPHIA, PA; PATRICK J. KEENAN, DUFFY & KEENAN, PHILADELPHIA, PA; THOMAS J. DUFFY, DUFFY & KEENAN, PHILADELPHIA, PA.

For FACEBOOK, INC., THEFACEBOOK, LLC, Defendants: ALFRED W. ZAHER, LEAD ATTORNEY, BLANK ROME LLP, PHILADELPHIA, PA; HEIDI L. KEEFE, LEAD ATTORNEY, WHITE & CASE LLP, PALO ALTO, CA; MARK R. WEINSTEIN, LEAD ATTORNEY, WHITE & CASE LLP, PALO ALTO, CA; SAM C. O'ROURKE, LEAD ATTORNEY, WHITE & CASE LLP, PALO ALTO, CA; DENNIS P. MCCOOE, BLANK ROME COMISKY & MCCAULEY, LLP, PHILADELPHIA, PA; JOEL L. DION, BLANK ROME LLP, PHILADELPHIA, PA.

For FACEBOOK, INC., THEFACEBOOK, LLC, Counter Claimants: HEIDI L. KEEFE, LEAD ATTORNEY, WHITE & CASE LLP, PALO ALTO, CA.

For CROSS ATLANTIC CAPITAL PARTNERS, INC., Counter Defendant: FREDERICK A. TECCE, LEAD ATTORNEY, MCSHEA TECCE PC, PHILADELPHIA, PA; PATRICK J. KEENAN, DUFFY & KEENAN, PHILADELPHIA, PA; THOMAS J. DUFFY, DUFFY & KEENAN, PHILADELPHIA, PA.

**JUDGES:** John R. Padova, J.

**OPINION BY:** John R. Padova

**OPINION**

**MEMORANDUM**

Padova, J.

Plaintiff Cross Atlantic Capital Partners, Inc. ("XACP") has brought this patent infringement action concerning *U.S. Patent No. 6,519,629* [*2] (the "'629 patent") entitled "System for Creating a Community for Users with Common Interests to Interact In," against Facebook, Inc., and The Facebook, LLC (collectively "Facebook"). Currently before the Court are the parties' claim construction briefs in which they seek to have the Court construe various claim terms of the patent pursuant to *Markman v. Westview Instruments, Inc., 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996)*. We held a Markman hearing on February 8, 2008.

**I. PRINCIPLES OF CLAIM CONSTRUCTION**

The first step in determining whether a patent has been infringed is construction of "any disputed terms and limiting expressions in the [asserted claims]." *Vivid Techs., Inc. v. American Science & Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999)*. "Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997)*. Construction of a patentee's claims is a matter of law. *Markman, 517 U.S. at 388-90*. In construing claims, a court need not

construe all the claims in their entirety. *U.S. Surgical Corp., 103 F.3d at 1568* [*3] ("The Markman decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court. . . . It is not an obligatory exercise in redundancy.") Rather, only those claim terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Vivid Techs., 200 F.3d at 803.*

"Claim interpretation begins with an examination of the intrinsic evidence, i.e. the claims, the rest of the specification and, if in evidence, the prosecution history." *CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002)* (citing cases). The language of the claim itself is of primary importance. See *Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005)* (noting that the Supreme Court has recognized that the claims are of primary importance); *Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001)* (stating that "[f]irst, we look to the claim language. Then we look to the rest of the intrinsic evidence . . ."). Words of a claim are generally given their ordinary and customary meaning, and the ordinary and customary meaning of a claim term [*4] is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. *Phillips, 415 F.3d at 1313.* A person of ordinary skill in the art is deemed to read the claim terms not only in the context of the particular claim, but in the context of the entire patent, including the specification and the prosecution history. Id.; see also *Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005)* ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips, 415 F.3d at 1314.*

Reliance on the specification, or written description, for guidance as to the meaning of the claims is entirely appropriate. *Id. at 1317.* "The specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; [*5] it is the single best guide to the meaning of a disputed term.'" *Id. at 1315* (quoting *Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).* The specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs. *Id. at 1316.* The specification may also reveal an intentional disclaimer, or disavowal, of claim scope by the inventor,

and the inventor's intention, as expressed in the specification, is dispositive. Id. Although courts should consider the specification when construing a claim, a court cannot add "limitations appearing only in the specification." *Electro Med. Sys. S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 1054 (Fed. Cir. 1994);* see also *Phillips, 415 F.3d at 1323* ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *Teleflex, Inc. v. Ficosa North Am. Corp., 299 F.3d 1313, 1328 (Fed. Cir. 2002)* (stating that the district court erred by importing a limitation from the specification into the claim); *Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 990 (Fed. Cir. 1999)* [*6] (stating that claim terms cannot be narrowed by reference to the written description or prosecution history unless the language of the claims invites reference to these sources). The United States Court of Appeals for the Federal Circuit has recognized that there is a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification. See *Comark Communs. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998).* To help locate this "fine line," the Federal Circuit has reminded courts that they "look 'to the specification to ascertain the meaning of the claim term as it is used by the inventor in the context of the entirety of his invention' and not merely to limit a claim term." *Interactive Gift Express, 256 F.3d at 1331* (quoting *Comark Communs., 156 F.3d at 1187).* Additionally, the Federal Circuit has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment. *Phillips, 415 F.3d at 1323* (citing *Gemstar-TV Guide Int'l., Inc. v. ITC, 383 F.3d 1352, 1366 (Fed. Cir. 2004)).* [1]

> 1 Besides consulting the specification, the [*7] Federal Circuit has instructed that intrinsic evidence includes a patent's prosecution history, if it is in evidence. *Phillips, 415 F.3d at 1317.* It is undisputed that the *'629 Patent* was not subject to a prior art rejection. Since there was no prior art rejection, the inventors never negotiated with the PTO or disclaimed any interpretations of the claims.

The Federal Circuit has also instructed that district courts may, in their discretion, admit and use extrinsic evidence, such as expert and inventor testimony, dictionaries, and learned treatises, to determine the meaning of a claim. *Id. at 1319.* However, the Federal Circuit cautioned that extrinsic evidence in general is less reliable than the patent and its prosecution history in determining how to read claim terms unless considered in the context of intrinsic evidence. *Id. at 1319.* One form of extrinsic evidence that a court may not use to supply limitations to

the patent claim language is the accused device. See *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co., 442 F.3d 1322, 1330-31 (Fed. Cir. 2006)* (repeating the rule that "claims may not be construed with reference to the accused device") (quoting *Neo Magic Corp. v. Trident Microsystems, Inc., 287 F.3d 1062, 1074 (Fed. Cir. 2002))*. [*8] However, a court may consider the accused device to determine what part of the claim must be construed. *Exigent Tech. v. Atrana Solutions, Inc., 442 F.3d 1301, 1309 n.10 (Fed. Cir. 2006)*; see also *Wilson, 442 F.3d at 1331* (stating that the court is not forbidden from being aware "of the accused product or process to supply the parameters and scope of the infringement analysis, including its claim construction component").

The Federal Circuit has also instructed that the "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term into the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." *Phillips, 415 F.3d at 1320*. Because the public must rely on the patentee to describe "just what he has invented, and for what he claims a patent," id. (quoting *Merrill v. Yeomans, 94 U.S. 568, 573-74, 24 L. Ed. 235, 1877 Dec. Comm'r Pat. 279 (1876))*, the Federal Circuit has stated that "[t]he use of a dictionary definition can conflict with that directive because the patent applicant did not create the dictionary to describe the invention. Thus, there may be a disconnect between the patentee's responsibility to describe and [*9] claim his invention, and the dictionary editors' objective of aggregating all possible definitions for particular words."

*Phillips, 415 F.3d at 1321*. The Phillips Court reiterated that "[a]s we said in Vitronics, judges are free to consult dictionaries and technical treatises 'at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'" *Phillips at 1322-23* (quoting *Vitronics, 90 F.3d at 1584 n.6*). With these precepts in mind, we turn to the claims that remain in dispute following the Markman hearing. [2]

2   The claims construction briefs filed prior to the Markman hearing, disclosed that the parties agreed to the following constructions of terms that were contested in their prior submissions:

1. Community Identification Information: Information that identifies the community being created, which may include, but is not limited to, a community name, description, search tags, keywords, information about the creator, and/or computer information.

2. Selection: One or more things that [*10] have been chosen.

3. Community Information: Information associated with a community.

4. Selecting: The act of choosing one or more things.

At the Markman hearing, the parties stipulated to the constructions of following additional terms:

5. User Interface: The junction between a user and a computer program, such as a set of commands or menus through which a user communicates.

6. Subscription Object: An object that is published and to which a user may subscribe, which may comprise, but is not limited to, chat content, a publication, a product to purchase, a photograph file, web page and/or other item.

7. Application Object: A computer program or module that functions to direct a user to specific information and/or enables a user to do something useful, and may be for, among other things, JAVA, chat, instant messaging, navigation, searching, addresses, a news group, announcements, a white board, a calendar, video conferencing, video chat, and/or a bulletin board.

8. Published: Made available for others to interact with and/or access in one or more communities.

9. Community Fields: Information that designates the interests and/or demographics of a community, which may comprise, but is not limited [*11] to, a category or categories of interest, language, location, age group, and /or meta-tags of interest associated with a community, which may overlap with other community identification information.

10. User Fields: Information that designates the interests and/or demographics of a user, which may comprise, but is not limited to, language, a category or categories of interest, age group, location, and/or other items associated with a user.

11. Vendor Fields: Information that describes a product or service, which may comprise, but is not limited to, a category or categories of interest, language, location, age group, and/or meta tags of interest associated with a product or service.

12. Receiver Module: A section of a computer program that provides the function of receiving data.

13. Creation Module: A section of a computer program that provides the function of creating a community.

14. Subscription Module: A section of a computer program that provides the function of subscribing to one or more subscription objects.

15. Transmitter Module: A section of a computer program or device that provides the function of transmitting data.

16. Subscribe / Subscribing: Select(ing) to be interacted [*12] with and/or accessed in one or more communities, which may comprise, but is not limited to, selecting to automatically receive updated information, applications, functions and/or other aspects of one or more communities.

17. Communications Address: The precise location in a computer system or network where a communication may be received or sent, such as an e-mail address, IP address, URL or Internet Relay Chat address.

## II. DISCUSSION

Claim 1 of the *'629 Patent*, with the terms we must construe highlighted, discloses:

A method for **creating a community** for users with common interests to interact in, the method comprising the steps of:

receiving a **creation transmission** from a **registered user**, the creation transmission indicating that the registered user desires to create a community;

receiving **community identification information** from the registered user;

receiving a **selection** of at least one application object from the registered user;

creating a community based on the community identification information and the at least one application object;

receiving at least one communications address designed by the registered user, the at least one communications address corresponding to a user [*13] to receive a **created community**; and **transmitting** the created community based in

part on the at least one communications address.

(*'629 Patent*, Col. 330, line 65-Col. 31, line 17.) We will discuss each term, along with related terms, in the order in which they appear in the claim.

1. "Community"

XACP argues that the term "community," which is used in claim 1 as well as most of the 32 claims in the *'629 Patent*, should be defined to mean: *Information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site.* (Pl. Br. at 12.) Facebook argues that the term should be defined as: *A virtual place or electronic medium where people having common interests can interact, which can be accessed by a computer or other device.* (Def. Br. at 11.) The dispute among the constructions is, thus, whether "community" should be defined as a "virtual place" or as "information and at least one function, . . . an expression of interest that may be accessed . . . through a communications [*14] network."

XACP draws our attention to several parts of the specification in the Patent to support its definition. First, in the "Summary of the Invention," the inventor states that the object of the invention is to:

provide a system and method which simplifies processes for interaction among individuals and/or entities which occur through a communications network.

(*'629 Patent*, Col. 3, lines 15-18.) According to an embodiment of the invention specified in the Patent, a "community creating module **165** may provide the framework through which central controller **115** interacts with a user to create a **community, and related applications and**

**functions**." (Id., Col. 3, lines 53-57 (emphasis added).) According to an embodiment of the invention cited in the specifications,

a community entitled "The XYZ Softball Team" may be created, where **information** about the XYZ Softball team, including a schedule of games, player statistics, and other information, is presented. A creator may determine that the only

members of the XYZ Softball team should be able to access the community.

(Id., Col. 11, lines 66-Col. 12, line 4 (emphasis added).) XACP focuses on this language in the specification, asserting that [*15] it incorporates the concepts of "function" and "information" into the definition of community. It asserts that a "virtual place"--Facebook's definition of community--finds no support in the intrinsic evidence.

Facebook argues that "community" should be defined as a "place" based upon the plain meaning of the term, which it asserts the dictionary defines as "1. a. A group of people residing in the same locality and under the same government. b. The area or locality in which such a group resides. 2. A group or class having common interest." (Def. Br. at 11, quoting *Webster's II New College Dictionary* 227 (Houghton Mifflin Co. ed. 1999).) Because the *'629 Patent* deals entirely in a computer environment, Facebook adds that the definition of "community" is necessarily "virtual."

We find that using Facebook's resort to a general dictionary definition, would not be appropriate given the Federal Circuit's admonition in Phillips, and, even if it were, does not support Facebook's own claimed construction. The subject of both the first and the third cited definitions are "groups," not "locations." The second proffered dictionary definition speaks of a location only in the context of the common thing [*16] that binds a group together. The extrinsic dictionary definition does not support Facebook's assertion that the term "community," as it is used in the claim, is more appropriately a reference to a specific place, rather than to the people who inhabit it.

More importantly, Facebook's citations to the intrinsic evidence of the specification to support its construction that a community is a virtual place are also unconvincing. In its first example, found in the "Detailed Description of the Preferred Embodiments" section of the *'629 Patent*, Facebook avers that the inventor--discussing an embodiment of the invention called the "William Henry Harrison Historical Preservation Society"--disclosed that "community" "is a **place** on a computer where people with a shared interest in William Henry Harrison can interact." (Def. Br. at 12 (emphasis added), citing *'629 Patent*, Col. 4, lines 27-46.) However, the cited reference to the Patent specification never mentions the word "place" or any similar real or virtual concept. To the contrary, we find that the reference supports XACP's construction.

In the cited portion, the inventor states that a creator--someone interested in creating a community--follows [*17] several steps to accomplish the purpose: he ac-

cesses "a central controller over a network to create a community using a community creating module," which permits the creator to "create a community, and designate applications and content presented in the community by a user interface." (*'629 Patent*, Col. 4, lines 27-33.) The application could be, for example, a chat room application, a schedule application, an application to pledge money or a photo application. (Id. at 33-40.) Nothing in the specification alludes to any "place," virtual or real, as a definition for "community." Rather it focuses upon the application--the thing the community has in common.

Another example, the "Omaha Sailing Club," is used to describe in more detail how a community is created. The inventor states that a creator "starts creating a community," "provides community identification information," "sets a category," "determines the look and feel of a community," "sets artwork and fonts," "sets text," "determines whether to have a link in an announcements screen," "sets up a mailing list," "sets a privacy level," "invites others," and finally, "launches a community." (Id., Col. 7, lines 27-50.) The "XYZ Softball [*18] team" example is another detailed description of how a community is created, and includes the description that the creator may "provide to central controller module 115 a list of team members, along with appropriate information. Central controller module 115 may compare information provided by a user to the information provided by a creator, thereby governing access to the community." (Id., Col. 11, line 66-Col. 12, line 4.) Again, there is no attempt to signify that a community is a specific place, either real or virtual.

Thus, we find it is clear that there is no "virtual place" requirement in the *'629 Patent*. Rather, a "community" is, as XACP argues, "information and at least one function, . . . and/or an expression of interest that may be accessed . . . through a communications network."

2. "Creating a Community," "Create a Community," "Created Community," "Community is Created"

Claim 1 is a "method of creating a community." Other than the just discussed dispute over the term "community," the parties essentially agree on the construction of "creating a community" and its related terms" create a community," "created community, "and" community is created." Both sides agree that to "create" [*19] is to bring into existence." (Pl. Br. at 14, Def. Br. at 13.) Incorporating our construction of "community," we find that "creating a community" means "to bring into existence information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web

pages or an Internet site." "Creating a community" is "to cause to come into existence, bring into being, make or originate information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site." A "created community" is "information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site, that was [*20] caused to come into existence, brought into being, made or originated." "Community is created" is "information and at least one function relating to a specific transaction interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site, having been caused to come into existence, brought into being, made or originated."

### 3. "Creation Transmission," "Transmit"

Claim 1 requires "receiving a **creation transmission** from a registered user, the creation transmission indicating that the registered user desires to create a community." XACP argues that a creation transmission must be defined to mean: *An electronic transmission through a private or public communications network indicating a request to create a community.* (Pl. Br. at 15.) Facebook argues that the term should be defined to mean: *An electronic signal indicating a request to create a community.* (Def. Br. at 21.) The primary difference between the two constructions is that XACP's version includes the requirement of a private or public communications network as the means for creating [*21] the community, which Facebook's version does not. In addition, Facebook incorporates a construction of "transmit" into the construction of "creation transmission," limiting the term to a "signal." XACP argues that the intrinsic evidence demonstrates that the inventor included the requirement that the method for simplifying the interaction among individuals must "occur through a communications network." (See *'629 Patent* Col. 3, lines 10-15.) It contends that Facebook's proposed definition of "signal" improperly narrows the permissible form of transmission, and is unsupported by the specification or the ordinary use of the word. We agree.

The root word "transmit" is incorporated into the concept of" creation transmission," and also appears at the end of claim 1 in the phrase "transmitting the created community based in part on the at least one communications address." (Id., Col. 31, lines 16-17.) XACP argues that "transmitting" should be construed to mean: *Elec-*

*tronically connecting, sending out and/or communicating by any wireless or wire mechanism.* (Pl. Br. at 25.) The construction proposed by Facebook is: *Electronically sending.* (Def. Br. at 23.) Thus, before we arrive at a construction [*22] of "creation transmission," we must decide whether the term "transmit" includes "connecting" and "communicating."

Both parties cite to dictionary definitions of the term. According to XACP, the term is defined as "to send or cause to go from one person or place to another, esp. across intervening space or distance; transfer, dispatch, convey. (Pl. Br. at 27, quoting *Webster's New World Dictionary* 1421 (3d College ed. 1994).) Facebook asserts the term means "to send (a signal), as by wire or radio." (Def. Br. at 23, quoting *Webster's II New College Dictionary* (Houghton Mifflin 1999).) Facebook argues that XACP's construction improperly redefines the term to capture Facebook's website by including activities that have nothing to do with transmitting. It contends that connecting and transmitting are distinct concepts: that two things can be connected even if nothing is transmitted between them and that, while transmitting "may inherently require the establishment of a connection, transmitting entails the further act of actually sending something from one place to another." (Def. Br. at 23.)

We do not, however, need to resort to extrinsic dictionary definitions because the specification [*23] itself requires a construction that includes the concept of "connecting" in the definition of "transmitting." The specification discloses a method for two-way communication by "interacting through a network" and allowing "widespread and rapid distribution of an electronic connection" between users. (*'629 Patent* Col. 3, lines 16-19; 24-29.) In the Detailed Description of the Preferred Embodiments, the inventor describes the embodiment as a "Network [that] maybe any network that permits multiple users to connect and interact," which may be a an internet service provider, a dial-up access or "other manner of connecting to a network." (Id., Col. 5, lines 26-27; 32-34.)

Numerous other parts of the specification make clear that interaction among users is the purpose of the invention. The method includes a "central controller module" with which a user must communicate to initiate the community, (id., Col. 26, lines 56-67), a "communications module" to enable communications with others (id., Col. 6, lines 39-40), a chat application object permitting users to communicate (id., Col. 18, lines 20-33), and an instant messaging application object to permit users to communicate (id., Col. 18, lines [*24] 37-54). Limiting "transmitting" to just "sending" would make these functions impossible. Accordingly, we adopt XACP's construction of "transmit" as "electronically connecting,

sending out and/or communicating by any wireless or wire mechanism."

The term "creation" in "creation transmission" is a limiting modifier. Claim 1 uses the term to describe the process by which the community is initiated by the registered user to express his intention and desire to create a community, as opposed to any later transmission. Thus, we find that the proper construction of creation transmission is an electronic transmission through a private or public communications network indicating a request to create a community.

### 4. "Registered User"

Another element of claim 1 is that the creation transmission must be received from a registered user. XACP asserts that "registered user" should mean: *A user who has provided, at least once, requested registration information (e.g., name, address, personal information, etc.) and forwarded the information to a controller.* (Pl. Br. at 17.) Facebook argues that the definition of "registered user" should be: *A person who has provided at least once, registration information* [*25] *(e.g., name, address, personal information, etc.)* (Def. Br. at 10.) The distinction between the two constructions is the requirement in XACP's definition that registration information be "requested," and that the registered user "forward" the information to a controller.

In the detailed embodiment of the invention, the inventor states that, "[u]pon creating the community, the creator designates other users to access the community." (*'629 Patent* Col. 4, lines 47-48.) "The central controller sends a transmission, such as an e-mail, to the invited users based on the information provided by the creator." (Id., Col. 4, lines 54-56.) "Upon receipt of the transmission, a user executes the executable component," (e.g. clicking on the appropriate icon), "provides registration information," (e.g., name, address, etc.) "and forwards the information to the central controller." (Id., Col. 4, lines 65-66, Col. 5, lines 3-5.) The user can then interact with the community through the central controller, other users, or both. (Id., Col. 5, lines 11-13.) Later, the specification also states that "on the user's first visit, the user is prompted to register. . . . A registration form . . . is completed [*26] by the user and may then be sent by client **110** to central controller module **115** . . . ." (Id., Col. 27, lines 1-7.)

While Facebook argues that the "requested" element does not appear in the specification, we find that both the "request" element and the "forwarding" element are both clearly stated in the specification. (Id., Col. 5, lines 3-5; Col 27 lines 1-7.) The requirement that the information be "requested" is embodied in the specification that the user is "prompted to register," and then "provides registration information."

Facebook also argues that the "requested" element and the "forwarded" element are limitations imported from the specification to narrow the definition of "registered user." It asserts that neither limitation has anything to do with the plain meaning of the term, and the "forwarded" element is merely a "design choice" included in the preferred embodiment and is not definitional. (Def. Br. at 10-11.)

We cannot agree that the "forwarded" element is merely a design choice and has nothing to do with the definition of registered user. The specification states that, after the registration is completed by the user, it "may then be sent" to a central controller module. [*27] Facebook reads the word "may" to indicate that the requirement is optional or permissive. We find, however, the specification cannot be read as permissive--as in it "may or may not be" sent. Rather, we find, the inventor used the "may be sent" element as a time orientation: the registration is to be sent after it is completed by the user. If forwarding was optional, the registration would never occur. If the registration were forwarded before the registration information was completed, the registration would fail. Thus, we find, the key concept in the "may then be sent" language is the word "then," setting forth the sequence of events.

Accordingly, we find that the construction of "registered user" is "a user who has provided, at least once, requested registration information (e.g., name, address, personal information, etc.) and forwarded the information to a controller."

### 5. Display Module

"Display Module" is a term found in claim 25 of the *'629 Patent*. The claim discloses a system for creating a community for users with common interests to interact in comprising a "transmitter module" containing certain features, and a "display module for displaying prompts." (*'629 Patent* Col. 33 line [*28] 60-Col. 34 line 13.) As noted, the parties agree that a "transmitter module" is a section of a computer program or device that provides the function of transmitting data. XACP argues that "display module" is: *A section of a computer program or device that provides the function of displaying onscreen information.* (Pl. Br. at 48.) [3]

> 3 While XACP's original formulation of all of the "module" terms stated that each "may provide the function of . . .," at the Markman hearing, counsel agreed to strike the word "may." (Tr. 2/8/08 19:3-6.)

Facebook proposes that a display module be limited to: *A device that displays on-screen information, such as a CRT display.* (Def. Br. at 19.) XACP's construction, using the disjunctive "or," permits computer software or

a device to be alternative embodiments of the display module, while Facebook's proposed construction limits the term to only a device. XACP argues that the Federal Circuit has instructed that terms must be construed consistently throughout a patent; that if a construction of other "module" terms includes, alternatively, only software with no device requirement, the construction of display module must also be permitted to include the alternative [*29] of software with no device requirement. (Pl. Br. at 48, citing *North Am. Container, Inc. v. Plastipak Packaging, Inc., 415 F.3d 1335, 1344-45 (Fed. Cir. 2005)* (holding that, as a general rule, terms "should be construed consistently throughout the claims"); *CVI/Beta Ventures, Inc. v. Tura, LP, 112 F.3d 1146, 1159 (Fed. Cir. 1997)* (same).)

In North Am. Container, Inc., the Federal Circuit specifically rejected employing the general rule cited by XACP where the prosecution history demonstrated that the plaintiff had disclaimed consistent treatment of a term when applied to different portions of the claim. *Id. at 1346* (holding that district court did not err in construing the term "generally convex" differently as it related to the inner and outer walls of the invention where the applicant disclaimed any concavity for the inner walls, but not the outer walls). This, we find, is the case with the *'629 Patent's* treatment of the various module terms.

Where the inventor intended that a module be comprised of computer software alone, perform its function using software and a device, or do so through a device, he so specified and distinguished those functions that required a device. The specification [*30] states that:

> According to an embodiment of the invention, each computer **110** may be configured as a typical home based computer. . . . Each computer **110** may contain a communication application module **155**, a processor module **160** and a memory module **170**. Communication application modules **155** and **155** b need not be the same specific *software* so long as communication between them is according to standard protocols. . . . Communication application module **155** may comprise an *e-mail application* such as Microsoft Beyond Mail, Netscape Mail, Eurora Pro, or the like. . . . Computer **110** may have at least one input *device* **120** for controlling the computer **110**. Input *device* **120** may be a *keyboard, joystick, touchpad, scanner or any combination of devices*. Each of computers **110** may also include a dis-

play module **140**, such as a *CRT display or other device*.

(*'629 Patent* Col. 5, line 56-Col. 6, line 8 (emphasis added).) Later, the inventor specified that one or more of the modules of a system "may comprise computer readable code that, when installed on a computer, perform the functions described above. Also, only some of the modules may be provided in computer readable code." (Id. at Col. 30, lines 50-53.) [*31] The entirety of the specification, we find, teaches that some modules may use software to perform their function, others require both software and a device to perform their function, and yet others perform their function using only a device. The communication application module requires only software, whereas to control the computer, a device and not software is clearly required.

The display module's ability to perform its function--displaying--is clearly articulated in the specification. A display module, if included, performs its function by a "CRT display or other device." XACP argues that the inventor's use of the words "such as" as a predicate to "CRT display or other device" indicate that the device requirement is merely a limitation that may not be imported into the claim. We cannot agree. In Figure 1 of the *'629 Patent*, the display module **140**, like the input device **120**, is depicted not as part of the computer **110**, but is shown outside of and connected to the computer **110**, which itself contains all of the other modules, such as the communication application module **155** and the memory module **170**. Clearly, this is because the display module's function is distinct from any other [*32] module that performs its function through computer software. While the other modules control aspects of the computer program, the specification makes clear that the display module has a physical function to perform comparable to no other module.

We find that, to a person of ordinary skill in the computer arts, the customary meaning of "display" requires hardware. Display is "[t]he visual output of a computer, which is commonly a CRT-based video display." *Microsoft Press Computer Dictionary* 145 (Microsoft Press 1999). Because the device requirement of the display module is recognized in Figure 1 and the specification, the dictionary definition "does not contradict any definition found in or ascertained by a reading of the patent documents." *Phillips at 1322-23*. Because in Figure 1 the patentee has demonstrated a clear intention to limit the claim scope using an "expressions of manifest exclusion or restriction," see *Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004)* (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313,*

*1327 (Fed. Cir. 2002)*, the proper construction of display module must be a device.

An appropriate order follows.

## ORDER

**AND NOW**, this 29th [*33] day of February, 2008, upon consideration of the parties' Memoranda on Claim Construction, and the Markman hearing held February 8, 2008, **IT IS HEREBY ORDERED** as follows:

1. The following disputed claim terms of the *'629 patent* are construed as indicated:

> a. "Community" is construed to mean "information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site."

> b. "Creating a community" is construed to mean "to bring into existence information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site."

> c. "Create a community" is construed to mean "to cause to come into existence, bring into being, make or originate information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may [*34] be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site."

> d. "Created community" is construed to mean "information and at least one function relating to a specific transaction, interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site, that was caused to come into existence, brought into being, made or originated."

> e. "Community is created" is construed to mean "information and at least one function relating to a specific transaction interaction, and/or expression of interest that may be accessed and/or interacted with by a plurality of users with common interests through a private or public communications network, such as web pages or an Internet site, having been caused to come into existence, brought into being, made or originated."

> f. "Creation transmission" is construed to mean "an electronic transmission through a private or public communications network indicating a request to create a community."

> g. "Transmit" [*35] is construed to mean "electronically connecting, sending out and/or communicating by any wireless or wire mechanism."

> h. "Registered user" is construed to mean "a user who has provided, at least once, requested registration information (e.g., name, address, personal information, etc.) and forwarded the information to a controller."

> i. "Display module" is construed to mean "a device that displays on-screen information, such as a CRT display."

2. The parties stipulate to the construction of the following terms:

> a. Community Identification Information: Information that identifies the community being created, which may include, but is not limited to, a community name, description, search tags, keywords, information about the creator, and/or computer information.

> b. Selection: One or more things that have been chosen.

> c. Community Information: Information associated with a community.

> d. Selecting: The act of choosing one or more things.

> e. User Interface: The junction between a user and a computer program,

such as a set of commands or menus through which a user communicates.

f. Subscription Object: An object that is published and to which a user may subscribe, which may comprise, but is not limited [*36] to, chat content, a publication, a product to purchase, a photograph file, web page and/or other item.

g. Application Object: A computer program or module that functions to direct a user to specific information and/or enables a user to do something useful, and may be for, among other things, JAVA, chat, instant messaging, navigation, searching, addresses, a news group, announcements, a white board, a calendar, video conferencing, video chat, and/or a bulletin board.

h. Published: Made available for others to interact with and/or access in one or more communities.

i. Community Fields: Information that designates the interests and/or demographics of a community, which may comprise, but is not limited to, a category or categories of interest, language, location, age group, and/or meta-tags of interest associated with a community, which may overlap with other community identification information.

j. User Fields: Information that designates the interests and/or demographics of a user, which may comprise, but is not limited to, language, a category or categories of interest, age group, location, and/or other items associated with a user.

k. Vendor Fields: Information that describes a product [*37] or service, which may comprise, but is not limited to,

a category or categories of interest, language, location, age group, and/or meta tags of interest associated with a product or service.

l. Receiver Module: A section of a computer program that provides the function of receiving data.

m. Creation Module: A section of a computer program that provides the function of creating a community.

n. Subscription Module: A section of a computer program that provides the function of subscribing to one or more subscription objects.

o. Transmitter Module: A section of a computer program or device that provides the function of transmitting data.

p. Subscribe / Subscribing: Select(ing) to be interacted with and/or accessed in one or more communities, which may comprise, but is not limited to, selecting to automatically receive updated information, applications, functions and/or other aspects of one or more communities.

q. Communications Address: The precise location in a computer system or network where a communication may be received or sent, such as an e-mail address, IP address, URL or Internet Relay Chat address.

BY THE COURT:

S/ John R. Padova

John R. Padova, J.

# EXHIBIT 4



**CROSS ATLANTIC CAPITAL PARTNERS, INC. v. FACEBOOK, INC and THE-FACEBOOK, LLC**

**CIVIL ACTION NO. 07-2768**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2008 U.S. Dist. LEXIS 62869*

**August 18, 2008, Filed**

**PRIOR HISTORY:** *Cross Atl. Capital Partners, Inc. v. Facebook, Inc., 2008 U.S. Dist. LEXIS 15862 (E.D. Pa., Feb. 29, 2008)*

**COUNSEL:** [*1] For CROSS ATLANTIC CAPITAL PARTNERS, INC., Plaintiff, Counter Defendant: FREDERICK A. TECCE, LEAD ATTORNEY, MCSHEA TECCE PC, PHILADELPHIA, PA; PATRICK J. KEENAN, THOMAS J. DUFFY, DUFFY & PARTNERS, PHILADELPHIA, PA.

For FACEBOOK, INC., THEFACEBOOK, LLC, Defendants: ALFRED W. ZAHER, LEAD ATTORNEY, JOEL L. DION, BLANK ROME LLP, PHILADELPHIA, PA; CRAIG W. CLARK, HEIDI L. KEEFE, MARK R. WEINSTEIN, SAM C. O'ROURKE, LEAD ATTORNEYS, WHITE & CASE LLP, PALO ALTO, CA; DENNIS P. MCCOOE, BLANK ROME COMISKY & MCCAULEY, LLP, PHILADELPHIA, PA.

For FACEBOOK, INC., THEFACEBOOK, LLC, Counter Claimants: HEIDI L. KEEFE, LEAD ATTORNEY, WHITE & CASE LLP, PALO ALTO, CA.

For FACEBOOK, INC., THEFACEBOOK, LLC, Counter Claimants: ALFRED W. ZAHER, LEAD ATTORNEY, JOEL L. DION, BLANK ROME LLP, PHILADELPHIA, PA; HEIDI L. KEEFE, MARK R. WEINSTEIN, SAM C. O'ROURKE, LEAD ATTORNEYS, WHITE & CASE LLP, PALO ALTO, CA; DENNIS P. MCCOOE, BLANK ROME COMISKY & MCCAULEY,LLP, PHILADELPHIA, PA.

**JUDGES:** John R. Padova, J.

**OPINION BY:** John R. Padova

**OPINION**

*ORDER-MEMORANDUM*

AND NOW, this 18th000 day of August, 2008, upon consideration of Defendants' Motion to Stay Proceedings (Docket Entry 179) and all responses thereto, **IT IS HEREBY ORDERED** that the Motion is **GRANTED** [*2] with leave to the parties to seek to lift the stay after the United States Patent and Trademark Office has issued its decision on whether to grant reexamination, or for other good and sufficient reasons that result from a change in circumstances.

On July 21, 2008, Defendants filed a request for inter partes reexamination of *United States Patent No. 6,519,629* with the United States Patent and Trademark Office ("PTO") pursuant to *37 U.S.C. § 311*. Concomitant therewith, Defendants move to stay this litigation pending the result of that request.

A district court is not required to stay a proceeding pending reexamination. *Viskase Corp. v. Am. Nat'l Can Co., 261 F.3d 1316, 1328 (Fed. Cir. 2001)*. However, "[o]ne purpose of the reexamination procedure is to eliminate trial of that issue (when the claim is canceled) or to facilitate trial of that issue by providing the district court with the expert view of the PTO (when a claim survives the reexamination proceeding)." *Gould v. Control Laser Corp., 705 F.2d 1340, 1342 (Fed. Cir. 1983)*. Thus, granting a stay is favored. *See Alltech, Inc. v. Cenzone Tech, Inc., Civ. A. No. 06-153, 2007 U.S. Dist. LEXIS 19989, 2007 WL 935516 (S.D. Cal. March 21, 2007)* (holding that "[t]here [*3] is a liberal policy in favor of granting motions to stay proceedings pending the outcome of reexamination proceedings") (quoting

*ASCII Corp. v. STD Entm't USA, Inc.*, 844 F. Supp. 1378, 1381 (N.D. Cal. 1994)). Stays are particularly appropriate when the reexamination result might assist the court in making a validity determination or would eliminate the need to make an infringement determination. *Id.* (citing *In re Cygnus Telecomm. Tech., LLC Patent Litig.*, 385 F.Supp. 2d 1022, 1023 (N.D. Cal. 2005).

District courts have listed the following factors to determine whether a stay is appropriate: (1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the nonmoving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set. *In re Laughlin Prods. Inc.*, 265 F. Supp. 2d 525, 530-31 (E.D. Pa. 2003); *Sabert Corp. v. Waddington North Am., Inc.*, Civ. No. 06-5423, 2007 U.S. Dist. LEXIS 68092, 2007 WL 2705157, *6 (D.N.J. Sept. 14, 2007) (citing *Alltech*, 2007 U.S. Dist. LEXIS 19989, 2007 WL 935516 at *2 (quoting *Cygnus*, 385 F. Supp. 2d at 1023); *Xerox Corp. v. 3Com Corp.*, 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999); *ASCII Corp.*, 844 F. Supp. at 1380 [*4] (citing *GPAC, Inc. v. D.W.W. Enter., Inc.*, 144 F.R.D. 60, 66 (D.N.J. 1992)). We find, applying these factors, that granting a stay pending the PTO's decision to grant reexamination is appropriate. [1]

> 1 Plaintiff's preliminary argument, that under *37 U.S.C. § 318* the stay motion is premature, is not substantial. *Section 318* states that "[o]nce an order for inter partes reexamination has been issued," a patent owner may obtain a stay of pending litigation which involves the patent undergoing reexamination. The Section speaks only to the timing that the patent owner follows to request a stay, not the third party requester in the inter partes reexamination proceeding. Further, as Facebook notes, courts faced with the issue regularly decide stay motions upon the filing of the request for reexamination, staying the civil action at least until the PTO makes its reexamination decision. *See PBI Performance Prods., Inc. v. NorFab Corp.*, Civ. 05-4836, 2007 U.S. Dist. LEXIS 721, 2007 WL 81065, *1 (E.D. Pa. Jan. 5, 2007)* (Bartle, J.) (noting that action was placed on suspense docket and ordered stayed pending a decision by the PTO whether to reexamine plaintiff's patent)); *Alltech, Inc. v. Cenzone Tech, Inc.*, Civ. 06-153, 2007 U.S. Dist. LEXIS 19989, 2007 WL 935516, *1 n.2 (S.D. Cal. Mar. 21, 2007) [*5] (assuming for purposes of ruling on stay motion that the PTO would grant the request because the PTO grants approximately 90% of reexamination requests (citing Paul Morgan & Bruce Stoner, *Reexamination vs. Litigation-Making Intelligent Decisions in Challenging Patent Valid-*

*ity*, 86 J. Pat. & Trademark Office Soc'y 441, 459 (2004))); *Pass & Seymoure, Inc. v. Hubbell, Inc.*, 532 F. Supp. 2d 418, 2007 WL 2172648, at *12 (N.D.N.Y. 2007) (holding that stay was warranted while the PTO made its initial determination; if reexamination was denied, plaintiff could move to lift stay); *Ralph Gonnocci Revocable Living Trust v. Three M Tool & Mach., Inc.*, Civ. A. No. 02-74796, 2003 U.S. Dist. LEXIS 24423, 2003 WL 22870902, at *4 (E.D. Mich. Oct. 7, 2003) (same); *but see DUSA Pharms., Inc. v. River's Edge Pharms, LLC*, Civ. A. No. 06-1843, 2006 U.S. Dist. LEXIS 29852, 2006 WL 1320049 (D.N.J. May 15, 2006) (denying the defendant's request for a stay citing *§ 318* without distinguishing that *§ 318* speaks only the to patent owner's right to request a stay after the reexamination decision has been issued, and does not by its terms limit the third party requester).

## A. Prejudice to Plaintiff

Defendants argue that Plaintiff will suffer no prejudice from a stay [*6] because it is undisputed that it: 1) has never sold or marketed any products that embody the '629 Patent; 2) does not compete with Defendants and thus will not be harmed by alleged infringement during the reexamination process; and 3) its damage claim is based on a reasonable royalty which will not be affected by the stay because damages run from the date the Complaint was filed. Plaintiff, while not directly addressing these assertions, argues that having expended substantial resources over the last year preparing for trial, it would be unduly prejudiced by a stay. It also argues that the lapse of time during reexamination could result in loss of evidence and the fading of witness memory.

We find that Defendants have demonstrated a superior argument on the issue of prejudice. It is undisputed that Plaintiff does not practice the patent in suit, does not compete with Defendants, and the delay caused by reexamination will not diminish its measure of damages. On the other hand, Plaintiff's prejudice argument is weak. Having to expend resources to prepare for trial is the natural consequence of its having filed the lawsuit. Fact witness testimony has already been memorialized in depositions [*7] and expert witness opinions have been exchanged. The intervening period should not overly burden either parties' ability to try the case. [2]

> 2 Plaintiff also argues that Defendants filed their reexamination request with the PTO to gain a tactical advantage. The test the courts have articulated for determining prejudice, however, is not whether the moving party will gain a tactical advantage but whether the non-movant will suffer a

clear tactical disadvantage. We find that Plaintiff has not shown that it will suffer a tactical disadvantage.

B. Simplification of the Issues for Trial.

This factor favors granting the stay. There are only three possible outcomes from the reexamination process and all three will simplify the issues remaining for trial: 1) the patent is found invalid and cancelled -- resulting in no issue remaining for trial; 2) the patent is amended limiting the scope of its claims -- and limiting the scope of claims that Defendants could possibly have infringed; and 3) the patent is reaffirmed -- removing from the trial Defendants' invalidity defense. Defendants, as the parties that requested the reexamination, are bound by the results of the reexamination. *See 37 U.S.C. § 315(c).*

Plaintiff [*8] argues that the reexamination procedure will not resolve issues of priority or Defendants' affirmative defense of inequitable conduct. While this is true, it does not speak to the purpose of the reexamination procedure -- patent validity -- a threshold issue in this lawsuit. If the invention was not patentable, Defendants' other affirmative defenses are immaterial.

C. Timing of the Motion.

This factor favors denying the stay in the sense that discovery has been completed, and summary judgment motions have been filed of record. Our current scheduling order provides for pre-trial memoranda to be filed in September, a final pre-trial conference on September 19, and a trial date of October 20, 2008. Clearly, granting a stay will disrupt this schedule. However, the expeditious movement of this case toward trial does not mean that granting the stay will unreasonably delay final adjudication of the case.

The reexamination process will take several months. Nonetheless, Defendants argue that this factor favors granting the stay. They note that the case has only been pending for only one year, trial remains three months away, and pre-trial preparations have not yet begun. Because a stay will conserve [*9] judicial resources and save the parties substantial resources for trial preparation because many trial issues may be mooted, Defendants conclude that the timing of the motion is not a ground for denying it. Plaintiff argues that the case is in its late stage and argues that other courts have denied requests for stays on this basis. *See e.g., Soverain Software LLC v. Amazon.com, Inc., 356 F. Supp. 2d 660, 663 (E.D. Texas 2005); Alltech, Inc., 2007 U.S. Dist. LEXIS 19989, 2007 WL 935516, at *4.*

Although this action is proceeding toward its conclusion in this court, the factors, on balance, favor granting the stay at least until the PTO makes its initial determination whether to conduct the reexamination. Plaintiff has not made a good argument on the prejudice prong and the reexamination will clearly simplify the issues remaining in the case. Staying further litigation until the PTO makes its decision whether to grant reexamination will permit the PTO to exercise its statutorily granted authority to make the initial Office action on the merits of the reexamination. At that point we can revisit whether the stay should be continued to the end of the reexamination process. If reexamination is denied, there may be no [*10] good reason not to proceed; if reexamination is granted, we would have the benefit of the PTO's initial reasoning on the patentability issues to inform our decision on the merits of continuing the stay to the conclusion of the reexamination proceedings.

For these reasons, the stay is **GRANTED** with leave to the parties to seek lifting of the stay after the PTO has issued its decision on whether to grant reexamination, or for other good and sufficient reasons that result from a change in circumstances.

BY THE COURT:

/s/ John R. Padova

John R. Padova, J.

# EXHIBIT 5

Westlaw.

Slip Copy
Slip Copy, 2008 WL 2788199 (E.D.N.Y.)
(Cite as: 2008 WL 2788199 (E.D.N.Y.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
KING PHARMACEUTICALS, INC., et al.,
Plaintiffs,
v.
EON LABS, INC., Defendant.
No. 04-CV-5540 (DGT).

July 15, 2008.

Francis Dominic Cerrito, James Edward Baker, John J. Normile, Eric C. Stops, Evangeline Shih, Jones Day, New York, NY, for Plaintiffs.

Alfred Henry Hemingway, Darren Scott Mogil, Marilyn Neiman, Martin B. Pavane, Cohen Pontani Lieberman & Pavane LLP, New York, NY, for Defendant.

### MEMORANDUM AND ORDER

ROANNE L. MANN, United States Magistrate Judge.

*1 Currently pending before this Court are defendant Eon's motions to compel plaintiff King and counterdefendant Elan to respond to Eon's discovery demands (docket entries ["D.E."] # 179 and # 180, respectively); Elan's motion for a protective order (D.E.# 183) and opposition to Eon's motion (D.E.# 182); King's opposition to Eon's motion to compel (D.E.# 185); and Eon's opposition to Elan's motion for a protective order (D.E.# 186).[FN1] For the reasons that follow, the various discovery motions are granted in part and denied in part.[FN2]

FN1. On July 10, 2008, Eon moved (D.E.# 190) to strike reply letters filed by Elan (D.E.# 188) and King (D.E.# 189) or, in the alternative, to have the Court consider

Eon's sur-reply (D.E.# 190). While none of these submissions adds much to the parties' arguments, the Court has nevertheless chosen to consider rather than strike them all.

FN2. On July 10 and 11, 2008, Eon moved to compel Elan and King to respond to additional document demands and further interrogatories (D.E. # 191 and # 192). As Elan and King have not yet responded to those motions, the Court will not rule on those specific disputes at this time. Nevertheless, the Court observes that a number of the latest discovery demands suffer from the same infirmities identified in this Memorandum and Order.

### DISCUSSION

This latest round of motions must be viewed in the context of the prior proceedings. In particular, more than a year ago, in related litigation involving 400 mg metaxalone tablets, Eon argued to Judge Trager that "the facts and issues" in that case and the instant action (involving 800 mg tablets) are "completely common," *see* D.E. # 189 at 9 *in Eon Pharmaceuticals, Inc. v. Eon Labs, Inc.,* 03-CV-6 (DGT), and that therefore discovery in both cases "is completely common." *Id.* at 26. Thereafter, in a letter to the undersigned magistrate judge in this case, Eon similarly asserted that "[d]iscovery concerning Eon's generic 400 mg. metaxalone tablet ANDA product, which was the subject of Civil Action No. 03-0006, was completed, and was closed, years ago," and that discovery should now be "confined to [that] concerning Eon's 800 mg metaxalone tablet."D.E. # 97 at 3; *see also* D.E. # 105 at 2 (Eon contends that "[p]atent validity and patent enforceability issues in the 400 mg cases and in this case are completely common and therefore are ready for trial."); D.E. # 88 at 1 (Eon notes that discovery and depositions in the related actions were

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2788199 (E.D.N.Y.)
(Cite as: 2008 WL 2788199 (E.D.N.Y.))

"taken as if [they] were done in this case."); D.E. # 103 at 1 (Eon asserts to Judge Trager that "fact and expert discovery concerning patent validity have been completed" and that "no additional discovery concerning validity is necessary."). In fact, very recently, in successfully opposing King's motion to compel discovery, Eon repeatedly and broadly reiterated that there had been "full" and "complete discovery" on the 400 mg product in the related litigation. D.E. # 152 at 2; *accord* D.E. # 181 at 4; D.E. # 157 at 2.

Because of the extensive discovery exchanged in those earlier related actions, this Court ruled on February 15, 2008, that discovery in the instant case must be "narrowly focused on the new issues presented" and completed on an expedited basis. D.E. # 98 at 1; *see also* D.E. # 102 at 7-8, 11. Eon's pending discovery demands essentially ignore its prior representations and arguments and this Court's admonitions. Simply put, contrary to Eon's suggestion (D.E. # 186 at 1-2), discovery *has* been limited-at Eon's behest. *Cf.* D.E. # 181 at 1-2 (Eon accuses King of ignoring those limits).

That is not to say that Eon may take no discovery in this case: Eon is of course entitled to discovery relating to new issues and, as discussed below, will be permitted to serve narrowly focused demands for additional information.[FN3] But given the breadth of discovery generated in the related cases (*see* D.E. # 183 Ex. 1)-as well as and the need to complete discovery and motions practice on an expedited schedule in order to comply with Judge Trager's order that the case be ready for trial in the fall (D.E. # 112 at 3)-no party will be permitted to "reinvent the wheel" in conducting discovery. D.E. # 102 at 11. Unfortunately, that is what Eon has been attempting to do.

FN3.*See infra* p. 5.

**(1) *King's Responses to Interrogatories # 4-7***

*2 King has objected to Eon's interrogatories as ex-

ceeding the Rule 33 limit of 25 interrogatories, "inclusive of discrete subparts." Fed.R.Civ.P. 33(a)(1). Eon counters that the subparts are not "discrete" and that, if they are, Eon should be granted permission to exceed the limit because of the alleged importance of the discovery sought. D.E. # 179 at 1-2.

Prior to serving Interrogatories # 4 through # 7, Eon had secured King's responses to Interrogatories # 1 through # 3, which, including subparts, comprised nearly 200 interrogatories. D.E. # 185 at 1 & n. 1. When Eon subsequently demanded responses to additional multi-faceted interrogatories, King was amply justified in objecting that Eon had exceeded its limit, particularly given Eon's refusal to answer interrogatories in excess of 25 and this Court's recent decision sustaining that objection. D.E. # 152 at 3; D.E. # 163 at 2. The subparts in Eon's interrogatories are no less "discrete" than those to which Eon had earlier objected.

Furthermore, Interrogatories # 4 through # 7 relate to issues that were subject to discovery in the 400 mg actions and thus cannot be said to constitute "new issues" in this case. Interrogatories # 4 and # 5 relate to certain patent claim terms; Interrogatory # 6 relates to the use of metaxalone; and Interrogatory # 7 asks when twelve named individuals first became aware of certain prior art references. Having successfully persuaded the Court to keep discovery "narrowly focused on the new issues presented" (D.E.# 98), Eon should not now be heard to complain when the Court enforces that limitation and sustains King's objections.[FN4]

> FN4. The Court will, however, require Elan, presumably the party with knowledge, to provide information related to the subject of Interrogatory # 7. *See infra* p. 5.

**(2) *Elan's Responses to Interrogatories # 2, 3 and 7***

Eon has served Elan with interrogatories seeking

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2788199 (E.D.N.Y.)
**(Cite as: 2008 WL 2788199 (E.D.N.Y.))**

facts establishing an absence of intent to deceive the United States Patent Office during the prosecution of the patents in suit (Interrogatory # 2), facts supporting any alleged "secondary considerations" of non-obviousness (Interrogatory # 3), and facts as to when a dozen specified individuals first learned of certain prior art references (Interrogatory # 7). Eon thus seeks additional discovery concerning validity and/or enforceability, issues as to which Eon previously disclaimed the need for further discovery.[FN5]On this basis alone, the Court would be warranted in denying Eon's motion to compel. Furthermore, the three interrogatories at issue all contain numerous subparts, which together exceed Rule 33(a) (1)'s limit of 25 interrogatories.[FN6]

> FN5.*See supra* p. 2. Eon does not dispute that obviousness and intent were explored at length in discovery in the prior actions.

> FN6. Elan also argues that Eon's requests improperly seek post-complaint information. D.E. # 182 at 1-2. Elan erroneously relies on this Court's Order of May 28, 2008 for the proposition that no post-complaint information is discoverable. In fact, the ruling cited by Elan concerned the need to include on a privilege log post-complaint communications withheld on grounds of privilege. D.E. # 163 at 2. The discoverability of unprivileged post-complaint information was not before the Court and thus was not expressly addressed by it. (However, Eon's demands for post-complaint discovery would appear to be inconsistent with their previous arguments that discovery on the 400 mg product was "complete" and that discovery in this case should be limited to issues relating to 800 mg metaxalone.)

Nevertheless, the Court in its discretion will allow Eon to serve Elan with narrowly focused interrogatories to elicit information that it apparently was unable to obtain through depositions in the 400 mg litigation: to wit, the custodians of prior art documents that Elan produced from its files but did not disclose to the Patent Office. D.E. # 180 at 2. As the Court will limit Eon to designating no more than ten prior art documents, requiring Elan to respond to such interrogatories will not cause any undue burden.

**(3)** *Elan and King's Responses to Document Request # 14*

**\*3** In a document demand served on both King and Elan, Eon requested that they produce "[a]ll communications between Elan and King concerning the Patents or any application for said Patents."D.E. # 180 Ex. D. Specifically, Eon seeks documents related to the state court litigation between King and Elan. D.E. # 180 at 3. According to Elan, it previously produced responsive documents, which are identifiable by the second set of bates numbers in the format used in the Elan/King state court action. D.E. # 180 at 3. Under these circumstances, absent a more narrow, targeted demand, the Court declines to order any further response from either Elan or King.

### CONCLUSION

For the foregoing reasons, Eon's motions to compel are denied, with one exception: King is authorized to serve on Elan, by July 17, 2008, narrowly focused interrogatories that require Elan to disclose, as to any ten prior art documents produced by Elan from its files but not disclosed to the Patent Office, the identities of the custodians of such documents. Elan's motion for a protective order is otherwise granted with respect to the discovery demands that are the subject of this opinion.

**SO ORDERED.**

E.D.N.Y.,2008.
King Pharmaceuticals, Inc. v. Eon Labs, Inc.
Slip Copy, 2008 WL 2788199 (E.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 6

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21699799 (N.D.Cal.)
(Cite as: 2003 WL 21699799 (N.D.Cal.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
NETWORK CACHING TECHNOLOGY, LLC,
Plaintiff,
v.
NOVELL, INC, et al, Defendants.
No. C-01-2079 VRW.

March 21, 2003.

Patent holder brought infringement action against competitor over patents describing algorithm for directing Internet network traffic and speeding up networks by caching, i.e., storing duplicate images of data. Competitor brought motions to dismiss and to sanction plaintiff's counsel for his alleged failure to conduct adequate pre-filing investigation of patent holder's infringement claims. The District Court, Walker, J., held that: (1) sanctions against patent holder were not warranted at pleading stage for patent holder's failure to conduct reasonable pre-filing investigation; (2) opponent's largely successful motion to strike did not afford opponent a basis for monetary award under sanctions rule; and (3) statute governing counsel's liability for excessive costs did not apply to patent holder's failure to conduct pre-filing investigation.

Motions denied.

West Headnotes

**[1] Federal Civil Procedure 170A ☞2771(8)**

170A Federal Civil Procedure
    170AXX Sanctions
        170AXX(B) Grounds for Imposition
            170Ak2767 Unwarranted, Groundless or Frivolous Papers or Claims
                170Ak2771 Complaints, Counterclaims and Petitions
                    170Ak2771(8) k. Intellectual Prop-

erty Cases. Most Cited Cases

**Federal Civil Procedure 170A ☞2783(1)**

170A Federal Civil Procedure
    170AXX Sanctions
        170AXX(B) Grounds for Imposition
            170Ak2767 Unwarranted, Groundless or Frivolous Papers or Claims
                170Ak2783 Duty of Reasonable Inquiry
                    170Ak2783(1) k. In General. Most Cited Cases
Sanctions against patent holder were not warranted at pleading stage for patent holder's failure to conduct reasonable pre-filing investigation of infringement claims against competitor, because patent holder continued to assert that its patent infringement claims had merit, although patent holder altered its underlying theories of infringement in successive revisions of its preliminary infringement contentions (PICs), and court was unable to ascertain definitively whether patent holder's infringement claims were without any objective merit. Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ☞2774(1)**

170A Federal Civil Procedure
    170AXX Sanctions
        170AXX(B) Grounds for Imposition
            170Ak2767 Unwarranted, Groundless or Frivolous Papers or Claims
                170Ak2774 Motions and Opposition Thereto
                    170Ak2774(1) k. In General. Most Cited Cases
Opponent's largely successful motion to strike did not afford opponent a basis for a monetary award under sanctions rule, since sanctions rule could be used only to target filings that were baseless. Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ☞2771(8)**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21699799 (N.D.Cal.)
(Cite as: 2003 WL 21699799 (N.D.Cal.))

170A Federal Civil Procedure
   170AXX Sanctions
      170AXX(B) Grounds for Imposition
         170Ak2767 Unwarranted, Groundless or Frivolous Papers or Claims
         170Ak2771 Complaints, Counterclaims and Petitions
           170Ak2771(8) k. Intellectual Property Cases. Most Cited Cases
Competitor could not establish that counsel was liable for excessive costs, on allegations that patent holder acted in bad faith by its numerous revisions of its preliminary infringement contentions (PICs), since governing statute did not apply to patent holder's failure to conduct pre-filing investigation, and court determined that patent holder set forth its theories of infringement with sufficient specificity to provide competitor with notice of infringement. 28 U.S.C.A. § 1927.

**Patents 291 ☞328(2)**

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most Cited Cases
5,611,049, 5,892,914, 6,026,452, 6,085,234. Cited.


ORDER

WALKER, J.

*1 Before the court are defendants' motions to dismiss and to sanction plaintiff's counsel for its alleged failure to conduct an adequate pre-filing investigation of its infringement claims and comply with Patent Local Rule 3-1, as described in the court's August 13, 2002, order. See Novell/Volera Mot for Sanctions (Doc # 249); Novell/Volera Mot to Dism (Doc # 266); Inktomi Mot for Sanctions (Doc # 253); Inktomi Mot to Dism (Doc # 259); Cacheflow Mot to Dism (Doc # 260). For the reasons set forth below, the court DENIES defendants'

motions to dismiss (Docs259, 260, 266) and for sanctions (Docs249, 253) without prejudice to renewal if it is shown during subsequent proceedings that NCT's patent infringement allegations are ultimately meritless.


I

On May 29, 2001, plaintiff Network Caching Technology LLC (NCT) commenced this action against defendants Novell, Inc, Volera Inc, Akamai Technologies, Inc, Cacheflow, Inc and Inktomi Corporation, alleging infringement of certain NCT patents. Defendant Akamai Technologies, Inc has since been dismissed from this action. See Notice of Dism (Doc # 236).

NCT alleges that defendants infringed its patents for network services software products. NCT alleges that it is the assignee of four patents at issue in this case: United States patent nos 5,611,049 ('049 patent); 5,892,914 ('914 patent); 6,026,452 ('452 patent); and 6,085,234 ('234 patent). The patents at issue describe an algorithm for directing network traffic and speeding up networks by caching (storing duplicate images of data). Applications of the patent technology are particularly useful in internet services to speed up and control internet traffic at a company's internet site and in intranet services to speed up and control traffic within a company's proprietary network.

NCT alleges that Novell, Volera and Inktomi make and sell software products that contain algorithms which allegedly infringe the patents. Cacheflow allegedly manufactures and sells computer equipment, specifically network servers, which work by themselves and in conjunction with other software to infringe the patents.

In February and March 2002, defendants brought to the court's attention several discovery disputes regarding, inter alia, NCT's preliminary infringement contentions (PICs). See Docs66-86. On March 15, 2002, the court held a status conference to discuss

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21699799 (N.D.Cal.)
(Cite as: 2003 WL 21699799 (N.D.Cal.))

the parties' discovery disputes. At that conference, NCT admitted that it had not reverse engineered defendants' products to determine whether the products infringed the patents at issue. See Transcript (Doc # 193), at 41:17-25. The conference concluded with the court suggesting that NCT revise its PICs to provide more detailed infringement allegations. See id at 48:10-50:5.NCT revised its PICs and, based on further discussions with defendants, revised its PICs a second time. Even with the second revision, defendants contended that NCT's PICs were inadequate and accordingly moved to strike NCT's second revised PICs and to dismiss the complaint for NCT's continued failure to comply with Patent LR 3-1. See Docs 115, 126, 129, 134.

*2 By written order dated August 13, 2002, the court found NCT's second revised PICs to be "plainly insufficient", granted defendants' motion to strike and ordered NCT to revise its PICs to comply with the requirements of Patent LR 3-1. The court, however, declined to dismiss NCT's complaint, finding such action to be "premature" on the existing record. 8/13/02 Order (Doc # 227), at 7. The court found "no evidence before it that NCT has not attempted to comply with the court's orders and the local rules in this case. * * * Until this order, the court's involvement has not definitively determined which party has the correct view."Id.

On October 15, 2002, NCT served its third revised PICs. Over two months later, on December 18, 2002, defendants filed the present motions to dismiss NCT's first amended complaint. See Docs259, 260, 266. Also on that date, Novell, Volera and Inktomi moved for sanctions against NCT and its counsel, Jones Day Reavis & Pogue. See Docs249, 253.

II

Defendants move for dismissal primarily based on NCT's purported continued failure to comply with Patent LR 3-1 despite the court's August 13, 2002, order. See Novell/Volera Mot to Dism (Doc # 266);

Inktomi Mot for Sanctions (Doc # 253); Inktomi Mot to Dism (Doc # 259); Cacheflow Mot to Dism (Doc # 260). Alternatively, defendants also urge dismissal under FRCP 11, based on inadequacies in the pre-filing investigation conducted by Jones Day Reavis & Pogue, NCT's counsel. See Novell/Volera Mot for Sanctions (Doc # 249). The court discusses each of these arguments below.

A

Defendants argue that NCT's third revised PICS fail to meet the requirements of Patent LR 3-1 and warrants the harsh sanction of dismissal. To support dismissal, defendants present various theories, including (1) NCT's failure to prosecute, pursuant to FRCP 41(b); (2) NCT's defiance of a discovery order, pursuant to FRCP 37; and (3) the court's inherent power to discipline willful or reckless misconduct.

Defendants attempt to characterize NCT's latest revised PICs as its "fifth" consecutive and deliberate failure to comply with Patent LR 3-1. The court previously explained, however, that NCT did not have actual notice that its PICs were deficient until the court's August 13, 2002, order. Notably, in response to NCT's third revised PICs, defendants do not move to strike on the ground of insufficiency, as they did previously, but rather seek dismissal of the entire action.

It is well-settled that NCT has a duty to prosecute its case. See FRCP 41(b). A court possesses the inherent authority to dismiss an action pursuant to FRCP 41(b) for failure to prosecute "to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R R Co.,* 370 U.S. 626, 630-32, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *Oliva v. Sullivan,* 958 F.2d 272, 273 (9th Cir.1992). Because dismissal is a harsh penalty, it should be limited as a sanction only in extreme circumstances. *Thompson v. Housing Auth.,* 782 F.2d 829, 831 (9th Cir.), *cert denied,* 479 U.S. 829, 107 S.Ct. 112, 93 L.Ed.2d 60 (1986). The Ninth Circuit has explained that a district court

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

must weigh several factors to decide whether to dismiss:

*3 (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits and (5) the availability of less drastic sanctions.

*Thompson,* 782 F.2d at 831. Dismissal is proper "where at least four factors support dismissal, * * * or where at least three factors 'strongly' support dismissal." *Yourish v. Calif. Amplif,* 191 F.3d 983, 990 (9th Cir.1999) (quoting *Ferdik v. Bonzelet,* 963 F.2d 1258, 1263 (9th Cir.1992)).

FRCP 37 also provides sanctions for failure to comply with federal rules pertaining to discovery. The court may "make such orders in regard to the failure as are just," including issue- and claim-dispositive findings. See FRCP 37(b)(2).

The parties do not discuss whether FRCP 37 provides a basis for sanction for violation of Patent LR 3-1. Patent LR 1-2 provides that "[t]he Civil Local Rules of this Court shall also apply to" patent cases, while Civil LR 1-4 provides that "[f]ailure by counsel or a party to comply with any duly promulgated local rule * * * may be a ground for imposition of any authorized sanction."Other patent local rules, aside from 3-1, specifically authorize certain types of sanctions. See, e g, Patent LR 3-8 (prohibiting reliance on opinion of counsel as part of a defense to willful infringement unless a party complies with Patent LR 3-8 or otherwise obtains the permission of all other parties or the court).

While FRCP 37 sanctions are limited to failures to respond to interrogatories and document requests served under FRCP 33 and 34 or to comply with an order compelling disclosure under FRCP 37, the Ninth Circuit has declined to extend these sanctions to general discovery disputes under the rule. *Halaco Engineering Co. v. Costle,* 843 F.2d 376, 380 (9th Cir.1988). Defendants do not address

whether the court may sanction failure to comply with Patent LR 3-1 with the remedies set forth under FRCP 37(b)(2).

Nevertheless, there is no question the court may, again under its inherent authority, sanction failure to comply with court orders, such as the August 13, 2002, order, and for "discovery abuses that may not be a technical violation of the discovery rules."Id at 381.Such action by the court may be justified to "protect[ ] the due and orderly administration of justice" and "maintain [ ] the authority and dignity of the court." *Primus Automotive Financial Servs., Inc. v. Batarse,* 115 F.3d 644, 648 (9th Cir.1997) (citing *United States v. Hudson,* 7 Cranch 32, 34, 3 L.Ed. 259 (1812)). Specifically, in the context of discovery abuse, the court must consider (1) the existence of certain extraordinary circumstances, (2) the presence of willfulness, bad faith, or fault by the offending party, (3) the efficacy of lesser sanctions and (4) the relationship or nexus between the misconduct drawing the sanction and the matters in controversy in the case. In addition, the court may also consider (5) the prejudice to the party victim of the misconduct and (6) the government interests at stake. *Halaco Engineering Co. v. Costle,* 843 F.2d 376, 380 (9th Cir.1988).

*4 Regardless of the theory, however, the court finds that dismissal of NCT's action on this ground is unwarranted because its third revised PICs are sufficient to comply with Patent LR 3-1, which requires disclosure of:

(a) Each claim of each patent in suit that is allegedly infringed by each opposing party;

(b) Separately for each asserted claim, each accused apparatus, product, device, process, method, act or other instrumentality * * * of each opposing party of which the party is aware. This identification shall be as specific as possible. Each product, device, and apparatus must be identified by name or model number, if known. Each method or process must be identified by name, if known, or by any product, device, or apparatus

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21699799 (N.D.Cal.)
(Cite as: 2003 WL 21699799 (N.D.Cal.))

which, when used, allegedly results in the practice of the claimed method or process;

(c) A chart identifying specifically where each element of each asserted claim is found within each Accused Instrumentality, including for each element that such party contends is governed by 35 USC § 112(6), the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function;

* * *

By previous order, the court rejected defendants' view that NCT was required to reverse engineer the allegedly infringing products to comply with these disclosure requirements. Instead, the court ruled that "reverse engineering or its equivalent" was required to provide the requisite level of preliminary infringement information to defendants. While the court did not elaborate on what an "equivalent" to reverse engineering would entail, the court was animated by its concern that NCT's PICs were "replete with vague discussions of the claim terms" and that NCT "ha[d] provided no further information to defendants than the claim language itself." 8/13/02 Order (Doc # 227), at 11-12.

NCT has remedied these deficiencies in its third revised PICs. While NCT's responses may not be an exemplary model of disclosure, Patent LR 3-1 does not require NCT to produce evidence of infringement or to set forth ironclad and irrefutable claim constructions. Rather, Patent LR 3-1 is "designed to require parties to crystallize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed." *LG Electronics Inc. v. Q-Lity Computer Inc.,* 211 F.R.D. 360, 367 (N.D.Cal.2002) (quoting *Atmel Corp. v. Information Storage Devices, Inc.,* 1998 WL 775115 at *2 (N.D.Cal.1998)). Whether those theories may ultimately be vindicated through claim construction and at trial is an entirely separate matter from whether Patent LR 3-1 has been satisfied. At this juncture, a party may comply with Patent LR 3-1 by setting forth particular theories of in-

fringement with sufficient specificity to provide defendants' with notice of infringement beyond that which is provided by the mere language of the patents themselves. See 8/13/02 Order (Doc # 227) ("Patent LR 3-1 * * * takes the place of a series of interrogatories that defendants would likely have propounded had the patent local rules not provided for streamlined discovery.").

**\*5** Defendants' dozens of objections to NCT's PICs take issue with the ultimate validity of NCT's claim construction or are based on defendants' belief that NCT will be unable to provide evidence of infringement at trial. For example, Inktomi contends that NCT has failed to provide "support for the allegation that [Inktomi's] Traffic Server [product] always saves a copy of the requested data." See Inktomi Mem (Doc # 262), at 11. But PICs are not meant to provide a forum for litigation of the substantive issues; they are merely designed to streamline the discovery process. Inktomi essentially objects to the merits of NCT's theory of infringement. These sorts of concerns clearly are not meant to be resolved all in the context of NCT's PICs, and the court declines to do so here. Defendants will be afforded shortly the opportunity to press the validity of NCT's construction of its own patent claims and defendants' products. See Jt Case Mgt Conf Stmt (Doc # 247) (*Markman* hearing scheduled for later this year).

Nor does Patent LR 3-1 require that NCT's preliminary infringement theories be incontrovertible or presented in excruciating detail. While the rule states that these disclosures should be "as specific as possible," there is no requirement that NCT thoroughly present and successfully defend its theories of infringement in the confines of a PIC chart. At this stage, mapping specific elements of defendants' allegedly infringing products onto NCT's claim construction is adequate.

Defendants also contend that by continuing to rely on marketing materials, white papers and other publicly available product documentation, NCT has failed to comply with the court's order which re-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21699799 (N.D.Cal.)
(Cite as: 2003 WL 21699799 (N.D.Cal.))

quired "reverse engineering or its equivalent." But the question whether NCT conducted "reverse engineering or its equivalent" is not synonymous with whether it has complied with Patent LR 3-1, which, as discussed, requires a party only to set forth its specific theories of infringement. The court finds that NCT has provided sufficient information in its PICs to satisfy Patent LR 3-1.

B

[1] Despite the court's determination that NCT has complied with Patent LR 3-1, information disclosed by way of PICs may nevertheless present a picture of the sort of prefiling investigation conducted by NCT. Because "NCT must provide in its PICs the relevant facts it obtained in its prefiling inquiry,""NCT's PICs * * * provide an accurate picture of the maximum possible inquiry in which NCT engaged before filing suit."See 8/13/02 Order (Doc # 227), at 8-9. Thus, the investigative methods underlying NCT's third revised PICs are relevant to defendants' alternative argument that dismissal and other sanctions are warranted under FRCP 11, a subject to which the court turns.

1

FRCP 11 requires counsel to sign every pleading, written motion or other paper presented to the court. Counsel's signature is a certification that "to the best of the person's knowledge, information, and belief," the paper is not baseless or meant to further "any improper purpose" and was submitted "after an inquiry reasonable under the circumstances."FRCP 11(b). A party moving for FRCP 11 sanctions bears the burden of establishing noncompliance. See *Tom Growney Equipment, Inc. v. Shelley Irr. Development, Inc.,* 834 F.2d 833, 837 (9th Cir.1987).

*6 The Ninth Circuit has held that, under the "frivolousness prong" of FRCP 11, an attorney may be sanctioned for failing to conduct a reasonable pre-filing inquiry if the paper at issue lacks merit.

See *In re Keegan Mgt. Co. Sec Lit.,* 78 F.3d 431, 434 (9th Cir.1995). In that case, the Ninth Circuit explained that FRCP 11 sanctions apply only to "a filing that is *both* baseless *and* made without a reasonable and competent inquiry."Id (emphasis in original) (quoting *Townsend v. Holman Consulting Corop,* 929 F.2d 1358, 1362 (9th Cir.1990) (en banc)); see also *Buster v. Greisen,* 104 F.3d 1186, 1190 (9th Cir.1997).

In a patent infringement case such as this, the Federal Circuit has explained that FRCP 11"require[s] that an attorney interpret the pertinent claims of the patent in issue before filing a complaint alleging patent infringement." *Antonious v. Spalding & Evenflo Cos., Inc.,* 275 F.3d 1066, 1072 (Fed.Cir.2002). This entails, "at a bare minimum, apply[ing] the claims of each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted." *View Eng'g Inc. v. Robotic Vision Systems, Inc.,* 208 F.3d 981, 986 (Fed.Cir.2000).

Alternatively, the court may sanction conduct under FRCP 11 intended "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation."FRCP 11(b). Objective evidence may be used to demonstrate subjective bad intent. See *Townsend,* 929 F.2d at 1362. But while defendants contend that NCT's and Jones Day's failure to conduct an adequate prefiling investigation was intentional, they do not argue that the improper purpose prong of FRCP 11 applies. Accordingly, the court limits its inquiry to the frivolousness prong of FRCP 11.

2

NCT does not dispute that it did not engage in what is traditionally thought of as "reverse engineering," which generally involves physical scrutiny and deconstruction of the actual product at issue to ascertain its operation. NCT has admitted that it did not

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21699799 (N.D.Cal.)
**(Cite as: 2003 WL 21699799 (N.D.Cal.))**

reverse engineer the products at issue prior to filing suit, Transcript (Doc # 193), at 41:17-25, but it contends that it need not have done so. NCT argues that its use of marketing materials is equivalent to traditional reverse engineering and that, as a result, its reliance on those materials is adequate to support a reasonable pre-filing inquiry. NCT presents several engineering treatises and articles to support its view that examination of marketing materials alone can operate as the functional equivalent of traditional reverse engineering.

Those treatises, however, recognize the limitation of relying solely on marketing materials, white papers and other product documentation. While these materials do contain some level of technical discussion (see, e g, Geyer Decl (Doc # 282), Exh I), looking at these indirect sources of information fails to satisfy the pre-filing investigation requirements described both by *View Eng'g* and the court's previous order.

*7 To satisfy the reasonable inquiry requirement of FRCP 11, the Federal Circuit requires, at a "bare minimum", that an attorney bringing an infringement suit apply the patent claims at issue "to an accused device." NCT, however, contends that it may compare its patent claims to an accused device without any actual examination of the accused device. The Federal Circuit's holding in *Antonious* is instructive on this matter. In that case, the plaintiff's law firm admitted that it had not directly examined most of the products alleged to infringe plaintiff's patents. See 275 F.3d at 1075-76. "Instead, the * * * attorneys inferred that the [products at issue] had an interior structure similar to the [product they had examined]." Id at 1076. The Federal Circuit held that, "[o]n remand, the trial court must decide whether that inference was reasonable, given the other information the * * * attorneys had at the time." Id.

In the instant case, NCT relies similarly on indirect evidence of infringement. Rather than directly examining of each of the allegedly infringing products, NCT looked to indirect evidence whose

reliability and actual resemblance to the products in question is questionable. Here, however, NCT seems to have engaged in even less inquiry than the counsel in *Antonious*, as NCT apparently failed to examine *any* of the accused products directly before filing suit.

The court finds that, under the circumstances, NCT failed to conduct a reasonable pre-filing investigation. NCT does not deny that it had the ability to obtain the allegedly infringing products and examine them to determine, for example, whether they operated materially in the manner described by the marketing materials. It is also undisputed that NCT was aware of possible infringement by defendants' products as late as October 1999, over 18 months before commencement of this suit on May 29, 2001. See Burton Decl (Doc # 255), Exhs 6-7. NCT's failure to examine the accused products directly is both preposterous and unjustified. Accordingly, the court concludes that its pre-filing investigation was unreasonable and does not comport with the requirements of FRCP 11.

The court, however, declines to award FRCP 11 sanctions at this time because, as earlier described, the Ninth Circuit requires that the filing at issue also be baseless. See *In re Keegan Mgt. Co. Sec Lit.*, 78 F.3d at 434. At this juncture, the court is unable to ascertain definitively whether NCT's infringement claims are without any merit. Cf Committee Notes on Amendments to Fed R of Civ P, 146 FRD 401, 590 (1993) (noting that FRCP 11 "should not be employed * * * to test the legal sufficiency or efficacy of allegations in the pleadings").

Defendants' reliance on *View Eng'g* and *Antonious* to support sanctions at this stage of the litigation is factually misplaced. Unlike the counter-claimant in *View Eng'g*, who dismissed dozens of claims and "admit[ted] that [they] had no factual basis * * * ", 208 F.3d at 984, NCT continues to assert that its patent infringement claims have merit. While NCT may have altered its underlying theories of infringement in successive PIC revisions, NCT con-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21699799 (N.D.Cal.)
(Cite as: 2003 WL 21699799 (N.D.Cal.))

tinues to assert the validity of its claims.

**\*8** *Antonious,* also cited by defendants, is inapposite at the present procedural posture because it involved a determination, after summary judgment, that the construction on which the plaintiff's infringement claims were based was frivolous. See 275 F.3d at 1071. Indeed, the trial court "withheld ruling on the sanctions motion until the liability issues were finally resolved."Id. Without further proceedings, such as a claim construction or summary judgment hearing, the court cannot definitively assess whether NCT's claims are in fact baseless.

In addition, the court is reluctant to hold that withdrawal of claims or theories of infringement alone is sufficient to conclude that these claims were baseless. With respect to FRCP 11 sanctions against the changing contentions contained in the PICs themselves, the court notes that, by its terms, FRCP 11 sanctions do not extend to discovery disputes. See FRCP 11(d); *Patelco Credit Union v. Sahni,* 262 F.3d 897, 913 n15 (9th Cir2001). Beyond that, however, imposing sanctions merely for withdrawal would ultimately create perverse incentives for parties to extend the lifespan of unsupportable claims and theories in order to avoid accusations of, and sanctions for, purportedly baseless conduct.

Based on the record before it, the court simply cannot ascertain, from an objective standpoint, whether NCT's patent infringement claims are baseless. The court therefore DENIES their motions for dismissal and for other sanctions under FRCP 11 without prejudice to renewal as further developments warrant. If renewed, defendants must demonstrate not only that NCT's claims are erroneous but that they are baseless.

### III

[2] Inktomi also moves for a monetary award pursuant to FRCP 11 for the costs of opposing NCT's motion to strike its affirmative defenses. See Doc #

253. But the court granted nearly the entirety of NCT's motion to strike Inktomi's affirmative defenses. See 12/31/01 Order (Doc # 53) (striking Inktomi's first, third, fourth, fifth, sixth, seventh, eighth, tenth and eleventh affirmative defenses). The only affirmative defense not struck by the court was Inktomi's second affirmative defense, which the court declined to strike because it found Inktomi's pleading "sufficient" "at this early stage in the litigation."Id at 10-11.

As discussed above, FRCP 11 may only be used to target filings that are baseless. Inktomi cannot credibly contend that NCT's largely successful motion to strike affords a basis for monetary award.

### IV

[3] Next, the court considers whether to impose monetary sanctions on NCT and its counsel under 28 USC § 1927. Section 1927 of Title 28 of the United States Code provides:

Any attorney \* \* \* who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

"Sanctions pursuant to section 1927 must be supported by a finding of subjective bad faith." *New Alaska Development Corp. v. Guetschow,* 869 F.2d 1298, 1306 (9th Cir.1989). This section does not apply to the initial filing of a complaint; it covers only subsequent conduct. *In re Keegan Mgt. Co. Sec Lit.,* 78 F.3d at 435. Thus, § 1927 does not afford defendants a remedy for lapses in NCT's prefiling investigation.

**\*9** Because the court has concluded that NCT is in compliance with Patent LR 3-1 and for reasons discussed in the court's August 13, 2002, order, the court finds that defendants have not established that NCT acted in bad faith by its numerous PIC revisions. NCT did not have definitive notice of the deficiency of its PICs until the court's August 13,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21699799 (N.D.Cal.)
(Cite as: 2003 WL 21699799 (N.D.Cal.))

2002, order, and it complied with Patent LR 3-1's requirements soon thereafter. The court therefore DENIES defendants' motion for sanctions to the extent they are sought under 28 USC § 1927 (Doc # 253).

## V

This leaves defendants' motion for partial summary judgment that claims 1,2,3 of the '234 patent are not entitled to an earlier priority date. At the March 5, 2003, hearing, in the interest of judicial economy, the court deferred oral argument on defendants' partial summary judgment motion until it had resolved the dispositive motions that are the subject of this order.

Having now determined that dismissal is unwarranted on the present record, the court shall SET a new hearing date so that defendants' motion for partial summary judgment may be heard. Counsel are directed to confer and present to the courtroom deputy within 10 days of the entry of this order a mutually agreeable hearing date.

## VI

In sum, the court DENIES defendants' motions for sanctions and to dismiss NCT's complaint (Docs 249, 253, 259, 260, 266) without prejudice to renewal if defendants are subsequently able to demonstrate the frivolousness of NCT's patent claims. In addition, the court administratively TERMINATES defendants' motion for partial summary judgment (Doc # 231) and REINSTATES it for hearing on a date to be selected by counsel, who are DIRECTED to inform the courtroom deputy within 10 days of the entry of this order of the new hearing date.

As an administrative matter, the court TERMINATES Inktomi's motion to compel production of documents listed in NCT's privilege log (Doc # 145). This matter was referred to Magistrate Judge Zimmerman but has not been ruled upon in light of the stay on discovery ordered by the court on August 13, 2001. See 8/13/02 Order (Doc # 227), at 14-15. If necessary, Inktomi may renew the motion before Magistrate Judge Zimmerman.

IT IS SO ORDERED.

N.D.Cal.,2003.
Network Caching Technology, LLC v. Novell, Inc.
Not Reported in F.Supp.2d, 2003 WL 21699799 (N.D.Cal.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 7

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 559573 (S.D.N.Y.)
**(Cite as: 2006 WL 559573 (S.D.N.Y.))**

**c**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
NEW YORK UNIVERSITY, Plaintiff,
v.
E.PIPHANY, INC. and Ssa Global Tech. Inc., Defendants.
No. 05Civ.1929(LTS)(RLE).

March 6, 2006.

OPINION & ORDER

ELLIS, Magistrate J.

I. BACKGROUND

*1 Plaintiff New York University ("NYU") filed this patent infringement action against defendant E.piphany, Inc., ("E.piphany") on February 8, 2005. The complaint was amended on October 31, 2005, to include defendant SSA Global Technologies, Inc., when that company acquired E.piphany. NYU alleges E.piphany's software infringes one of NYU's patents, U.S. Patent No. 6,236,978 ("the '978 patent"). NYU has filed a motion to compel responses to certain outstanding discovery requests. The discovery dispute which led to the instant motion has been ongoing before the undersigned since November 2005.

In its complaint, NYU challenged forty of E.piphany's products but referred only to one product by name, Interaction Advisor. To date, E.piphany has produced documents only for Interaction Advisor and none of its other products. NYU asks the Court to compel E.piphany to produce all documents responsive to Plaintiff's First Set of Requests for Production of Documents to Defendant E.Piphany, Inc. served August 15, 2005. Plaintiff NYU's Memorandum in Support of its Motions

("NYU Mem.") at 1. Specifically, NYU focuses on the following areas of production which E.piphany has withheld: 1) software architecture documents for Interaction Advisor; 2) the source code and software architecture documents for E.piphany's products: E.piphany Real-Time, E.piphany Sales and Service, E.piphany Customer Relationship Backbone, E.piphany Marketing/E-Marketing, and E.piphany E6 and E6.5 Suite which are related to E.piphany's Interaction Advisor; 3) the source code and software architecture documents for commercial versions of Interaction Advisor other than 6.5; and 4) Preliminary Invalidity Contentions and supporting documents, if any, relating to claims 1, 15, 25-34 and 37 of the '978 patent. *Id.* at 3. Consistent with this Court's previous oral rulings, the motion is GRANTED, in part, and DENIED, in part.

NYU has also asked the Court to adjourn the parties' claim construction schedule. However, E.piphany has filed a motion to limit claim construction before Judge Swain. As Judge Swain will be reviewing the claim construction process in this case, this Court will not rule on that aspect of NYU's motion at this time.

II. DISCUSSION

A. Production of Documents for Products Other than Interaction Advisor

E.piphany opposes production related to its other products primarily because it believes that NYU has failed to provide sufficiently detailed Preliminary Infringement Contentions ("PICs") under Patent Local Rule 3-1 for those products. Defendants' Memorandum of Law in Opposition to NYU's Motion ("E.piphany Mem.") at 7. Judge Swain issued a scheduling order which provides that, for discovery, the following Patent Local Rules of the United States District Court for the Northern District of California apply: 3-1, 3-2, 3-3, and 3-4. Pre-Trial Scheduling Order, July 1, 2005, at 6. Under these

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 559573 (S.D.N.Y.)
**(Cite as: 2006 WL 559573 (S.D.N.Y.))**

rules, plaintiffs are to provide PICs to better define the scope of discovery. Patent Local Rule 3-1 states:

**\*2** Not later than 10 days after the Initial Case Management Conference, a party claiming patent infringement must serve on all parties a "Disclosure of Asserted Claims and Preliminary Infringement Contentions"... which shall contain the following information: ...

(b) Separately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of each opposing party of which the party is aware. This identification shall be as specific as possible....

(c) A chart identifying specifically where each element of each asserted claim is found within each Accused Instrumentality, including for each element that such party contends is governed by 35 USC § 112(6), the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function.

The rule is "essentially a 'discovery device' intended to streamline the discovery process by 'tak[ing] the place of a series of interrogatories that defendants would likely have propounded." ' *Renesas Tech. Corp. v. Nanya Tech. Corp.,* 2004 WL 2600466, at \*2 (N.D.Cal. Nov. 10, 2004) (*quoting Network Caching Tech., LLC v. Novell, Inc.,* 2002 WL 32126128, at \*3-4 (N.D.Cal. Aug. 13, 2002)). The plaintiff must include all facts known to it that could support its claim of infringement. *Id.* "[T]he standard of [Federal Rule of Civil Procedure ("FRCP") ] 11 prefiling inquiry establishes a minimum level of detail that Patent LR 3-1 requires." *Network Caching,* 2002 WL 32126128, at \*4. "FRCP 11 requires that a plaintiff compare an accused product to its patents on a claim by claim, element by element basis for at least one of each defendant's products." *Id.* at \*5. In order to provide such detail, parties often demonstrate that they have done what is called "reverse engineering," but that

is not required if the plaintiff has an equivalent way of showing the level of detail the rule requires. *Renesas,* 2004 WL 2600466, at \*2. The "party claiming infringement does not have to reverse engineer every one of a defendant's products. Instead, a plaintiff must only demonstrate 'why it believed before filing the claim that it had a reasonable chance of proving infringement." ' *Id.* (*quoting View Eng'g, Inc. v. Robotic Vision Sys., Inc.,* 208 F.3d 981, 986 (Fed.Cir.2000)). In *Renesas,* the plaintiff did reverse engineer three products, and then provided declarations pointing out why reverse engineering for the others would be burdensome, expensive, and provide no additional information. *Id.* at \*4. The court found the PICs to be adequate. *Id.*

In some situations, a plaintiff must first obtain information from the defendant in order to provide sufficiently detailed PICs. In *Network Caching,* for example, the defendants moved to strike plaintiff's PICs and dismiss the complaint for failure to comply with Patent LR 3-1. 2002 WL 32126128, at \*4. The court ordered the plaintiff to amend its PICs after receiving more discovery from defendants, finding that the only way to be more specific as to their claims was to analyze the source code which was in the defendant's sole possession. *Id.* at \*7. Similarly, in *Renesas,* the court refused to strike plaintiffs' PICs and found that "[r]equiring Renesas to prove more ... seems inappropriate, as it alleges it has not yet received the discovery necessary to run the voltage tests properly." 2004 WL 2600466, at \*5.

**\*3** Plaintiffs in computer software infringement cases apparently often find themselves in this particular "Catch-22:"

Software cases present unique challenges for the parties and the courts because, prior to discovery, plaintiffs usually only have access to the manifestation of the defendants' allegedly infringing source code and not the code itself. From this manifestation, plaintiffs must somehow divine whether the defendants' code infringes. Although

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 559573 (S.D.N.Y.)
(Cite as: 2006 WL 559573 (S.D.N.Y.))

defendants vigorously and rightly guard their source code, until plaintiffs have access to it, plaintiffs are typically unable to give highly specified infringement contentions. To the extent defendants are given vague infringement contentions, they are hampered in their ability to prepare their defense.

*Am. Video Graphics, L.P. v. Elec. Arts, Inc.,* 359 F.Supp.2d 558, 560 (E.D.Tex.2005). The court may therefore require a defendant to provide source code so that the plaintiff may be more specific about its claims. *Id.* The plaintiffs, of course, may first be required to demonstrate that they exhausted other ways of exploring potential infringement. *See Connectel, LLC v. Cisco Sys., Inc.,* 391 F.Supp.2d 526, 528 (E.D.Tex.2005) ("The plaintiff in [*Am. Video Graphics* ] did not just allege infringement of hundreds of video games, submit those games' user manuals as evidence, and expect to narrow its claims upon the receipt of source code.").*See also Network Caching.* 2002 WL 32126128, at *5.

In a conference before this Court on November 8, 2005, NYU made an application to compel the same discovery requested in the current motion, and E.piphany raised the same concerns about NYU's PICs. NYU had provided detailed PICs for six of E.piphany's products, including Interaction Advisor. The undersigned reviewed the PICs for the other thirty-six products and questioned the adequacy of NYU's PICs for products without ruling on whether they were inadequate as E.piphany had not made any formal application to strike NYU's claims or compel more detailed PICs. While a plaintiff is not required to reverse engineer all the accused products, the courts have required other evidence of infringement in place of reverse engineering. For all other "accused products," NYU simply referred to the PIC charts for Interaction Advisor, and then contended that E.piphany had not produced sufficient information for NYU to complete the PIC charts. *See* Letter from NYU, November 1, 2005, Exh. A. In some cases, plaintiffs request specific *pieces* of source code for a particular

product. In comparison, NYU's request for all documents and complete source code for all forty products was strikingly broad and it has not made a showing of its alternative efforts to develop infringement contentions for those products for which it has not provided detailed PICs.

At the same time, E.piphany has the responsibility to produce information that NYU can use to substantiate its claims. Where a plaintiff's PICs are found to be adequate, the court will not stay discovery. *Teknowledge Corp. v. Akamai Tech., Inc.,* 2003 WL 23861926, at *1 (N.D.Cal. Oct. 21, 2003) ("Plaintiff has sufficiently identified the accused products, indicated where the elements of the asserted claims are found and specified where means-plus-function elements are found."). The court in *Teknowledge* cited Patent Local Rule 2-5, which was not specifically incorporated into Judge Swain's order but applies to discovery under the rules and provides that "it shall not be a legitimate ground for objecting to an opposing party's discovery request ... that the discovery request is premature ... or otherwise conflicts with, these Patent Local Rules."*Id.* E.piphany has not moved to strike NYU's PICs or compel further detail, but instead has continued to raise lack of detail as a defense to discovery.

*4 At the November 8, 2005 conference, the parties discussed this discovery dispute and came to an agreement: E.piphany would produce responsive documents for those six products for which NYU had presented more detailed PICs. These products were presented to the Court as part of a "suite" of documents for which Interaction Advisor was the backbone. *See* NYU Mem. at 18; E.piphany Mem. at 3. This Court then issued a ruling requiring E.piphany to produce responsive documents for Interaction Advisor and "related products." Apparently, E.piphany then did produce documents, but only those pertaining specifically to Interaction Advisor. At the time, the parties seemed to agree about which other products were subject to this order, but the agreement proved illusory.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 559573 (S.D.N.Y.)
(Cite as: 2006 WL 559573 (S.D.N.Y.))

As noted, NYU has focused its discussion here on the five products for which it provided more detailed PICs and which have been described as related to Interaction Advisor. E.piphany does not respond directly to the contention that this Court already ordered it to produce documents for those five products or that the parties agreed to their production. Instead, E.piphany argues that production on any product other than Interaction Advisor is unnecessary or unwarranted. First, E.piphany asserts that NYU's sole infringement contention pertains to "the functionality provided by [Interaction Advisor]." E.piphany Mem. at 6. E.piphany than argues that all forty products NYU has accused in its complaint may be sold in conjunction with Interaction Advisor and that producing the source code for all forty would be both burdensome and inappropriate given that NYU has not provided detailed infringement contentions for all those products. *Id.* E.piphany does not respond to NYU's contention that the five products it has listed are "related to Interaction Advisor."

E.piphany also argues that the source code for its "unrelated" products is a trade secret and that NYU carries the burden to demonstrate that production of the source code is necessary and relevant to this action. *Id.* at 7.*See Synopsis, Inc. v. Nassda Corp.,* 2002 WL 32749138, at *1 (N.D.Cal. Sept. 16, 2002) (finding that plaintiff had not demonstrated that the source code beyond the date of the pertinent patent application was both relevant and necessary and denying plaintiff's motion to compel). Again, E.piphany has not distinguished between the five products referred to in the November 8, 2005 conference as "related" to Interaction Advisor, and appears to lump all its other products in this "unrelated" category. Confidential information and trade secrets are covered by the protective order both parties have signed. Furthermore, this Court's previous order reflecting the parties' agreement that E.piphany would produce responsive documents only for those products for which NYU has presented detailed PICs limits the scope of production, undermining the claim of burden by E.piphany.

Consistent with this Court's November 8, 2005 order, NYU's motion to compel production of responsive documents for the following products is GRANTED: E.piphany Real-Time, E.piphany Sales and Service, E.piphany Customer Relationship Backbone, E.piphany Marketing/E-Marketing, and E.piphany E6 and E6.5 Suite which the parties represented as related to Interaction Advisor and for which NYU has presented detailed PICs. However, NYU's motion to compel responsive documents for the other E.piphany products for which NYU has not provided detailed PICs is DENIED.

B. Outstanding Production for Interaction Advisor

1. Software Architecture Documents

*5 At a conference on January 11, 2006, NYU complained that while E.piphany had produced source code for Interaction Advisor, it had not produced any of the "software architecture documents" which would facilitate analysis of the source code. E.piphany argues that to the extent any software architecture documents exist, those documents have been produced. E.piphany Mem. at 5. NYU argues that E .piphany has produced one document that "approach[es] the software architecture level of detail," which according to their expert Dr. Robert Grossman, indicates there are other such documents which E.piphany has failed to produce. Declaration of Dr. Robert Grossman in Support of NYU's Motion to Compel, ¶ 12. E.piphany contends that, as a small company, it has not had the time or resources to develop such documentation of the design process. E.piphany Mem. at 5. E.piphany submits a declaration from Maksim Kouznetsov, current development manager at SSA Global Technologies and former Manager of Analytics within Interaction Advisor at E.piphany. Declaration of Maksim Kouznetsov in Opposition to NYU's Motion, ¶ 6. He states that he has worked on the design of Interaction Advisor since 1998 and that defendants did not "create the complex documentation system hypothesized by Dr. Grossman."*Id.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 559573 (S.D.N.Y.)
(Cite as: 2006 WL 559573 (S.D.N.Y.))

At the January 11 conference, this Court ordered E.piphany to produce any such documents to the extent they exist. Therefore, with respect to such documents, NYU's motion is GRANTED. Should it later be discovered that other documents exist, but were not produced, E.piphany should note that "where ... the nature of the alleged breach of a discovery obligation is the non-production of evidence, a District Court has broad discretion in fashioning an appropriate sanction, including the discretion to delay the start of a trial ..., to declare a mistrial ..., or to proceed with a trial with an adverse inference instruction ... [which] may be imposed upon a party that has breached a discovery obligation not only through bad faith or gross negligence, but also through ordinary negligence." *Residential Funding Corp. v. Degeorge Fin. Corp.,* 306 F.3d 99, 113 (2d Cir.2002).

2. Versions of Interaction Advisor Other than 6.5

E.piphany has refused to produce source code of versions of Interaction Advisor sold prior to the date it received actual notice of NYU's claim of infringement, December 11, 2003. E.piphany Mem. at 8. E.piphany argues those versions are not relevant because it cannot be held liable for infringement before having actual notice since NYU has alleged indirect infringement which requires proof that defendants "knowingly induced" its customers' infringement. *Id.See Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 553 (Fed.Cir.1990). NYU contends it has also alleged direct infringement and that knowledge of its patent is imputed to potential infringers on the date the patent was issued. Plaintiff NYU's Reply Memorandum in Further Support of its Motions at 7. *See Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1219-20 (Fed.Cir.2002). NYU's Amended Complaint does allege both direct and indirect infringement. Amended Complaint ¶ 13-14. Whether NYU will be able to meet the burden of proof of direct infringement at trial should not be confused with E.piphany's responsibilities to produce materials in discovery. NYU's motion with respect to other ver-

sions of Interaction Advisor is GRANTED. E.piphany must produce source code and other documents for versions of Interaction Advisor dating back to the date NYU's patent was issued: May 22, 2001.

C. E.piphany's Preliminary Invalidity Contentions

*6 NYU asks the Court to compel E.piphany to provide Preliminary Invalidity Contentions and supporting documents relating to claims 1, 15, 25-34 and 37 of the '978 patent. At this point, E.piphany has provided such contentions solely for claim 25, which is the only claim E.piphany maintains NYU has properly asserted. E.piphany Mem. at 8. E.piphany points out that NYU's Preliminary Infringement Contentions are only detailed as to claim 25, obviating E.piphany's responsibility to respond with further Preliminary Invalidity Contentions. *Id.* For every other claim, NYU's PICS refer to claim 25 and states that E.piphany has not produced sufficient documents to allow NYU to provide further detail. Declaration of Timur E. Slonim in Support of NYU's Motion to Compel ("Slonim Decl."), Exhs. A-G.

NYU does not explain why claims 1, 15, 25-34, and 37 are targeted here. Nor does NYU explain how E.piphany is expected to respond to its additional claims despite the lack of detail in NYU's PICs. NYU merely points out that E.piphany has treated claims other than claim 25 as properly asserted by stating that claims "4, 5, 23, 34, 38, and 39 of the '978 Patent are also invalid" in E.piphany's Preliminary Invalidity Contentions submitted for claim 25, without stating the reasons for their assertion of invalidity. *Id.,* Exh. 11.

Pursuant to this order, NYU should receive the additional production it has been seeking on the five additional products mentioned above. Should NYU seek to amend its infringement contentions as a result of receiving this information, E.piphany will then be obligated to respond and amend its corresponding invalidity contentions. At this point, there-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 559573 (S.D.N.Y.)
**(Cite as: 2006 WL 559573 (S.D.N.Y.))**

fore, NYU's motion to compel E.piphany's additional Preliminary Invalidity Contentions is DENIED without prejudice.

### III. CONCLUSION

For the foregoing reasons, NYU's motion to compel production of responsive documents for the following products is GRANTED: E.piphany Real-Time, E.piphany Sales and Service, E.piphany Customer Relationship Backbone, E.piphany Marketing/E-Marketing, and E.piphany E6 and E6.5 Suite which the parties represented as related to Interaction Advisor and for which NYU has presented detailed PICs. However, NYU's motion to compel responsive documents for the other E.piphany products for which NYU has not provided detailed PICs is DENIED.

NYU's motion with respect to the production of documents pertaining to versions of Interaction Advisor is GRANTED: E.piphany must produce source code and other documents for versions of Interaction Advisor dating back to the date NYU's patent was issued: May 22, 2001. NYU's motion is also GRANTED with respect to software architecture documents to the extent they exist. However, NYU's motion to compel in regard to E.piphany's Preliminary Invalidity Contentions is DENIED without prejudice.

SO ORDERED

S.D.N.Y.,2006.
New York University v. E. Piphany, Inc.
Not Reported in F.Supp.2d, 2006 WL 559573 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 8

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2581777 (E.D.N.Y.)
(Cite as: 2007 WL 2581777 (E.D.N.Y.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
RATES TECHNOLOGY INC., Plaintiff,
v.
MEDIATRIX TELCOM, INC. and Media5 Corporation, Defendants.
No. CV 05-2755(JS)(AKT).

Sept. 5, 2007.

James B. Hicks, Hicks Park Law, LLP, Los Angeles, CA, David Lazer, Jennifer Marie Rosen, Zachary Murdock, Lazer, Aptheker, Rosella & Yedid, P.C., Melville, NY, for Plaintiff.

Daniel Carl Miller, Ethan Horwitz, King & Spalding LLP, New York, NY, for Defendants.

ORDER

A. KATHLEEN TOMLINSON, Magistrate Judge.

I. *PRELIMINARY STATEMENT*

*1 The subject of this Order has given rise to a series of motions to compel brought by both parties concerning the claim construction of the patents at issue here, namely, the @085 and '769 patents. A detailed factual and procedural history of this case is set forth in the Court's Report and Recommendation of March 16, 2007, familiarity with which is assumed for purposes of these motions. For the following reasons, Plaintiff's motions to compel [DE 94, 118] are hereby DENIED and Defendants' motion [DE 93] is hereby GRANTED, provided that Plaintiff does not fully and adequately respond to Interrogatory No. 3 within the time frame set forth herein.

II. *STANDARD OF REVIEW*

A motion to compel is entrusted to the sound discretion of the district court. *American Sav. Bank, FSB v. UBS Paine Webber, Inc.,* ( *In re Fitch, Inc.*), 330 F.3d 104, 108 (2d Cir.2003); *United States v. Sanders,* 211 F.3d 711, 720 (2d Cir.2000). The Second Circuit has noted that this is because a "trial court enjoys wide discretion in it handling of pretrial discovery, and its rulings with regard to discovery are reversed only upon a clear showing of an abuse of discretion."*DG Creditor Corp. v. Dabah,* ( *In re DG Acquisition Corp.*), 151 F.3d 75, 79 (2d Cir.1998) (citing *Cruden v. Bank of N.Y.,* 957 F.2d 961, 972 (2d Cir.1992)). A district court is considered to have abused its discretion "if it bases its ruling on a mistaken application of the law or a clearly erroneous finding of fact." *Milanese v. Rust-Oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001).

III. *DISCUSSION*

Although there are several motions to compel pending before the Court, the gravamen of the parties' arguments and the fundamental issue at stake here are the same and relate to the ongoing issue of specific Interrogatory responses which date to the beginning of this case but are still not resolved.

Defendants' letter motion [DE 93] seeks a "dismissal of this action with prejudice and attorney fees" based upon Plaintiff's failure to provide a response to Interrogatory No. 3 which calls for Plaintiff to identify on an "element-by-element basis" the "component, structure, feature, functionality, method or process of each accused Mediatrix product that allegedly satisfies each element ."[DE 93] Defendants argue that the severe sanction of dismissal is warranted because Plaintiff has repeatedly flouted the Orders of this Court by failing to adequately respond to this Interrogatory. In opposition, Plaintiff argues that it cannot produce in-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2581777 (E.D.N.Y.)
(Cite as: 2007 WL 2581777 (E.D.N.Y.))

formation which it does not have and asserts that it has "no further responsive information at this time."[DE 99] Plaintiff also adds that "the main reason RTI doesn't have further information is that Mediatrix won't meaningfully respond to RTI's own discovery (as detailed by RTI's pending motion to compel Mediatrix to answer interrogatories and produce documents)."*Id.* The motion to compel referred to by Plaintiff, docketed as entry 94, seeks Defendants' response to its Interrogatory Nos. 2 and 4 which, curiously, also seeks "an element-by-element analysis of RTI's infringement claims."[DE 94] Specifically, Plaintiff argues that:

*2 Mediatrix should be ordered, separately for each claim limitation of the Patents-in-suit that it identified in its original responses to RTI's Interrogatories Nos. 2 and 4, to state the basis for its contention that each of its accused products and services, and/or the telephone system to which they are connected, fails to meet such claim limitations, including by identifying on an element-by-element basis why they allegedly fail to meet such elements of those claim limitations.

*Id.* Plaintiff maintains that it is entitled to obtain this information through discovery in order to develop its infringement claims and supplement its pre-filing investigation. *Id.* In opposition to Plaintiff's motion to compel, Defendants argue that Plaintiff is seeking to have it "disprove infringement" which is not the appropriate standard here. Additionally, Defendants assert that it is impossible to answer "why" various claim elements are not present in the accused Mediatrix products and services because, as Defendants' answers states, Defendants' products physically lack the elements. [DE 100]

Plaintiff's letter motion to compel, docketed as entry 118, renews its prior motion to compel responses to Interrogatories Nos. 2 and 4 and seeks a response to Interrogatory No. 25 which requests the same information sought in Interrogatories Nos. 2 and 4.[FN1] Additionally, in this letter motion to compel, Plaintiff seeks a further response to Inter-

rogatory No. 25 which calls for a description of the factual basis of a statement made by defense counsel that Cablevision cut Gerald Weinberger's cable service due to so-called "erratic behavior." [DE 118] This information was brought to the Court's attention tangentially in earlier motion practice which the Court found "not germane" as noted in the Court's August 24 Order. [DE 70] I find that this information is still not relevant to any of the claims and defenses in this action. Accordingly, Defendants are not required to furnish a response to Interrogatory No. 25.

> FN1. Plaintiff's Interrogatory No. 25 provides: "Separately for each claim limitation of the Patents-in-suit that identified in original responses to Interrogatories Nos. 2 and 4, to state the basis for contention that each accused products and services, and/or telephone system to which they are connected, fails to meet such claim limitations, including by identifying on an element-by-element basis why they allegedly fail to meet such elements of those claim limitations."

Both parties seek to have the other provide an element-by-element claim construction analysis. Defendants seek to have Plaintiff show where the elements of the claims are found in the Mediatrix products at issue. Plaintiff seeks to have Defendants provide information (1) why their products do not infringe RTI's patents; and (2) specifically, why each of Defendants' claims fails to meet such claim limitations, including, on an element-by element basis, why they fail to meet such elements of those claim limitations. This issue is not new and has been revisited by the Court on several occasions. On November 4, 2005, Magistrate Judge Orenstein directed Plaintiff to provide detailed answers to these interrogatories by December 19, 2005. [DE 14] On January 19, 2006, Magistrate Judge Orenstein found Plaintiff's responses to be inadequate and ordered Plaintiff to properly respond by February 15, 2006. [DE 19] On July 20, 2006, the parties

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

appeared before me for a status conference at which time I also found that Plaintiff had not adequately responded to Defendants' Interrogatory Nos. 2 and 3 and granted Defendants' motion to compel as to these interrogatories. [DE 60] Further, I gave Plaintiff until August 28, 2006 to supplement its responses and emphasized that, based on the prior history of this issue, this is "Plaintiff's *final* opportunity to comply with this Court's orders and the rules of discovery. Should Plaintiff fail to do so, the Court will fashion an appropriate remedy."*Id.* (emphasis in original). Evidently, Plaintiff's counsel did not heed the Court's directives and this latest motion practice ensued.

*3 It is well settled that a prima facie case of literal infringement (which Plaintiff asserts is the basis of his infringement claim, as well as a claim of contributory infringement) requires the accused matter to fall clearly within the patent claim, and this means that "every limitation of a claim [must] be met to establish literal infringement." *Honeywell Int'l, Inc. v. United States,* 70 Fed. Cl. 424, 446 (Fed.Cl.2006) (quoting *Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.3d 1384, 1389 (Fed.Cir.1992)); *see also Angelo Mongiello's Children, LLC, v. Pizza Hut, Inc.,* 70 F.Supp.2d 196, 206 (E.D.N.Y.1999). As stated in *Honeywell,*"federal trial courts are to compare each of the 'properly construed' claims to the alleged infringing device." *Honeywell,* 70 Fed. Cl., at 446. "To prove literal infringement, the patentee must show by a preponderance of the evidence that the device accused of infringement contains every limitation in the asserted claims." *Windbrella Prods. v. Taylor Made Golf Co.,* 414 F.Supp.2d 305, 311 (S.D.N.Y.2006). Therefore, as stated in my July 20, 2006 Order, Defendants' counsel, in order to properly defend this case, has a right to know, on an element-by-element basis, every limitation of a claim that Plaintiff expects to proffer to establish literal infringement of the respective patents at issue here. Plaintiff is not relieved of this burden simply because it has requested the same information in a different way and filed motions to compel for the same relief.

Plaintiff is charged with the prosecution of this action and it is its sole responsibility to demonstrate infringement. *See Under Sea Indus., Inc. v. Dacor Corp.,* 833 F.2d 1551, 1557 (Fed.Cir.1987) (holding that "the burden is always on the patentee to show infringement"). A plaintiff in a patent infringement action is relieved of this burden only in certain limited circumstances as noted by the court in *New York University v. E.piphany, Inc.,* No. 05-CV-1929, 2006 WL 559573, at *3 (S.D.N.Y. Mar. 6, 2006). There, the court noted that parties in computer software infringement cases often find themselves in the following "Catch-22:"

Software cases present unique challenges for the parties and the courts because, prior to discovery, plaintiffs usually only have access to the manifestation of the defendants' allegedly infringing source code and not the code itself. From this manifestation, plaintiffs must somehow divine whether the defendants' code infringes. Although defendants vigorously and rightly guard their source code, until plaintiffs have access to it, plaintiffs are typically unable to give highly specified infringement contentions. To the extent defendants are given vague infringement contentions, they are hampered in their ability to prepare their defense.

*Id.* at *3 (quoting *Am. Video Graphics, L.P. v. Elec. Arts, Inc.,* 359 F.Supp.2d 558, 560 (E.D.Tex.2005)). The court noted that under these limited circumstances, a defendant may be required to provide source code for the software so that the plaintiff can be more specific about its claims. *Id.* at *3. But, as the court emphasized in *E.piphany, Inc.,* the plaintiffs may first be required to demonstrate that they exhausted all other ways of exploring potential infringement. *Id.* at *3 (citing *Connectel, LLC v. Cisco Sys., Inc.,* 391 F.Supp.2d 526, 528 (E.D.Tex.2005)).

*4 Although the allegations in the First Amended Complaint here make reference to certain "Unit Manager Network" and "IP Communications Server" software, this case is not entirely a computer

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2581777 (E.D.N.Y.)
(Cite as: 2007 WL 2581777 (E.D.N.Y.))

software infringement action nor have the parties ever asserted that access to Defendants' software source code is the root of the problem here. Indeed, the software issue here is tangential as shown by a copy of a March 15, 2005 opinion letter by consulting engineer Shlomo Shur which was submitted by Plaintiff in opposition to Defendants' Rule 11 motion. The letter states "I carefully reviewed and tested one of the Mediatrix ATA product series and I also reviewed the website literature of the other products and services ..."*See* Declaration of James B. Hicks, Esq. ¶ 5, Ex. D. In his letter, Shur offers the following,

it is my opinion that contributory and induced infringement are clearly present with the functionality of the Product. Direct infringement is also present, in so far as the Doctrine of Equivalents part of direct infringement; I cannot tell about literal infringement (the other part of direct infringement) until we can get discovery and I can see the schematics, firmware, software and electronics drawings of the product, so I will not at this time express my opinion about the literal infringement part of direct infringement.

*Id.*

Therefore, based on this letter and the discovery produced by Defendants thus far, which from the Court's perspective is substantial, Plaintiff should be able to make an element-by-element claim construction analysis at this point. It is routine practice in patent infringement actions to require a plaintiff to provide defendant with its claim construction. *See, e.g., Whitserve LLC v. Computer Patent Annuities,* No. 04-CV-1897, 2006 WL 1273740, at *3 (D.Conn. May 9, 2006); *Tritek Tech., Inc. v. United States,* 63 Fed. Cl. 740, 742 (Fed.Cl.2005); *Refac Int'l, Ltd. v. Hitachi, Ltd.,* 921 F.2d 1247, 1255 (Fed.Cir.1990). This case is no different.

Rule 37 provides in pertinent part as follows:

If a party ... fails to obey an order to provide or permit discovery, ... the court in which the action is

pending may make such orders in regard to the failure as are just, and among others the following:

....

(C) An order ... dismissing the action or proceeding ...

Fed.R.Civ.P. 37(b)(2)(C). This Rule 37 sanction lies within the broad discretion of the district court. *See, e.g., Corp. of Lloyd's v. Lloyd's U.S.,* 831 F.2d 33, 36 (2d Cir.1987)."[D]ismissal with prejudice is a harsh remedy to be used only in extreme situations, and then only when a court finds willfulness, bad faith, or any fault on the part of the [sanctioned party]." *Bobal v. Rensselaer Polytechnic Inst.,* 916 F.2d 759, 764 (2d Cir.1990). As the Supreme Court has noted, however, "the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *see also Update Art, Inc. v. Modiin Pub., Ltd.,* 843 F.2d 67, 73 (2d Cir.1988) (affirming magistrate judge's decision to award summary judgment against party who failed to comply with discovery orders: "[W]e wish to emphasize the importance we place on a party's compliance with discovery orders. Such compliance is necessary to the integrity of our judicial process. A party who flouts such orders does so at his peril. If one suggests that our decision today is strong medicine, that is precisely what it is intended to be.").

*5 Although Plaintiff repeats caselaw for the proposition that it is entitled to take discovery to support its claims, this action is well past the pleading stage and Plaintiff's ongoing history of noncompliance here borders on a finding that such action is willful. *See, e.g., Refac Int'l, Ltd.,* 921 F.2d at 1255 (holding that the extent of plaintiff's noncompliance

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2581777 (E.D.N.Y.)
(Cite as: 2007 WL 2581777 (E.D.N.Y.))

supports a willfulness finding and plaintiff's "inability to spell out a proper basis for charging infringement more than a year after bringing suit highlights its willfulness."). I find the best way to determine which claims are in dispute here is to have the party asserting infringement provide their interpretations to the alleged infringer so that the Defendant can determine which terms they agree on and which they do not. This is basic claim construction which Plaintiff should be able to provide at this juncture.

Consequently, in light of the above information and the prior orders of this Court, I am giving Plaintiff one final opportunity to respond to Defendants' Interrogatory No. 3. Plaintiff is directed to do so no later than September 27, 2007. This final opportunity is being given so as not to prejudice the Plaintiff's rights in this action. I am cautioning Plaintiff however, that this is indeed its last opportunity to comply with the directives of this Court and Plaintiff proceeds at its own peril. If a full and complete response is not provided to Defendants with respect to Interrogatory No. 3, I shall recommend to District Judge Seybert that this matter be dismissed pursuant to Fed.R.Civ.P. 37(b)(2)(C).

Finally, in its letter motion, docket entry 94, Plaintiff argues that:

Mediatrix should also be ordered to produce all of its product, technical and application manuals; part lists; electronics schematics, bills of material; systems and network diagrams' and software and firmware, in its accused gateways, edge routers, ATA devices, voice modems, IP and legacy PBX's, IP telephones, and core routers which comprise an IP system or network handling VoIP-type calls; and to organize and label its documents to correspond to RTI's requested categories.

In opposition, defense counsel argues that it has provided this information electronically and notes that Plaintiff's counsel advised him "that it could not open some of the electronic files that Mediatrix produced."[DE 100] Defendants' counsel notes that "he does not understand how Rates could claim that it does not have sufficient information to analyze Mediatrix's products without being able to open the files that Mediatrix produced."*Id.*

It appears that the parties have not engaged in the good faith "meet and confer" required under Local Civil Rule 37.3. Since this information is important to the claim construction issue, I am directing the parties to meet and confer to resolve this issue no later than September 14, 2007. If necessary, I am directing the parties are to meet and open the electronic files together so that the information contained therein may be accessed. If the parties have any issues they are directed to notify me immediately.

## IV. *CONCLUSION*

*6 Accordingly, Plaintiff's motions to compel [DE 94, 118] are hereby DENIED and Defendants' letter motion [DE 93] is hereby GRANTED provided that Plaintiff does not fully and adequately respond to Interrogatory No. 3 by September 27, 2007.

**SO ORDERED.**

E.D.N.Y.,2007.
Rates Technology Inc. v. Mediatrix Telcom, Inc.
Not Reported in F.Supp.2d, 2007 WL 2581777 (E.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.