1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF DELAWARE

 3     _____
       LEADER TECHNOLOGIES,      )
 4     INC., a Delaware          )
       corporation,              )
 5                               )
            PLAINTIFF,           )
 6                               )
         v.                      ) C.A. No. 08-862 JJF
 7                               )
       FACEBOOK, INC., a         )
 8     Delaware corporation,     )
                                 )
 9          DEFENDANT.           )
       _____
10
                         Thursday, May 28, 2009
11                       10:35 a.m.
                         Courtroom 4B
12
                         844 King Street
13                       Wilmington, Delaware

14     BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
                United States District Court Judge
15

16     APPEARANCES:

17              POTTER ANDERSON & CORROON, LLP
                BY:  PHILIP ROVNER, ESQ.
18
                KING & SPALDING LLP
19              BY:  PAUL ANDRE, ESQ.

20                      Counsel for Plaintiff

21              BLANK & ROME, LLP
                BY:  STEVEN L. CAPONI, ESQ.
22
                WHITE & CASE
23              BY:  HEIDI L. KEEFE, ESQ.

24                      Counsel for Defendant
```

Dockets.Justia.

1          THE COURT:  Now we have the group

2     from detention coming in.  You all are in the

3     enviable position of having a dispute that seems

4     to be continuing.  It's like the kid in class

5     that won't listen.  We can take care of this.

6               Want to announce your appearances?

7          MR. ROVNER:  Good morning, Your

8     Honor.  Phil Rovner from Potter Anderson.  And

9     with me from King and Spauling is Paul Andre.

10              THE COURT:  Good morning.

11              MR. CAPONI:  Good morning, Your

12    Honor.  Steve Caponi from Blank Rome, and with

13    me today is Heidi Keefe from White and Case for

14    Facebook.

15              Your Honor, Ms. Keefe has a little

16    laryngitis kicking in.

17              THE COURT:  Well, first of all, I

18    have to tell you -- well, in the brief in

19    opposition.  This is in this case.  Ms. Keefe's

20    brief.

21              What size font is that footnote

22    font?  I didn't think they made that.  What is

23    that?

24              MS. KEEFE:  Which one, Your Honor?

1             THE COURT:  All of them.  You have

2     this print.  I had to go to my ophthalmologist.

3     They thought it was me.

4             MS. KEEFE:  I think it's ten.  I

5     apologize, Your Honor.

6             THE COURT:  Don't apologize.  I

7     have fun up here.  Trust me.  This is all good.

8             What size is yours, Mr. Andre?

9             MR. ROVNER:  I believe ours is

10    eleven, Your Honor.

11            THE COURT:  Is that all the

12    difference is?  That's shocking.

13            Well, we're going to have an order

14    that says nothing less than eleven.

15            MS. KEEFE:  No problem.  That's

16    easy.

17            MR. ROVNER:  Your Honor, I think I

18    misspoke.  Ours is twelve, which is the same as

19    the body.

20            THE COURT:  Okay.  That's good to

21    know.  Twelve.  Making a note of that.  So I was

22    thinking I was getting a lot older all of a

23    sudden.

24            Seriously, we kind of knew this

1    was going to happen.  This is -- you know, I got

2    the note from the sixth grade teacher as you

3    came into the seventh.

4            She said, "This is what's going to

5    happen.  You have to be on top of it in

6    September."

7            Let me ask both of you, and we'll

8    start with the plaintiff.  Give me a description

9    of what a person of ordinary skill in this art

10    would look like.  And I know.  Believe me, I'm

11    not committing you to this.  I'm just interested

12    today in understanding that.

13            MR. ANDRE:  Your Honor, I think it

14    would be someone with a computer science degree,

15    maybe even an advanced degree like a master's or

16    doctorate, or someone who has a lot of computer

17    experience, industry experience.  Someone who

18    has spent a significant amount of time working

19    on the computer over the last ten, twenty years.

20            That would by my understanding of

21    someone skilled in the art as a layperson

22    reading or using Facebook.  I think a layperson

23    without those skills can understand these

24    claims.  You characterize it as two guys in a

1   dorm room.

2           I don't think it is overcomplex

3   technology, but for one skilled in the art, I

4   think a definition for validity purposes, it

5   would be that characterization I just gave.

6           THE COURT:  And with regard to the

7   case, this case at hand:  Pre-filing.  And I

8   don't want you to disclose anything prematurely.

9   This is just a yes or no.  Did you have a

10  consultation with potential experts?

11          MR. ANDRE:  Yes.

12          THE COURT:  Would they have been

13  academics or more toward the industry side?

14          MR. ANDRE:  It was both, Your

15  Honor, but primarily academics.

16          THE COURT:  Okay.

17          And with regard to the claims,

18  your papers tell me that -- and I always want to

19  be a careful reader -- you say in response to

20  their effort at discovery from you, with

21  interrogatory number one, that you've given them

22  your preliminary infringement analysis.

23          MR. ANDRE:  Yes, that's correct.

24          THE COURT:  Tell me why you use

1    the word "preliminary."

2              MR. ANDRE:  Your Honor, what we

3    know is what's available in the public.  So we

4    can look at the manifestation of the source

5    code, which is the web site.

6              So what we will do once we get

7    their technical information is take the back end

8    stuff and supplement our infringement

9    contentions.  That's why we use the word

10   "preliminary."

11             We know their web site functions

12   just as the claims dictate.  We can tell that by

13   looking at it.  What we don't know are what

14   components or modules are responsible for those

15   functions.

16             We don't know what components or

17   modules, for example, do the tracking or things

18   of that nature.  So these are preliminary

19   infringement contentions based on the public

20   information.

21             There are only two sources of

22   public information available to us:  Their web

23   site itself and API.  That's it.  So we used

24   those two sources to provide preliminary

1    infringement contentions.

2                We're probably borrowing a little

3    bit from the districts that have requirements

4    that you get preliminary infringement

5    contentions early in the case and then your

6    final later, once you get discovery.

7                THE COURT:  And the source code,

8    that is what will be, kind of, like, the step

9    off technical information?

10               MR. ANDRE:  The source code and

11   the technical documents in support of the source

12   code.

13               The way the source code is written

14   is, usually you have a design note.  And they

15   write the code based on that note.  Those two

16   sources of technical documents will give us all

17   we need to finalize our infringement

18   contentions.

19               This is unique to all software

20   cases, unless the code is open source of some

21   type or available to the public.

22               I think, Your Honor, one of the

23   points here is that the parties know the source

24   code is going to be produced in the case.  We've

1  negotiated it in the protective order.

2          THE COURT:  It's all a question of

3  timing, and what I hear all the time,

4  particularly in these cases, is, "as the

5  discovery evolves."  And I am never in tune with

6  that evolution, apparently.  But that's okay.

7          Let me ask Ms. Keefe some

8  questions.  Thank you.

9          If you could just start out

10  helping me with your idea of who might be a

11  person, by characteristics, skilled in the art.

12          MS. KEEFE:  At a very broad level,

13  Your Honor, I think I agree.  Someone with

14  computer science experience, whether that be

15  from industry experience or from a degree.

16          I think what we find in Silicone

17  Valley most times is that degrees are not the

18  arbiter of a person of skill since so many

19  computer scientists/software engineers come

20  straight out of high school and start working.

21  So it really is someone with some experience in

22  the field.

23          THE COURT:  Okay.  Now, I guess

24  the way I read your paper was that you felt that

1 you should get a -- I'll say in the first

2 instance -- the full contention of plaintiff

3 with regard to why they think they can accuse

4 you of infringement, and that what has been

5 produced in a -- quote, unquote -- preliminary

6 context doesn't help you because it doesn't

7 define the infringement issue.

8     MS. KEEFE:  That's exactly what

9 our point is, Your Honor, especially with

10 respect to the fact that they haven't linked any

11 of their infringement contentions with any of

12 the claim limitations or elements.

13     THE COURT:  You say you want a

14 limitation-by-limitation analysis.

15     MS. KEEFE:  Correct, that's what

16 our interrogatory asked for.

17     What the case law tells us is that

18 we know that there may be some aspects that are

19 back end that the code would be helpful to them

20 for.  Before we get to that point, they still

21 have to tell us everything that they know from

22 the publicly available information.  They

23 haven't done that.

24     In fact, we had a broad narrative

1     that wasn't linked to any limitations that

2     didn't link itself to any of the products on

3     Facebook's web site and therefore didn't tell

4     us, even, what code we needed to go and gather.

5            And instead, they've asked for all

6     of the codes for all of the Facebook web site

7     without telling us how that's linked in any way

8     to the claims.

9            So what we're asking for now, Your

10    Honor --

11           THE COURT:  What's the feeling

12    there?  That they're going to find some

13    additional infringement?

14           MS. KEEFE:  I'm sorry.  Could you

15    repeat that, please?

16           THE COURT:  What's the fear?

17           Say I order you to produce the

18    entire source code.  It's electronic.  You

19    produce it.  You have provisions in the

20    protective order.  What's the fear about that

21    production, particularly the protective order?

22           MS. KEEFE:  I think for any

23    software company, the first fear is simply

24    wanting to make sure that the amount of code

1    that gets out is limited to what's involved in

2    the case.  No matter how good the protective

3    order is, there's always human nature.  There

4    are always mistakes.  There are always things

5    that happen, and you can't unring that bell.

6              And that's not accusing anyone of

7    doing anything.  It's just protecting the

8    possibilities of potential problems.

9              Secondarily, Facebook's website is

10   terabytes worth of data.  Your Honor had a case

11   recently with a similar thing where the entire

12   source code was produced.  And immediately,

13   plaintiffs came back and said, "This is too big.

14   I need you to tell me the lines in here that do

15   X and Y."

16             And Your Honor rightfully said,

17   "You asked for all.  You get it."  What we're

18   hoping to forestall are any of those types of

19   problems.

20             We understand that our code is

21   going to be disclosed in this case.  If they can

22   show us that there are portions of our website

23   that legitimately track to their claim

24   limitations, we will provide that narrow scope

1    of source code.

2              We never refused to produce source

3    code.  We simply said, "Tell us what it is that

4    we're supposed to produce.  Not the whole site.

5    We need to protect our assets, but the things

6    that are relevant to this case."

7              And they have yet to come to that

8    hurdle.  They still haven't given us that

9    analysis.

10             I think the most striking thing,

11   if you read their interrogatory response, the

12   one that is --

13             THE COURT:  If I read their claims

14   and I was a person of skill by whatever

15   definition we use, you're telling me that I

16   could, from reading their claims, I could be

17   able to tell what portions of the source code I

18   want to see?

19             MS. KEEFE:  I think so, Your

20   Honor.

21             For example, one of the things

22   that's very striking about what they haven't

23   given us yet in the response itself --

24             The response itself is a broad

1    narrative.  Someone goes to Facebook and does

2    something, but it doesn't link it to any web

3    pages or any actual limitations.

4               In their letter and their

5    opposition papers, we're starting to suddenly

6    see an actual linkage to real things that are

7    happening.  We see for the first time a mention

8    of when a gift is given on Facebook.  It's the

9    gift, and how the gift is tracked.

10               If the interrogatory response was

11    that specific for the publicly-facing material,

12    we would be able to give them the back code that

13    allowed those publicly-facing things to happen.

14    So they would be asking for the very things that

15    they need by virtue of telling us what the

16    front-end facing components are.

17               In the claim, if you would review

18    the declaration of Mr. Gray --

19               THE COURT:  Do you have category

20    of bits?  Not you personally.  Does Facebook

21    have categories of bits in the source code?

22               MS. KEEFE:  I'm not 100 percent

23    certain that I understand what you mean.  If you

24    mean are there pods or modules that relate to

1  certain applications on the web site, then the

2  answer is yes.

3          What you can do, for example, with

4  an application like gifts, there is a string of

5  codes that affects gifts.  There are also

6  multiple other strings of codes and other

7  modules that have nothing to do with gifts that

8  affect other portions of the web site and how

9  they work.

10          So, yes, you can compartmentalize.

11          THE COURT:  How many modules are

12  there?

13          MS. KEEFE:  My client will be

14  angry that I don't know the number, but it is a

15  very large number.  And I know this from a

16  previous case that I worked on with them where

17  we had to parse through to find the module that

18  we needed.  And we went to them, got the module

19  that we needed with the attendant arms and limbs

20  that it touched into, and we were able do

21  produce that to the other side.

22          THE COURT:  Mr. Andre, if you saw

23  the list of modules, do you think that would

24  help you relate it to your claims?

1          MR. ANDRE:  Most likely, Your

2     Honor.

3               If they had some kind of a map of

4     their source code or the list of modules or

5     anything like, I'm sure that would be very

6     helpful to us, and we could probably limit it

7     from there.

8               We offered that to them, saying if

9     they tell us how categorize their source code,

10    how they -- everyone maps their codes so they

11    can find it easily.  Someone skilled in the art

12    can easily pinpoint places in the codes.

13               So if we had that, yes.  That

14    would be very helpful.  We could probably, as

15    long as they did somewhat of an accurate job of

16    labeling the modules, we would be able to do

17    that.

18               Your Honor, one of the things

19    we're concerned about, and Counsel raises it

20    several times a day, is if we give them an

21    example of infringement like the gifts, we don't

22    want just the application for the gift.

23               Our infringing contention is the

24    fundamental architecture of their website.  It's

1    a context component and tracking component and

2    other limitations in the claims.

3              Our concern is we can't give them

4    every single example of infringement.  There

5    would be hundreds of them because there's

6    hundreds of applications that run on this

7    architecture.

8              If we get the list of their

9    modules, we could probably look at that and

10   determine what part of the architecture would be

11   needed for us to look at.

12             With the protective order, there's

13   no worry at all about source code.  There's no

14   copies of it.  We're not going to be able to

15   print copies of it.  It's held in a secure

16   location at their office.  We examine it.  They

17   have someone there watching us as we examine it.

18   It's very safe.  I don't think there is any

19   threat at all that the source code is going to

20   get out to the public somehow.

21             THE COURT:  One of the things -- I

22   know you understand this, and that's a rational

23   argument.  But if you and I owned it --

24             MR. ANDRE:  Trust me, Your Honor,

1    I'm on both sides of the table involving

2    software.  I understand how proprietary

3    engineers get about this.

4              THE COURT:  You would be very

5    concerned about anybody looking at it.

6              MS. KEEFE:  Your Honor, I think

7    one of the things that we're missing here is the

8    limitation-by-limitation analysis that we still

9    don't have.

10             Mr. Andre keeps talking about not

11    wanting to be limited to an application.  He

12    hasn't even given one limitation-by-limitation

13    example of how the website infringes, telling us

14    which portion of our code would be affected.

15    Instead, we keep hearing "the platform."

16             The case law tells us it is the

17    plaintiff's burden to prove infringement at the

18    stage of showing an infringement contention,

19    showing how they believe someone infringes.

20    They do have to go limitation by limitation.

21             If they are contending, for

22    example, that the tracking software on the back

23    end or the storage aspect on the back end, which

24    are the two elements they've listed as back end,

1    we would be content to have them not say that,

2    and say this is in things that we don't have.

3                But they still have to tell us

4    where the rest of the user-facing things are

5    when they use the web site.  That will help us

6    determine which software to give them.  That's

7    what the case law says.

8                The case law says that the

9    Catch-22 we're talking about -- and the parties

10    actually agree.  It's a unique situation that

11    the parties agree on the case law that's

12    applied.  It's just that we disagree on whether

13    or not they've given sufficient notice.

14                THE COURT:  I have to ask you a

15    question because when I read these papers, why

16    would anybody think the case law is more

17    important than the rules?

18                I understand the case law guides

19    the decisions, but every patent case is

20    different.  And, well, that's why we don't have

21    patent rules here.  If you tried to apply them

22    across the board to every type of patent case

23    you get in, it doesn't work, is the result.

24                When you read the rules, what

1  happens is some judicial officer decides to

2  write about their view of how the rules should

3  be applied.

4            Let me ask this question of both

5  of you.  Do you think most of these discovery

6  decisions are informed or arbitrary?

7            MR. ANDRE:  In this court or other

8  courts, Your Honor?

9            THE COURT:  You can say here

10  because I think it's arbitrary.  I wonder what

11  lawyers and clients think.

12            I understand at other courts,

13  because judges talk at these conferences, I

14  think it's arbitrary.  Don't you think it's

15  arbitrary?

16            MS. KEEFE:  Sometimes I feel like

17  it's arbitrary, but sometimes I think there

18  really are underlying things that can inform

19  decisions.

20            For example, in this case, the

21  facts can inform what feels right and what seems

22  fair based on what the plaintiff is supposed to

23  do in a case and what the defendant is supposed

24  to do.

1          THE COURT:  What I think the most

2     interesting thing about this case is, from that

3     kind of point, is that -- and I think somebody

4     mentioned in the papers -- what was out there by

5     the Facebook folks before the inventors of these

6     claims.

7          I'm not asking for an answer, but

8     that's the kind of thing that's nuanced into

9     this, that, to me, if I were a businessperson or

10    on your side of the bench, it would drive me

11    nuts.

12          MS. KEEFE:  It's driving Facebook

13    nuts.

14          THE COURT:  I get that.  I

15    understand what you're telling me.  I don't find

16    the case law particularly helpful.

17          I just gave a talk on eBay.  eBay

18    didn't do anything but say what was being done

19    anyway, except they wanted to tell us what

20    exceptions they liked as opposed to what the

21    Federal Circuit likes.

22          It's the craziest thing, but they

23    have the equitable principles, which the trial

24    judge applied.  They have general principles

1     from Roberts, and then Kennedy tells you, "Watch

2     out for trolls."

3            It's same thing the Federal

4     Circuit said, just different words.  I don't

5     think that was any help at all for the trial

6     courts, what they told us.

7            I am concerned, both because I

8     think these claims are readable -- the

9     limitations are readable, even to me -- but I'm

10     also concerned about the property of Facebook.

11            I'll give you one more story.  I

12     was on the beach in Saint Thomas in January with

13     my family, and some guy starts talking to me.

14     And he winds up being the head of the computer

15     department at the University of Chicago where

16     they're building the world largest computer now.

17            And he's in charge of that

18     project, and he told me, when he heard I was

19     from Delaware and heard I was judge, he said,

20     "It's just terrible what's going on because

21     inventors can't get tribute, and people who have

22     property are getting abused."

23            He thought the whole thing was

24     crazy and didn't understand why we didn't have

1  people of technology come in and help us

2  regularly get rid of these disputes.  Everybody

3  is alerted to this.  It's a problem.

4  What I think we need to do to try

5  and make this a little bit informed and to let

6  it evolve a little bit, I think I would like

7  Facebook to produce that category list.  Then

8  I'd like to see how reasonable Mr. Andre is in

9  polling that list.  Does that make sense?

10  MS. KEEFE:  It does, Your Honor.

11  The only thing -- I'll go back to a rule instead

12  of going to case law.

13  THE COURT:  You can do both.  I'm

14  just being frank with you.

15  MS. KEEFE:  I absolutely

16  understand, and I agree with a lot of what Your

17  Honor said.

18  The rule, though, says that the

19  plaintiff is supposed to have the burden of

20  showing what's infringing.

21  THE COURT:  I know, but see,

22  you've got a dumb judge who thinks I've bought

23  into that preliminary showing.

24  MS. KEEFE:  We still don't know.

1 We even have a declarant with thirty years

2 experience.

3    THE COURT:  I had to start

4 somewhere with my arbitrariness.

5    I said, "Okay.  They've given

6 enough at this stage of the case, but that's not

7 enough to let them go full bore into Facebook."

8    MS. KEEFE:  We understand.

9    THE COURT:  I'm trying.

10    But I think you have to come up

11 with something, and I've kind of heard about

12 these modules or bytes or all different things.

13    I thought maybe if we got that

14 list and then I go back and see how reasonable

15 Mr. Andre wanted to be, and you can discuss this

16 between yourselves.  And then I'd have you back

17 if you couldn't agree.

18    MS. KEEFE:  I think that's

19 probably good.

20    THE COURT:  And then we see where

21 we go next.

22    MS. KEEFE:  Okay.

23    THE COURT:  Mr. Andre?

24    I'm trying to get you to stop

1    talking.  I'm getting nervous.

2              MS. KEEFE:  It's hard to do, Your

3    Honor.

4              MR. ANDRE:  Thank you.

5              Your Honor, that would be fine.

6    One of the things I do tend to agree with Your

7    Honor that these -- my general impression is

8    that discovery disputes are the biggest waste of

9    courts' resources and clients' moneys in the

10   civil litigation process.  I think a lot of

11   these rulings are arbitrary.  I do tend to agree

12   with you.  We're not trying to ask for the

13   world.  We just want --

14             THE COURT:  I didn't think you

15   were, but I can understand where they think that

16   you are.

17             MR. ANDRE:  Absolutely.  It is

18   something that if we have a map or list of

19   modules, we can pare that down and selectively

20   target those modules.

21             We can have our expert look at

22   them, and if he says, "Well, this is having a

23   call from another module," we'd like to be able

24   to back and say, "We need that module as well."

1     Because if it's calling information from another

2     module, we need that, obviously.

3             THE COURT:  Just so you know I'm

4     not totally off the wall, the reason I asked

5     those questions at the beginning, the next round

6     of this evolution, I may ask each of you to

7     bring in an expert to tell me why you want more

8     than they're willing to give and let their

9     expert tell me why you don't need it.  So we

10     have some information beyond legal argument.

11     Does that make sense?

12             MR. ANDRE:  It does, Your Honor.

13     If we get that and if we get the technical

14     documents in support of those modules as well,

15     once we identify them, that will take us almost

16     all the way to all the technical documents we

17     need anyway.

18             THE COURT:  Then you have to

19     become very firm in your infringement analysis,

20     limitation by limitation.

21             MR. ANDRE:  We think we've already

22     done limitation by limitation on a broad scale

23     based on public information.  We've done

24     everything we can do based on public

1    information.  We'll be glad to supplement

2    interrogatories and give them those limitation

3    by limitation.  No problem.

4              I think the bigger issue we're

5    going to have, obviously, is the fact that we're

6    going to have those discovery fights.  You heard

7    from the very first time we were in the

8    courtroom.

9              Just to give you an example, kind

10   of, like, Facebook, which is a magnitude larger

11   than my small client, has produced about 2,800

12   documents.  We've produced two-and-a-half times

13   that much already.  This constant pull to try to

14   get information is getting to be --

15             It's kind of what you said in the

16   earlier case today.  They can make us spend a

17   tremendous amount of money to try to pull out

18   every single document.

19             One of the things we were hoping

20   for on this motion, for example, we filed a

21   motion because they said they wouldn't give us

22   documents.  In their opposition, they give it to

23   us.  They said they weren't going to, then they

24   did.  So maybe it's moot now.  Some of these

1    categories are moot.

2             But the technical documents, we

3    don't want to have to come back here twenty

4    times because every single time we ask for

5    something, they put up a wall.  That's our

6    biggest concern, and that's what I'm most

7    anxious about, I guess.

8             We will be very precise on the

9    modules.  We won't go overbroad on this at all.

10            MS. KEEFE:  We've never, ever said

11    we're not going to give the documents.  We've

12    given over 100,000 pages.

13            If there is specificity to the

14    request for our documentation, it will be

15    forthcoming.  There is no I'm pulling it, and

16    you can't have it.

17            We've maintained our position

18    absolutely consistently.  The one thing I'm

19    worried about --

20            I don't want Facebook to be

21    trashed.

22            THE COURT:  Don't be so defensive.

23            MS. KEEFE:  I love my company.

24            The only other thing I am hearing

1    just a little bit, Your Honor, and I know this

2    is just going to be, whenever it comes out is

3    where it comes out.

4                    Mr. Andre seems to be saying,

5    "Once I identify that module, I want every

6    single thing about it, and then I'll keep coming

7    back for more and more and more before I stop

8    looking."

9                    One of the biggest points of us

10   bringing this motion was in order to start

11   moving forward in order for us to be able to do

12   a proper invalidity analysis to start looking at

13   claim construction.  We need to know what's

14   accused, and we do not still believe that we

15   understand what's accused.

16                    So I would just ask that there be

17   a little more give and take, that this just not

18   be, I give a module list, he picks two, then he

19   says he needs four, then six, then eight, and

20   we're still left with no supplementation.

21                    Instead, maybe after each time,

22   they have to supplement with additional

23   information they learned each time so that we

24   can keep moving this forward.  He seems to be

1    afraid of the fact that each supplementation is

2    a limitation.  I know that the rules state that

3    you can supplement interrogatories with newly

4    found information, so --

5              THE COURT:  The rules also say I

6    can enter an order saying no more

7    supplementation.  That's why I like the rules.

8              MS. KEEFE:  Rules are good.

9              THE COURT:  In American courts, we

10   don't follow them.  You'll get briefs in

11   discovery disputes, and it's all cases, and

12   nobody analyzes the rule.  Isn't that crazy?

13   Maybe not.  Call me crazy.

14             I can order no more

15   supplementation.  I can put that down.

16             You know what I'm going to do in

17   this case?  This case got started early, but I

18   think it's an interesting enough case.  I'm

19   going to put you in my little study.

20             MS. KEEFE:  Oh, no.

21             THE COURT:  Yes.  You're going to

22   like this.  You're not going to.  Maybe you

23   will.

24             There's a big push in the courts

1    for a whole lot of things in patent cases, some

2    of which is completely ill-advised, I think.

3    And to some extent, they're going to kill the

4    goose, which is not a good thing for you all, in

5    my view.

6              So -- and there's a lot of this

7    international push, that we do things like they

8    do it other places and why we have juries and

9    all sorts of stuff out there.

10             I'm going put you in the study

11   which is going to, kind of, address what you

12   just raised and also what you raised, Mr. Andre.

13             There's a little questionnaire I

14   have, and, for instance, I'll send you a letter

15   and then you can respond to it.

16             In camera, I'm going to ask you to

17   submit -- which means it doesn't go on the

18   docket, it's not available in the clerk's

19   office, it's only a chambers review document --

20   and I tag it to Rule 1 and Rule 16.  The word

21   "inexpensive."

22             Can you imagine that word is in

23   the rules?  It really is.  There's actually a

24   study commencing by an appellate judge, a guy

1    who was an appellate lawyer who's been a

2    district judge for five years or six years.

3    He's doing a study on patent cases in complex

4    litigation because in all his experience, he

5    figured out how do this.  Now he just needs some

6    statistics to support it.

7            He's polling lawyers and trial

8    judges, and this is another ill-advised effort

9    by our federal judicial center, in my view, to

10   destroy the practice for lawyers.  I think to

11   make it more inefficient.

12           I want you to send me a letter and

13   tell me what your client spent pre-Rule 16

14   conference to get to the Rule 16 conference,

15   both in fees and costs.

16           Then I want you to tell me in the

17   letter what the budget -- you don't have to

18   share this with each other.  It just comes to me

19   -- what the budget your client has for this case

20   to a verdict or whatever interval you've priced

21   the case.  A budget of the case.  Unless you're

22   on a fixed fee, it would be a budget.

23           And then at the end of the case,

24   I'm going to ask you to tell us what was

1  actually spent to get the verdict, and I will

2  tie that budget number, without being biased or

3  unduly influenced, to the amount of work I allow

4  to be done in the discovery phase and allow the

5  number of revitalizations of positions we'll

6  allow and supplementations by whether or not

7  we're tracking, to some extent, on the numbers.

8  And the other financial collision

9  we have going on is, you understand, even with

10  the limited resources that your clients may be

11  willing to spend on the this case or the

12  extensive resources they may be willing to

13  spend, you understand.  Do they understand?

14  And they don't.  That's why

15  they're whining to the Congress and all that

16  they're basically throwing that up against a

17  sole practitioner.  It's unbelievable.

18  To face, like, an -- even in that

19  patent pilot program we're talking about, for

20  them to seriously allow us to handle what is

21  thrown over this bench just in our patent cases

22  would require a staff of ten law clerks, some of

23  whom would have to have technical backgrounds.

24  They don't get any of that.  They look at you

1    like you're crazy.

2              But then you ask them, "How many

3    associates do you have employed in this case as

4    we go to trial?"  Or staff and associates.  I've

5    never heard less than double digits.  Never.

6              So maybe we could use this case as

7    one of our shining ten to twelve examples of how

8    you can get cases through, stay on budget, if

9    the court has knowledge.  Then you have

10    different mechanisms like we do here.  There are

11    some other things we'll tag, time to resolve

12    discovery disputes.

13              But I'll send you the whole

14    questionnaire and the data we're going to

15    collect.  You're now in that study.

16    Congratulations.

17              MR. ANDRE:  Sounds like fun.

18              MS. KEEFE:  Thank you, Your Honor.

19              THE COURT:  At least you can tell

20    the client we're mindful.  We're not out there

21    in left field with no understanding of what

22    they're going through and what you're going

23    through to get the litigation completed as far

24    as both sides and to resources.

1           I'm going to deny all the pending

2    motions as moot and order the production just on

3    the transcript.  I'm not going to enter a second

4    order of the categories.

5           When do you think you can get

6    those?

7           MS. KEEFE:  I'm actually traveling

8    this whole week.  If Your Honor would give me

9    until -- not the week of June 1st -- the

10   following week, mid week.  I would be able to go

11   to my client --

12          THE COURT:  That's the week of

13   June 15th.  That's the Monday.  So we'll say

14   produce it by the 19th of June.  That's the end

15   of that week, and you can have a reasonable

16   extension.

17          MS. KEEFE:  Yes, Your Honor.

18   Thank you, Your Honor.

19          MR. ANDRE:  Your Honor, I think

20   that's -- with the production they made with

21   their opposition, there was a category of

22   documents where their affirmative defense is

23   they said they produced everything, so we're

24   okay with that.  We don't want eleventh hour

1    surprises, obviously.  But that's fine.

2              There was also a category of

3    document requests for sales and marketing.  They

4    told us they produced those to us.  We haven't

5    had a chance to look at 100,000 pages of

6    documents.  If we start taking depositions and

7    realize they didn't produce a lot of these

8    documents, we would like to have it on the

9    record that we can renew that portion of the

10   motion in some formal way, re-filing the motion

11   or with a less formal letter brief to Your Honor

12   asking for a teleconference.

13             A good example, Facebook announced

14   in the news they just got a $200 million

15   financing based on a $10 billion valuing of the

16   company.  I don't know if that kind of

17   information is going to be useful information

18   because George Pacific factors, not that any

19   marked projections and stuff would be useful.  I

20   don't know.

21             We will want that type of

22   information from them if it's relevant to our

23   case.  We want some process in place where we

24   can come back to Your Honor if we review the

1    technical documents and don't think they are

2    complete.  They are the tenable documents I

3    think Your Honor has handled.

4                The fourth category, and this is

5    something that we haven't mentioned today, is

6    the documents in the previous litigations.

7    There's two litigations in particular, one

8    involving trade secrets and another involving

9    patent infringement.

10                In those cases, source code was

11    produced.  We've seen some of the deposition

12    testimony from the founder of the company.  It's

13    on the web.  We're finding it very relevant to

14    our case.

15                Their position has been those two

16    litigations don't involve our patent; therefore,

17    it's not relevant.  It involves their

18    technology.

19                In those previous litigations,

20    they made admission about their technology, they

21    made other positions that we think would be very

22    relevant.  Their only objection for not

23    producing it is on the relevancy ground.

24                We don't think there will be any

1    burden to producing deposition transcripts,

2    discovery responses, and relevant documents from

3    those litigations without implicating third

4    parties.

5              We want Facebook's information

6    from those litigations.  We don't think there's

7    any burden.  We think it's highly relevant.

8              That's one issue we'd like to

9    bring to the Court's attention today.  There

10   will be motion papers, as well.

11             THE COURT:  Right.

12             MS. KEEFE:  On taking them

13   backwards, on the prior litigations, we're back

14   to the same problem of Facebook's technology.

15   It's everything on our web site.

16             I actually would prefer that we

17   revisit this issue after we identify which

18   source code is going to be produced so we can

19   see if those cases actually did, in fact, touch

20   on the technology in these cases, so we're not

21   just doing a but you're Facebook and there was

22   technology at issue, so it must be at issue in

23   this case.

24             So far, that's all we have, is

1    that it's relevant because it's about Facebook

2    and about how Facebook developed.

3            Once the technology -- a broad,

4    broad category -- is circumscribed by virtue of

5    this exchange that we're going to do now, I

6    think we can revisit the issue and tell whether

7    or not those cases are, in fact, related.  And

8    if they are, we'll produce them.

9            THE COURT:  Since you're in the

10   study with the test group, you're -- in the test

11   group, you will be --

12           I'm going to order this category

13   production by June 19th, but you're going to be

14   with Judge Stark, and you're not going to have

15   to follow the Motion Day procedure.

16           He has agreed to work with me on

17   this study, and, actually, since he's a younger

18   person and much brighter, he's going to be the

19   one that goes out and talks about the study, I

20   think.

21           He's out in Berkeley right now at

22   the program run by Professor Munell.  He'll be

23   back this weekend.  You'll be able to call him

24   up and present discovery disputes, and he's

1    tracking the time it takes to resolve them and

2    what you present.

3            And then if you have an objection

4    to his ruling, it'll come up to me, and I'm

5    going to schedule it on the telephone.  So I'm

6    going to agree with you.

7            Let's get the June 19th -- I don't

8    want to be inconsistent in the rulings since

9    he's going to be taking as part of this group.

10    Let's get that produced first, and then we'll

11    take up these, Mr. Andre.

12            MR. ANDRE:  That's fine, Your

13    Honor.

14            THE COURT:  And you'll have very

15    good access to him because we've limited the

16    cases, and we have this two-page data poll.

17    And, of course, Judge Stark will want to look

18    good, so I think he's going to have everything

19    resolved in five days.

20            I think it's going to be good to

21    see what you can do, and -- you know what the

22    other part of that is?  You have to hire a

23    person to handle mediation.  We don't care if

24    you go there because you both have to agree to

1      go to mediation.

2                      We want you to put somebody on

3      board and then we'll give you a reporting

4      interval.  It will probably be every ninety

5      days, and you can report to us that we didn't

6      meet, so it doesn't cost anything.

7                      We're tracking it through various

8      stages of discovery and then right up to the

9      trial.  But if you do meet, and you say, "We

10     met.  Progress made.  Progress not made."

11     That's all we want.

12                     Since we're putting all these

13     financial resources -- again, we have this

14     financial collision with Judge Stark and myself

15     into these cases.  We felt that that was

16     something that was the least cost that we could

17     move out, and what could it cost you to retain

18     somebody?  $1,000 or $500 a piece?

19                     And you can select them from the

20     list of people we have here.  You can't use one

21     of the judicial officers.  Someone asked me

22     could they go to Vice Chancellor Parsons, who

23     was a patent litigator at Morris Nichols.  He's

24     at the Chancery Court, and they have a program

1    where they mediated intellectual property.  You

2    can go to him, or you can agree on somebody

3    that's in Silicone Valley.  I don't care.

4              MS. KEEFE:  Could we use a JAMS

5    mediator?

6              THE COURT:  Sure.  Whatever you

7    want.  That's the point.  You get them.  You

8    decide what to pay them, and we're out of that.

9              But, we're fulfilling our ADR

10   obligation, and we're not imposing costs on you

11   and not sapping resources here meeting every --

12   the only thing we're going to tell you is how

13   often we're suggesting you report this on

14   anything you've done in that regard.  It's

15   strictly up to the parties to engage it.

16             MS. KEEFE:  That's easy, Your

17   Honor.

18             THE COURT:   We're interested in

19   getting to a trial.

20             MS. KEEFE:  That sounds easy.

21   Only one other question, and that is, with

22   respect, we actually have, just to please Your

23   Honor, we've filed a second motion to compel

24   already.  Would you like us to now address that

1    to Judge Stark?

2              THE COURT:  That would go to Judge

3    Stark.  I'm not trying to get rid of it.  I

4    think you're going to find this test group --

5    we're trying to find a way to expeditiously and

6    inexpensively move patent cases through courts,

7    so I think this is actually going to be less

8    arbitrary and more informed for you and get you

9    to the trial date more efficiently.

10             MS. KEEFE:  So for this second

11   motion, it was on Your Honor's calendar for

12   June 18th, is that now on Judge Stark's

13   calendar?

14             THE COURT:  We'll send it down to

15   Judge Stark.  You don't have to use the patent

16   Motion Day procedure in your case.  You're going

17   to have access to him by phone call or whatever

18   he sets up with you.

19             He's going to be tracking volume

20   and that type of thing, which is something you

21   both raised.

22             MS. KEEFE:  Thank you, Your Honor.

23             THE COURT:  Any other questions?

24             MR. ANDRE:  No, thank you.

1          MS. KEEFE:  No, thank you very

2     much.

3          THE COURT:  You talked me into

4     putting you in that group.  I think it's going

5     to be good for this case, and it'll get you,

6     hopefully, better decisions and get them more

7     expeditiously.

8          But there is that one order, so

9     ordered on this transcript, for June 19th.

10    We'll be in recess.

11          (Proceeding ended at 11:15 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

C E R T I F I C A T I O N

        I, DEANNA WARNER, Professional
Reporter, certify that the foregoing is a true and
accurate transcript of the foregoing proceeding.

        I further certify that I am neither
attorney nor counsel for, nor related to nor employed
by any of the parties to the action in which this
proceeding was taken; further, that I am not a
relative or employee of any attorney or counsel
employed in this case, nor am I financially
interested in this action.


_____
DEANNA WARNER
Professional Reporter and Notary Public