IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LEADER TECHNOLOGIES, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 08-862-JJF |
| | : | |
| FACEBOOK, INC., | : | |
| | : | |
| Defendant. | : | |

---

Paul J. Andre, Esquire, and Lisa Kobialka, Esquire of KING &
SPALDING LLP, Redwood Shores, California.
Philip A. Rovner, Esquire of POTTER ANDERSON & CORROON LLP,
Wilmington, Delaware.

Attorneys for Plaintiff.

Heidi L. Keefe, Esquire; Mark R. Weinstein, Esquire; Jeffrey
Norberg, Esquire; and Melissa H. Keyes, Esquire of COOLEY GODWARD
KRONISH LLP, Palo Alto, California.
Stephen L. Caponi, Esquire of BLANK ROME LLP, Wilmington,
Delaware.

Attorneys for Defendant.

---

**MEMORANDUM OPINION**

March __9__ , 2010
Wilmington, Delaware

Farnan, Joseph J. Farnan, District Judge.

Plaintiff Leader Technologies, Inc. ("Leader") filed this action against Defendant Facebook, Inc. ("Facebook") alleging infringement of United States Patent No. 7,139,761 (the "'761 patent" or the "patent-in-suit"). The parties briefed their respective positions on claim construction, and the Court conducted a Markman hearing on the disputed terms. This Memorandum Opinion provides constructions of the disputed terms.

## I.   Background

The patent-in-suit is entitled "Dynamic Association of Electronically Stored Information With Iterative Workflow Changes." It relates to the "management and storage of electronic information," and specifically relates to "new structures and methods for creating relationships between users, applications, files and folders." '761 patent, col. 1:20-24. At the core of their dispute, the parties have very divergent understandings of the technology covered by the '761 patent. Leader maintains that the '761 patent discloses a system which automatically captures environmental and tracking information on a document uploaded by a user, so that other users can search for the information associated with the document, and access the document from a central repository without having to know the document's exact location. (D.I. 179, at 3-4; D.I. 196, at 3.) In contrast, Facebook contends that the '761 patent discloses a system in which data created by a user is automatically tethered

to the user, so that when the user moves to a new location, the change in user context is captured dynamically, and the data is automatically available to the user in the new location. (D.I. 191, at 3-4.)

## II. Legal Principles of Claim Construction

Claim construction is a question of law. Markman v. Westview Instruments, Inc., 52 F.3d 967, 977-78 (Fed. Cir. 1995), aff'd, 517 U.S. 370, 388-90, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996). When construing the claims of a patent, a court considers the literal language of the claim, the patent specification and the prosecution history. Id. at 979. Of these sources, the specification is "always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed. Cir. 2005)(citing Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). However, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004)(citing Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002).

A court may consider extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises, in order to assist it in understanding the underlying technology, the meaning of terms to one skilled in the art and how the invention works. Phillips, 415 F.3d at 1318-19; Markman, 52 F.3d at 979-80 (citations omitted). However, extrinsic evidence is considered less reliable and less useful in claim construction than the patent and its prosecution history. Phillips, 415 F.3d at 1318-19 (discussing "flaws" inherent in extrinsic evidence, and noting that extrinsic evidence "is unlikely to result in a reliable interpretation of a patent claim scope unless considered in the context of the intrinsic evidence").

In addition to these fundamental claim construction principles, a court should also interpret the language in a claim by applying the ordinary and accustomed meaning of the words in the claim. Envirotech Corp. v. Al George, Inc., 730 F.2d 753, 759 (Fed. Cir. 1984). The ordinary and accustomed meaning of claim terms denotes the meaning that a person having ordinary skill in the pertinent art would ascribe to the terms in the context of the entire patent, including its specification. Phillips, 415 F.3d, at 1313. If the inventor clearly supplies a different meaning, however, then the claim should be interpreted according to the meaning supplied by the inventor. Markman, 52 F.3d at 980 (noting that patentee is free to be his own

lexicographer, but emphasizing that any special definitions given to words must be clearly set forth in patent). If possible, claims should be construed to uphold validity. In re Yamamoto, 740 F.2d 1569, 1571 (Fed. Cir. 1984) (citations omitted).

## III. Term Construction

Leader alleges that Facebook infringes 27 of the 35 claims of the '761 patent. The parties were unable to agree on a set of representative claims for claim construction. (See D.I. 176, 177.) Leader contends that most claims of the '761 patent do not require construction, and accordingly asks the Court to construe five terms from the asserted claims. (D.I. 179, at 1.) Facebook initially sought construction of 31 additional terms, and argued that Leader's failure to identify the "plain and ordinary meaning" of terms which Leader contends do not require construction "virtually ensure[d] that the parties [would] attempt to present claim construction evidence at trial." (D.I. 191, at 8.) At the Markman hearing, the Court advised the parties that "claim construction evidence" would not be presented at trial, and the Court would entertain a party's motion to strike if experts disagreed on the plain and ordinary meaning of claim terms. (See D.I. 269, Tr. at 60:8-63:7; 101:18-104:14.) Thereafter, by letter dated January 22, 2010, Facebook narrowed its proposed list of claim terms requiring construction to three terms. (D.I. 219.) By letter dated January 29, 2010, Leader

4

contends that the three terms identified by Facebook do not require construction, as they are understood by one of ordinary skill in the art. (D.I. 224.)

The parties agree that the following five claim terms require construction: 1) "context"; 2) "component"; 3) "ordering"; 4) "traversing"; and 5) "many-to-many functionality." The three additional terms for which Facebook seeks construction are: 1) "dynamically"; 2) "metadata"; and 3) "access." (D.I. 219.) For the reasons discussed, the Court construes the disputed terms as follows:

## A. Context

| Leader's Construction | Facebook's Construction |
|------------------------|--------------------------------------|
| Environment | A collection of interrelated webs |

The term "context" appears in Claims 1-8, 23-26, 29, and 31-34. Leader contends that the meaning of the term " context" can be understood by reference to the intrinsic evidence. (D.I. 179, at 6-7.) Specifically, Leader contends that the terms "context" and "environment" are used interchangeably throughout the specification. (Id.) Facebook responds that "context" and "environment" are not used interchangeably in the specification, and further, that the doctrine of claim differentiation dictates that these two terms must have different meanings. (D.I. 191, at 13-14.) Facebook contends that the specification actually

supports its proposed construction, and makes clear that "contexts" are used to organize the interrelated webs that sit beneath them. (Id. at 13.)

In the Court's view, Leader's proposed construction has stronger support in the specification. In describing Figure 9, the specification states, "[u]nder the context level 904 is the web level 906 that associates one or more of the webs with one or more of the contexts of the context level 904." '761 patent col. 12:10-20. Facebook argues this supports defining "context" to mean "a collection of interrelated webs."

While the specification clearly dictates that the one or more of the contexts of the context level associates with one or more of the webs of the web level, it is not clear that the associated webs must be "interrelated," or that there must be a "collection" of webs. In contrast, Leader's proposed construction of "context" is supported by this language in the specification:

> [W]hen a user logs-in to the system 100, user data 102 is generated and associated with at least the user and the login process. The user automatically enters into a user workspace or a first context 104 (also denoted CONTEXT.sub.1) or environment. This environment can be a default user workspace, or a workspace environment predesignated by the user or an administrator after login, for example.

'761 patent, col. 6:26-333. Facebook focuses on the word "or" to contend that the three terms are not used as synonyms, but rather, as different constructs. Facebook's position is

6

untenable, however, when this portion of the specification is read as a whole.

Turning to Facebook's claim differentiation argument, the doctrine of claim differentiation is "based on 'the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scopes.'" Anderson Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1369 (Fed. Cir. 2007) (citing Karlin Tech. Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971-72 (Fed. Cir. 1999)). The Federal Circuit has observed that two considerations generally govern the doctrine of claim differentiation when applied to two independent claims: "(1) claim differentiation takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous; and (2) claim differentiation 'can not broaden claims beyond their correct scope.'" Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1381 (Fed. Cir. 2006)(citing Fantasy Sports Props. v. Sportsline.com, 287 F.3d 1108, 1115-15 (Fed. Cir. 2002)).

In relevant part, Claim 1 of the '761 patent claims:

1.   A computer-implemented network-based system that facilitates management of data, comprising:
    a computer-implemented **context** component of the network-based systems for capturing **context** information . . . created by user interaction of a user in a first **context** of the network-based system, the **context** component dynamically storing the **context** information in metadata associated with the user-defined data . .

7

> .; and
>
> a computer-implemented tracking component . . . for
> tracking a change of the user from the first **context** to
> a second **context** of the network-based system . . .
> wherein the user accesses the data from the second
> **context**.

'761 patent, col. 20:63- 321:21 (emphasis added).  In relevant

part, Claim 9 of the '761 patent claims:

9.   A computer-implemented method of managing data,
     comprising computer-executable acts of:
   creating data within a user **environment** of a web-based
     computing platform via user interaction with the user
     **environment** by a user using an application . . .;
   dynamically associating metadata with the data, . . .,
     the metadata includes information related to the user,
     the data, the application, and the user **environment**;
   tracking movement of the user from the user **environment**
     of the web-based computing platform to a second user
     **environment** of the web-based computing platform; and
   dynamically updating the stored metadata with an
     association of the data, the application, and the
     second user **environment**, wherein the user employs at
     least one of the application and the data from the
     second **environment**.

'761 patent, col. 21:38-58 (emphasis added).

     Facebook contends that, under the doctrine of claim

differentiation, the use of different terms in these Claims

indicates that the terms "context" and "environment" should have

different meanings.  (D.I. 191, at 14.)  Leader responds that

Claim 9 refers to "user environment," not simply "environment."

(D.I. 196, at 7.)  Further, Leader notes that dependent Claim 4

requires that "context information" includes "user environment."

'761 patent, col. 21:22-24.  According to Leader, because Claim 1

is necessarily broader than Claim 4, "context" (i.e.,

8

"environment") is broader than, and not identical to, "user environment." (D.I. 196, at 7.)

The Court is not persuaded that Leader's proposed construction runs afoul of the doctrine of claim differentiation. First, if every reference to "context" in Claim 1 is replaced with "environment," the scope of Claim 1 does not appear to be broadened. Second, if every reference to "context" in Claim 1 is replaced with "environment," Claims 1 and 9 do not appear to be totally identical in scope. As noted by Leader, Claim 9 specifically references "user environment" rather than merely "environment," and dependent Claim 4 dictates that "context" information (or "environment" information, if Leader's proposed construction is adopted) includes a relationship between the user and user environment. Third, even if independent Claims 1 and 9 were made to have similar scopes as a result of construing "context" to mean "environment," case law suggests that the doctrine of claim differentiation does not necessarily prevent two independent claims which use different terminology from having similar scopes. See Hormone Research Found., Inc. v. Genentech, Inc., 904 F.2d 1558, 1567 n.15 (Fed. Cir. 1990)(noting that, although the doctrine of claim differentiation is well-established, it "cannot overshadow the express and contrary intentions of the patent draftsman. It is not unusual that separate claims may define the invention using different

9

terminology, especially where (as here) independent claims are involved.") Finally, claim differentiation is "not a hard and fast rule and will be overcome by a contrary construction dictated by the written description of prosecution history." Seachange Int'l, Inc. v. C-COR, Inc., 413 F.3d 1361, 1369 (Fed. Cir. 2005). For the reasons set forth above, the Court concludes that construing "context" to mean "environment" is dictated by the specification, and thus, the specification should prevail over claim differentiation principles. Accordingly, the Court concludes that "context" means "environment."

**B. Component**

| Leader's Construction | Facebook's Construction |
|---|---|
| A computer-related entity, either hardware, a combination of hardware and software, software, or software in execution | The term "component" should be construed in reference to three specific components identified in the asserted claims: "tracking component"; "storage component"; and "context component" |

The term "component" appears in Claims 1-3, 5, 9, 17, 23, 29, and 32. Leader contends that its proposed construction of "component" is identical to the definition in the specification, which is dispositive because the patentee can act as his own lexicographer. (D.I. 179, at 8.) Facebook does not provide a proposed construction for the term (see D.I. 191, at 25), and does not dispute that the patentee has defined the term

10

"component" in the specification as follows: "As used in this application, the terms "component" and "system" are intended to refer to a computer-related entity, either hardware, a combination of hardware and software, software, or software in execution." '761 patent, col. 5:54-57. Rather, Facebook contends that "component" is never used in isolation, and always appears in the phrases "context component," "tracking component," and "storage component". According to Facebook, all three terms are means-plus-function claim terms, and all three terms are indefinite because the specification fails to identify algorithms to perform the claimed functions. (D.I. 191, at 26-30.) Therefore, the parties' dispute centers on whether means-plus-function treatment is appropriate.[1]

35 U.S.C. § 112(6) provides that "an element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in

_____

[1]Facebook also states that the explicit definition of "component" in the specification is so "broad and amorphous . . . as to render it almost entirely meaningless." (D.I. 191, at 25.) While the definition is expansive, it is well-settled law that a patentee is free to be his or own lexicographer as long as "any special definition given to a word [is] clearly defined in the specification." E.g., Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995). To the extent Facebook contends that the Court should disregard the patentee's definition of "component" solely for its breadth, Facebook has provided no authority to support such a contention.

the specification and equivalents thereof." 35 U.S.C. § 112(6).
Section 112, ¶ 6 applies only to "purely functional limitations
that do not provide the structure that performs the recited
function." Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,
469 F.3d 1005, 1023 (Fed. Cir. 2006)(citing Phillips, 415 F.3d at
1311). In determining whether a claim element is subject to
Section 112, ¶ 6, a court considers the phrasing of the element.
Use of the word "means" creates the presumption that a claim is
employing means-plus-function language, and therefore, that
Section 116, ¶ 6 applies. Id. Its absence creates a presumption
to the contrary. Id. The presumption that a claim term is not a
means-plus-function term "can be rebutted 'by showing that the
claim term element recite[s] a function without reciting
sufficient structure for performing that function." Id. (citing
Watts v. XL Sys., Inc., 232 F.3d 877, 880 (Fed. Cir. 2000)).

Facebook recognizes that the term "means" is not used with
these terms in any of the claims, which gives rise to the
presumption that none of the three terms are means-plus-function
terms. (D.I. 191, at 26, 28, 29.) However, Facebook contends
that the presumption is overcome because "component" is a generic
term that does not connote structure to one of ordinary skill in
the art, and the modifying terms "context," "tracking," and
"storage" do not provide additional structural identification.
(Id.) In response, Leader contends that Facebook ignores both

12

the specification and the claim language in that the patentee explicitly defined "component" in the specification, and described each of the three types of components in the claims. (D.I. 196, at 5.) Further, Leader contends that the patentee explicitly used means-plus-function language in Claim 22, and therefore, would have done so with respect to these three terms if they were intended to be means-plus-function terms. (Id. at 5-6.)

The Court concludes that Facebook has not overcome the presumption against means-plus-function treatment, and that "context component," "tracking component," and "storage component" should be not construed as means-plus-function terms. With respect to the term "context component," Claim 1 claims "a computer-implemented **context component** of the network-based system." '761 patent, col. 20:65-66 (emphasis added). Claim 23 claims "a computer-implemented **context component** of a web-based server." '761 patent, col. 23:22-23 (emphasis added). With respect to the term "tracking component," Claim 1 claim "a computer-implemented **tracking component** of the network-based system." '761 patent, col. 21:7-8 (emphasis added). Claim 23 claims "computer-implemented **tracking component** of the web-based server." '761 patent, col. 23:31-32 (emphasis added). With respect to the term "storage component," Claim 9 claims "the data and metadata stored on a **storage component** of the web-based

13

computing platform." '761 patent, col. 21: 44-46 (emphasis added). Claim 17 claims "storing in a **storage component** ordering information." '761 patent, col. 22:28 (emphasis added). Claim 23 claims "storing the context data as metadata on a **storage component** of the web-based server," and "storing the change information on the **storage component** [of the web-based server] as part of the metadata." '761 patent, col. 23:27-29, 35-36 (emphasis added). Upon consideration of the phrasing used in the Claims, the Court concludes there is sufficient structural identification for each of the three terms. Because means-plus-function treatment is not appropriate, "component" is explicitly defined in the specification, and Facebook has not otherwise proposed a construction for the term, the Court concludes that "component" means "a computer-related entity, either hardware, a combination of hardware and software, software, or software in execution."

### C.   Ordering

| Leader's Construction | Facebook's Construction |
|---|---|
| Organizing | Placing into a fixed sequence |

The term "ordering" is recited in Claim 17. Leader proposes that "ordering" be construed to mean "organizing" because the terms are used interchangeably in the computer science field when referring to data stored on a computer. (D.I. 179, at 9.) Further, Leader contends that its proposed construction comports

14

with the plain language used in the Claim, and is consistent with the specification. Facebook also contends that its proposed construction, "placing into a fixed sequence," is what one of ordinary skill in the art understands "ordering" to mean. (D.I. 191, at 31.) Facebook argues that the surrounding language in Claim 17 "clearly implies a relationship between environments that is based on placement into a fixed sequence." (Id. at 32.) Moreover, Facebook contends that the specification supports its proposed construction because Claim 17 is discussed in the context of a routing algorithm which defines sequential arrangements. (Id.)

The Court concludes that Facebook's proposed construction reads in a limitation not supported by either the language of Claim 17 or the specification, and thus, will adopt Leader's construction. In relevant part, Claim 17 claims:

    17. A computer-implemented method of managing data,
        comprising computer-executable acts of:
        generating a plurality of user environments in a web-
          based system;
        **ordering** two or more of the plurality of user
          environments according to different arrangements of the
          user environments;
                    * * *
        storing in a storage component **ordering** information
          related to the **ordering** of the two or more of the
          plurality of user environments;
        traversing the different arrangements of the user
          environments with one or more of the applications based
          on the **ordering** information to locate the data
          associated with the user environment.

'761 patent, col. 22:12-34 (emphasis added). As Facebook

alleges, the claim language surrounding the term "ordering" does imply a relationship between user environments. The Claim consistently specifies the manner in which the relationship between user environments is achieved: "according to different arrangements of the user environments." Id. However, nothing in the literal claim language suggests that the "ordering" of the user environments according to "different arrangements" necessarily means that the user environments are placed in a fixed sequence.

The parties do not agree on which portion of the specification applies to Claim 17. Facebook directs the Court's attention to a portion of the specification describing Figure 4B. In Figure 4B, "there is illustrated board/web relationship diagram 402." '761 patent, col. 8:18-19. This embodiment teaches that "[b]oards can exist in any number of webs," and that "[t]he web represents a certain view of the relationship among boards." '761 patent, col. 8:19-22. Further,

> [t]he disclosed system has associated therewith a routing algorithm, referred to herein as a 'webslice'. A webslice is a relationship rule that defines a relationship between a web and one or more boards of that web. If a web changes (e.g., a board is added), and meets the criteria of the rule, the content will be on the new board as well.

'761 patent, col. 8:59-64. Facebook contends that this routing algorithm defines the sequential arrangements in which the user environments may be placed, but upon review of the specification as a whole, the Court disagrees.

The Summary of the Invention states that "[w]hen a user logs in to the system that employs the tool, the user enters into a personal workspace environment.  This workspace is called a board, and is associated with a user context."  '761 patent, col. 3:32-35.  Further, the Summary of the Invention states that "[t]wo or more boards (or workspace environments) can be grouped as a collection of boards, also called a web."  '761 patent, col. 3:64-66.  These terms, "workspace environment" and "board" appear to be used consistently throughout the '761 patent.  Understood as such, the routing algorithm (or webslice) defines the relationship between a web (or collection of boards) and one or more boards (or workspace environments) within that web.  By its terms, the routing algorithm does not define the relationship between user environments within the web, and thus, does not support Facebook's proposed limitation.  Accordingly, the Court concludes that "ordering" means "organizing."

### D.   Traversing

| Leader's Construction | Facebook's Construction |
|---|---|
| Searching | Navigation by the user according to a specific path or route |

The term "traversing" appears in Claims 17 and 18. Both Leader's and Facebook's proposed constructions of the term "traversing" are closely related to their proposed constructions

17

of the term "ordering," discussed above. Leader contends that its proposed construction is correct because one of ordinary skill in the art would understand "traversing" to mean "searching." (D.I. 179, at 10-11.) Further, Leader contends that the claim language describes "a process where the system searches for, and locates, the different data that is associated with the user environments" (id. at 11), directly supporting its proposed construction. Facebook similarly argues that one of ordinary skill in the art would understand "traversing" to mean "navigation by the user according to a specific path or route." (D.I. 191, at 33.) Facebook contends that the claim language requires that the user environments "be navigated according to a specific path or route as defined by their ordering." (Id.) Additionally, Facebook essentially makes a claim differentiation argument, contending that the patentee used the term "searching" in other claims and portions of the specification, and thus, "traversing" should not be construed as synonymous with "searching." (Id. at 33-34.) Leader responds that it can agree that "traversing" means "navigating," but that Facebook's proposed construction reads in two unsupported limitations: that the navigation must be "by a user," and "according to a specific path or route." (D.I. 196, at 9.)

The Court initially concludes that Facebook's proposed limitation- that "traversing" must be done "by the user"- is not

18

supported by the claim language. In relevant part, Claim 17 claims "[a] computer-implemented method of managing data, comprising computer-executable acts of: . . . **traversing** the different arrangements of the user environments with one or more of the applications based on the ordering information to locate the data associated with the user environment." '761 patent, col. 22:12-13, 31-34 (emphasis added). Dependant Claim 18 claims "[t]he method of claim 17, the act of **traversing** is performed using a webslice that includes traversal information for locating the data associated with a given user environment." '761 patent, col. 22:35-38 (emphasis added). By the plain language of Claims 17 and 18, the act of "traversing" does not require a certain action to be taken by a user, but rather is a "computer-executable act[]." '761 patent, col. 22:13. Facebook has not pointed to anything in the specification to support a construction of "traversing" which requires some action by the user.[2]

The Court concludes, however, that "traversing" must be done

---

[2]Ironically, a portion of the specification which might be read to support Facebook's position that "traversing" must be done "by the user" provides as follows: "the data content is indexed to facilitate searching for the content in a number of different ways in the future by the user of other users." '761 patent, col. 3:50-53. However, Facebook maintains that "searching" and "traversing" are not synonymous. Because Leader has agreed that "traversing" can mean "navigating," the Court will not undertake an unnecessary analysis of whether "traversing" also means "searching."

"according to a specific path or route," as Facebook contends.
Claim 18 clearly provides that "traversing" is an act performed
for "locating the data associated with a given user environment."
'761 patent, col. 22:35-38; see also Claim 17, '761 patent, col.
21:31-34 ("traversing . . . to locate the data associated with
the user environements"). The manner in which data associated
with the user environments is located is provided for by the
Claims. According to Claim 17, "traversing" is done "based on
the ordering information." '761 patent, col. 22:32-34.
According to Claim 18, "traversing" is done "using a webslice
[i.e., routing algorithm] that includes transversal information."
'761 patent, col. 22:36-37. Transversal information, in turn,
includes "at least a collection ID, a user environment ID, and a
routing path to the location of the environment data." '761
patent, col. 22:40-41. Therefore, the act of "traversing" is
more than merely "navigating" to locate data associated with the
user environment- the navigation must be performed in the manner
or path specified by the claim language. Accordingly, the Court
adopts, in part, Facebook's proposed construction, and concludes
that "traversing" means "navigation according to a specific path
or route."

## E. Many-To-Many Functionality

| Leader's Construction | Facebook's Construction |
|---|---|
| Two or more users able to access two or more data files | claim term is indefinite |

The term "many-to-many functionality" appears in Claim 32. Leader contends that the term reflects a well-known concept in computer science, and that the language of Claim 32 and the specification both support its proposed construction, in which "many-to-many functionality" means "two or more users able to access two or more data files."  (D.I. 179, at 11-12.) Specifically, Leader contends that the specification describes the "many-to-many functionality" claimed by the '761 patent, and juxtaposes the claimed functionality with prior art systems which reflected "many-to-one" and "one-to-many" functionalities.  (Id. at 12.)  Facebook does not provide a proposed construction, but rather, contends that the term "many-to-many functionality" is invalid for indefiniteness. (D.I. 191, at 37.)  With regard to the claim language, Facebook contends that Claim 23 only discusses one user, not many users, and does not mention multiple data files.  (Tr. at 118:2-10.)  Facebook also argues that the specification does not support Leader's contention that "many-to-many" refers to multiple users accessing multiple data files. (D.I. 191, at 37.)  In addition, Facebook contends that there is no basis on which one of ordinary skill in the art could determine what the two "manys" in the claimed functionality refer to.  (Id.)

The issues before the Court with respect to this term are whether it is indefinite, and if not, what its proper

construction should be. "If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, [the Federal Circuit has] held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." Exxon Res. & Eng'g Co. v. U.S., 265 F.3d 1371, 1375 (Fed. Cir. 2001). "A claim will be found indefinite only if it 'is insolubly ambiguous, and no narrowing construction can properly be adopted . . .'" Praxair, Inc. v. ATMI, Inc., 543 F.3d 1306, 1319 (Fed. Cir. 2008)(citing Exxon, 265 F.3d at 1375). In contrast, a claim term is definite if it can be given any reasonable meaning. See Young v. Lumenis, Inc., 492 F.3d 1336, 1346 (Fed. Cir. 2007)(citing Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir 2005)). A court should apply general principles of claim construction when determining whether a claim term is indefinite. Id.

A reasonable meaning for the term "many-to-many functionality" can be derived from the specification, and the specification makes clear that the "many-to-many functionality" claimed in Claim 32 envisions multiple users and multiple data files. Limitations inherent in the prior art systems, particularly in "one-to-many" and "many-to-one" storage paradigms are discussed in the specification. The following example of the functionality of these systems is provided:

> an email message to ten recipients is a one-to-many
> relationship, while ten customers sending orders to a dingle
> vendor exemplifies a many-to-one relationship. In the case
> of the former, the email is stored in an Outbox, and the ten
> recipients store the received messages in their respective
> folders, called an Inbox. In the latter case, the ten
> received orders are placed in an Orders folder for the
> associated the product [sic].

'761 patent, col. 2:36-44. Thus, the phrases "one-to-many" and

"many-to-one" describe the relationship between the number of

users and the number of data files- in both instances, multiple

users and a single data file. See also '761 patent, col. 2:45-46

("Conventional systems are designed to allow multiple users to

access the same file for collaboration purposes.") That the term

"many-to-many functionality" refers to multiple users and

multiple data files is further supported at numerous points

throughout the specification. See '761 patent, col. 3:25-27

("The data management tool includes a novel architecture where

the highest contextual assumption is that there exists an entity

that consists of one or more users."); col. 3:37-43 ("Any user

operating within a board has access to the suite of applications

associated with that board, and can obtain access to any data in

any form . . . created by the applications . . . [T]hereafter,

the user can then move to shared workspaces (or boards), and

access the same data or other data."); col. 3:63 ("the tool

supports multiple users"); col. 4:5-7 ("All files and groups of

files can be associated with any other file in the system,

allowing a system user the flexibility in determining dynamic

associations.").

In the Court's view, Leader's proposed construction of "many-to-many functionality" comports with the specification, from which the meaning of Claim 32 is made sufficiently clear to avoid invalidity on indefiniteness grounds. Accordingly, the Court concludes that "many-to-many functionality" is not indefinite, and means "two or more users able to access two or more data files."

### F. Dynamically

| Leader's Construction | Facebook's Construction |
|---|---|
| plain and ordinary meaning | Automatically and in response to the preceding event |

The term "dynamically" appears in Claims 1, 9, 17, 21-23, and the dependent claims thereof. Leader contends that the term "dynamically" requires no construction because it is commonly used in the computer science field, and one of ordinary skill in the art understands its meaning. (D.I. 179, at 25.) Leader agrees that the ordinary meaning of "dynamically" can be "automatically," but contends that the rest of Facebook's proposed construction reads limitations into the term which are not supported by the intrinsic record. (Id.) Facebook contends that the term "dynamically" cannot be understood without reference to how the automatic action is triggered. (D.I. 191, at 20.) According to Facebook, the intrinsic record supports its

24

proposed construction because "[n]owhere in the claims or specification does the '761 patent identify an action taking place 'dynamically' without such action being in response to the preceding action by the user ." (Id.) Further, Facebook contends that the file history, which shows that occurrences of the term "automatically" in each independent claim were replaced with the term "dynamically," confirms that "dynamically" means more than just "automatically." (Id. at 21-22.) Because the parties agree that "dynamically" means "automatically," the only issue to be decided by the Court is whether the term "dynamically" contains Facebook's proposed limitation of "in response to the preceding event."

When read in the context of the entire '761 patent, including the specification, the Court concludes that the term "dynamically" means "automatically and in response to the preceding event." Admittedly, neither the phrase "in response to the preceding event" nor the terms comprising that phrase explicitly appear in the Claims or the specification. However, in each of the Claims, the actions identified as taking place "dynamically" only occur after some identified action by the user. The specification provides further support for this limitation. "As a user creates a context, or moves from one context to at least one other context, the data created and applications used previously by the user automatically follows

the user to the next context. The change in user context is captured dynamically." '761 patent, col. 3:1-5. Thus, a change in context is captured "automatically," but it is only automatic upon the user creating a context or moving from one context to another. Accordingly, the Court concludes that "dynamically" means "automatically and in response to the preceding event."

## G. Metadata

| Leader's Construction | Facebook's Construction |
|---|---|
| plain and ordinary meaning | A stored item of information associated with the user's data that identifies at least the context, user workspace or user environment in which the user and the data currently reside |

The term "metadata" appears in numerous claims throughout the '761 patent. Facebook contends that its proposed construction is consistent with the specification and prosecution history of the '761 patent. (D.I. 191, at 15.) Facebook generally contends that "metadata" cannot be understood without reference to the system in which it is stored and utilized. (Id. at 17.) According to Facebook, the system disclosed by the '761 patent is about linking data to a user and keeping track of the user's location in the system, and therefore, "[t]he purpose of the 'metadata' [in the system] is to store information related to the (a) user to whom the data is tied, and (b) the user's

26

location (since that is where the data will be)."  (Id. at 15.)
Leader contends that Facebook's proposed construction suffers
from three main faults: 1) it incorporates limitations that are
inconsistent with the intrinsic record; 2) it creates ambiguity
in a commonly understood term; and 3) needlessly attempts to
deconstruct the term.  (D.I. 179, at 30-31.)  Leader contends
that "metadata" is universally understood by one of ordinary
skill in the art to mean data about data.  (Id. at 30.)  Thus,
Leader contends that this term should be given its plain and
ordinary meaning.  (Id. at 32.)

    The Court concludes that Facebook's proposed construction
imports unnecessary and unwarranted limitations into the term
"metadata."  The claim language demonstrates that the patentee
intended "metadata" to have a broad meaning.  For example, Claim
1 states that context information is stored in metadata.  '761
patent, col. 21:2-3.  Claim 9 states that "the metadata includes
information related to the user, the data, the application, and
the user environment."  '761 patent, col. 21: 46-48.  Claim 17
states that metadata stores "the association of the data and the
second user environment."  '761 patent, col. 22:26-27.  Claim 21
states that metadata "includes information related to the user of
the user workspace, to the data, to the application and to the
user workspace.  '761 patent, col. 22:54-56.  Facebook's
contention that the words "at least" in its proposed construction

make it "abundantly clear" that "metadata could *theoretically* contain information beyond" the information identified in its construction, (D.I. 191, at 7 (emphasis added)), is not persuasive. As defined by the literal claim language, "metadata" *actually* includes types of information beyond that included in Facebook's proposed construction, such as information related to the application.

Facebook's contention that its proposed construction is supported by the specification is similarly unavailing. The specification does state, <u>inter alia</u>, that "[d]ata created while the user is in the board is immediately associated with the user, the current workspace, any other desired workspace that the user designates, and the application. This association is captured in the form of metadata . . . The metadata automatically captures the context in which the data was created . . .." '761 patent col. 9:50-56. In the Court's view, this portion of the specification is consistent with the claim language, and was not meant to restrict the term "metadata." The specification describes association and context as being captured in the form of "metadata," but there is no necessary corollary that "metadata" is exclusively comprised of that information.

The Court further concludes that the prosecution history does not support Facebook's proposed construction. Facebook contends that the following excerpt from the May 2006 Amendments

and Remarks submitted by the patentee to the Patent and Trademark

Office demonstrates that the intended meaning of "metadata" is "a

stored item of information associated with the user's data that

identifies at least the context, user workspace or user

environment in which the user and the data currently reside":

> When a user logs in to a system that employs the tool, the
> user enters into a personal or user workspace environment .
> . . Context information associated with the workspace is
> automatically stored in the database as metadata, and the
> metadata is further associated with data that is created in
> the workspace. Accordingly, any data created by the user in
> the workspace can be searched via the metadata.
>
> Moreover, thereafter, the user can then move (or login) to a
> different workspace, such as a shared workspace (or shared
> board) that accommodates multiple users, for example, and
> the user can then access the same data created by the user
> in the first workspace and/or new data that was created in
> the shared workspace. The fact that the user is now in the
> shared workspace, and that s/he accessed the same data
> created in the personal (or first) workspace, is recorded as
> additional information stored in the metadata of the same
> data created in the personal workspace.
>
>                ***
>
> Again, this context information of the single workspace
> and/or shared workspaces and any movement of a user or users
> between the workspaces is automatically captured and stored
> in the metadata, and the metadata is further associated with
> data that is created in the workspaces.

(D.I. 180, Andre Decl., Ex. 4 at LTI 000610-11). The Court

disagrees with Facebook's contention. Nothing in this lengthy

excerpt amounts to an unambiguous disavowal of the scope of the

term "metadata," and accordingly, no disclaimer has taken place.

See Purdue Pharma L.P. v. Endo Pharms. Inc., 438 F.3d 1123, 1136

(Fed. Cir. 2006)("Under the doctrine of prosecution disclaimer, a

patentee may limit the meaning of a claim term by making clear
and unmistakable disavowal of scope during prosecution.").

Accordingly, the Court declines to adopt Facebook's proposed
construction for the term "metadata."

**H. Accesses [the data]³**

| Leader's Construction | Facebook's Construction |
|---|---|
| plain and ordinary meaning | Retrieves information in the second context or user workspace as distinct from uploading it, adding or creating it |

The phrase "accesses the data" appears in Claims 1, 17, and
23.⁴ Facebook contends that the disputed claim term "accesses"
means "retrieves information in the second context or user
workspace as distinct from uploading, adding or creating it."
(D.I. 191, at 22.) According to Facebook, this proposed
construction is supported by the intrinsic record, and is
consistent with the plain meaning one of ordinary skill in the
art would ascribe to the term. (Id. at 23-24.) Leader
criticizes Facebook's proposed construction on several grounds:
1) it reads limitations which are unsupported by the
specification into a simple term; 2) if adopted, it would render

---

³The bracketed terms are not being offered for construction.
(D.I. 179, at 14 n.3.)

⁴ In Claim 17, the phrase reads "the data is accessed."
'761 patent, col. 22:24.

30

the claim nonsensical; and 3) it attempts to deconstruct the term
rather than construe it. (D.I. 179, at 14-15.) Leader contends
that the term "accesses" in the '761 patent is used consistently
with its everyday meaning, and accordingly, should be given its
plain and ordinary meaning. (Id. at 14.)

The Court concludes that Facebook's proposed construction is
not supported by the intrinsic record. The specification
provides that

> Any user operating within any board has access to the suite
> of applications associated with that board, and can obtain
> access to any data in any form (e.g., documents and filed)
> created by the applications and to which he or she has
> permission. Moreover, thereafter, the user can then move to
> shared workspaces (or boards), and access the same data or
> other data.

'761 patent, col. 3:37-43. There is no references to "access" of
the data being distinct from uploading, adding, or creating the
data. Facebook points to a portion of the specification,
referring to Figure 8, which states that "[d]ata of any kind and
size can be uploaded to a common or shared workspace or board.
Varying levels of access can be provided to the uploaded data."
'761 patent, col. 11:29-31. The Court is mindful of the Federal
Circuit's admonition that "although the specification often
describes very specific embodiments of the invention, we have
repeatedly warned against confining the claims to those
embodiments." Phillips, 415 F.3d at 1323. That uploaded data
can be "accessed" in this embodiment is insufficient, in the

Court's view, to import Facebook's proposed limitation into the claim term.

Accordingly, the Court declines to adopt Facebook's proposed construction for the term "accesses."

## IV.  Conclusion

An Order consistent with this Memorandum Opinion will be entered.