# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

LEADER TECHNOLOGIES, INC.,
a Delaware corporation,                              )
                                                     )
        Plaintiff-Counterdefendant,                  )   Civil Action No. 08-862-LPS
                                                     )
                v.                                   )
                                                     )
FACEBOOK, INC.,                                      )
a Delaware corporation,                              )
                                                     )
        Defendant-Counterclaimant.                   )

---

## PLAINTIFF LEADER TECHNOLOGIES, INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL PURSUANT TO RULES 50(b) AND 59 OF THE FED. R. CIV. P.

OF COUNSEL:

Paul J. André
Lisa Kobialka
KING & SPALDING, LLP
333 Twin Dolphin Drive
Suite 400
Redwood Shores, California  94065-6109
(650) 590-7100

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Plaintiff and Counterdefendant
Leader Technologies, Inc.*

Dated: August 25, 2010

## TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II. STATEMENT OF THE CASE AND OF THE FACTS .................................................... 2

III. ARGUMENT ........................................................................................................... 2

    A. STANDARDS OF REVIEW .......................................................................... 2

    B. LEADER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW
       BECAUSE FACEBOOK DID NOT PROVE AN INVALIDATING
       PUBLIC USE OR OFFER FOR SALE BY CLEAR AND CONVINCING
       EVIDENCE ................................................................................................... 4

         1. Leader Did Not Offer For Sale Or Publicly Use *The Patented
            Invention* More Than One Year Before Filing The Patent Application. ..... 4

            a) Facebook did not offer any evidence that the purported public
                demonstrations or offers for sale met the claim limitations. ........... 6

            b) Facebook's attacks on Mr. McKibben's credibility do not
                fill the evidentiary gap in its case. ................................................. 10

         2. The Patented Technology Was Not Ready For Patenting More Than
            One Year Before The Filing Of The Patent Application. ......................... 11

         3. The Experimental Use Doctrine Negates Any Public Use Or Offer
            For Sale. ................................................................................................. 12

         4. Leader's Purported Public Demonstrations Were Covered By
            Nondisclosure Agreements. ..................................................................... 14

         5. Leader Did Not Make Any Commercial Offers For Sale Of The
            Patented Invention. ................................................................................. 15

         6. The '761 Patent Is Entitled To The Provisional Application's Priority
            Date. ....................................................................................................... 17

    C. LEADER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW
       THAT FACEBOOK DIRECTS OR CONTROLS ITS EMPLOYEES
       AND USERS. ............................................................................................... 18

    D. IN THE ALTERNATIVE, LEADER IS ENTITLED TO A NEW TRIAL. ......... 20

IV. CONCLUSION ...................................................................................................... 20

i

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allen Eng'g Corp. v. Bartell Indus., Inc.,*
    299 F.3d 1336 (Fed. Cir. 2002) ................................................................................4

*Allied Chem. Corp. v. Daiflon, Inc.,*
    449 U.S. 33 (1980) ...................................................................................................3

*American Bearing Co. v. Litton Indus., Inc.,*
    729 F.3d 943 (3d Cir. 1984) ..................................................................................20

*BMC Res., Inc. v. Paymentech, L.P.,*
    498 F.3d 1373 (Fed. Cir. 2007) ............................................................................18

*Bose Corp. v. Consumers Union of U.S., Inc.,*
    466 U.S. 485 (1984) ...............................................................................................10

*Bullen v. Chaffinch,*
    336 F. Supp. 2d 342 (D. Del. 2004) ........................................................................3

*CIF Licensing, LLC v. Agere Sys. Inc.,*
    C.A. No. 07-170-JJF, 2010 WL 3001775 (D. Del. July 30, 2010)....................5, 10

*Clock Spring, L.P. v. Wrapmaster, Inc.,*
    560 F.3d 1317 (Fed. Cir. 2009) ............................................................................15

*Colorado v. New Mexico,*
    467 U.S. 310 (1984) .................................................................................................3

*Combined Sys., Inc. v. Defense Tech. Corp. of Am.,*
    230 F. Supp. 2d 544 (S.D.N.Y. 2002) .....................................................................9

*Cordance Corp. v. Amazon.com, Inc.,*
    687 F. Supp. 2d 449 (D. Del. 2010) ........................................................................9

*Dyer v. MacDougall,*
    201 F.2d 265 (2d Cir. 1952) (Hand, J.) ................................................................11

*Egbert v. Lippmann,*
    104 U.S. 333 (1881) ...............................................................................................14

*Elan Corp. v. Andrx Pharms., Inc.,*
    366 F.3d 1336 (Fed. Cir. 2004) ......................................................................15, 16

*Fineman v. Armstrong World Indus., Inc.,*
    980 F.2d 171 (3d Cir. 1992) ...................................................................................20

*Gemmy Indus. Corp. v. Chrisha Creations Ltd.,*
    452 F.3d 1353 (Fed. Cir. 2006) ................................................................................5

*Goldhirsh Group, Inc. v. Alpert,*
    107 F.3d 105 (2d Cir. 1997) ...................................................................................11

*Greenleaf v. Garlock, Inc.,*
    174 F.3d 352 (3d Cir. 1999) ...............................................................................3, 20

*Group One, Ltd. v. Hallmark Cards, Inc.,*
    254 F.3d 1041 (Fed. Cir. 2001) .........................................................................15, 16

*Helifix Ltd. v. Block-Lok, Ltd.,*
    208 F.3d 1339 (Fed. Cir. 2000) ................................................................................5

*Helvering v. Leonard,*
    310 U.S. 80 (1940) .....................................................................................................3

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.,*
    370 F.3d 1131 (Fed. Cir. 2004) ................................................................................3

*Honeywell Int'l, Inc. v. Nikon Corp.,*
    672 F. Supp. 2d 638 (D. Del. 2009) .......................................................................15

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,*
    488 F.3d 982 (Fed. Cir. 2007) ................................................................................11

*In re Bose Corp.,*
    580 F.3d 1240 (Fed. Cir. 2009) ................................................................................3

*Innovation Techs., Inc. v. Splash! Med. Devices, LLC,*
    528 F.3d 1348 (Fed. Cir. 2008) ................................................................................3

*Invitrogen Corp. v. Biocrest Mfg., L.P.,*
    424 F.3d 1374 (Fed. Cir. 2005) ........................................................................passim

*Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.,*
    315 F. Supp. 2d 589 (D. Del. 2004) .......................................................................11

*Juicy Whip, Inc. v. Orange Bang, Inc.,*
    292 F.3d 728 (Fed. Cir. 2002) ..................................................................................9

*Lightning Lube, Inc. v. Witco Corp.,*
    4 F.3d 1153 (3d Cir. 1993) .......................................................................................3

*Linear Tech. Corp.,v. Micrel, Inc.,*
  275 F.3d 1040 (Fed. Cir. 2001) ....................................................................................... 17

*Lucent Techs., Inc. v. Newbridge Networks Corp.,*
  168 F. Supp. 2d 181 (D. Del. 2001) .................................................................................. 3

*MLMC, Ltd. v. Airtouch Commcns., Inc.,*
  215 F. Supp. 2d 464 (D. Del. 2002) ................................................................................. 17

*Moore v. Chesapeake & Ohio Ry. Co.,*
  340 U.S. 573 (1951) ........................................................................................................ 10

*Motionless Keyboard Co. v. Microsoft Corp.,*
  486 F.3d 1376 (Fed. Cir. 2007) ....................................................................................... 15

*Muniauction, Inc. v. Thomson Corp.,*
  532 F.3d 1318 (Fed. Cir. 2008) ....................................................................................... 19

*Pfaff v. Wells Elecs., Inc.,*
  525 U.S. 55 (1998) ..................................................................................................... 11, 15

*Pfizer, Inc. v. Apotex, Inc.,*
  480 F.3d 1348 (Fed. Cir. 2007) .................................................................................... 9, 18

*Polypro, Inc. v. Addison,*
  222 Fed. Appx. 960, 2007 WL 788345 (Fed. Cir. Mar. 13, 2007) ................................. 11

*Purdue Pharma Prods. L.P. v. Par Pharm., Inc.,*
  642 F. Supp. 2d 329 (D. Del. 2009) ................................................................................ 18

*RCA Corp. v. Data Gen. Corp.,*
  887 F.2d 1056 (Fed. Cir. 1989) ......................................................................................... 6

*Rhenalu v. Alcoa Inc.,*
  224 F. Supp. 2d 773 (D. Del. 2002) ................................................................................ 17

*Roebuck v. Drexel Univ.,*
  852 F.2d 715 (3d Cir. 1988) .................................................................................... 3, 4, 20

*Scaltech Inc. v. Retec/Tetra, L.L.C.,*
  178 F.3d 1378 (Fed. Cir. 1999) ......................................................................................... 4

*Sonoscan, Inc. v. Sonotek, Inc.,*
  936 F.2d 1261 (Fed. Cir. 1991) ...................................................................................... 6, 8

*Tec Air, Inc. v. Denso Mfg. Mich., Inc.,*
  192 F.3d 1353 (Fed. Cir. 1999) ......................................................................................... 9

## STATUTES AND RULES

35 U.S.C. § 102(b)........................................................................................................2, 4

35 U.S.C. § 282 ...............................................................................................................3

Fed. R. Civ. P. 50(b)........................................................................................................2

Fed. R. Civ. P. 59........................................................................................................2, 4

## OTHER AUTHORITIES

*Restatement (Second) of Contracts* §26 (1981).........................................................17

*Restatement (Second) of Contracts* §33(3)(1981) .................................................15, 16

*Restatement (Third) of Agency* § 7.07(1)(2006)........................................................19

9A Charles A. Wright & Arthur A. Miller, *Federal Practice & Procedure* § 2257 (2d ed.)........11

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

The jury found that Facebook infringed Leader's patent and the patent was neither anticipated nor obvious in light of the prior art. But the jury nonetheless found the patent invalid on the theory that Leader had publicly used the patented invention and offered it for sale more than one year before filing the patent application. That conclusion is unsupported by the evidence. Indeed, Facebook did not present *any* evidence, let alone clear and convincing evidence, on crucial elements of its public use and on-sale defenses. Leader is therefore entitled to judgment as a matter of law or, at the very least, a new trial.

First and foremost, Facebook was required to prove, on a limitation-by-limitation basis, that the alleged public use and offers for sale of Leader2Leader involved the patented invention, yet it did not even attempt such an analysis. Instead, Facebook asserted that because the current version of Leader2Leader practices the patented invention, the 2002 version of that suite of products must have as well. That supposition is not only unsupported by the evidence, it is directly contrary to all of the evidence on point. Facebook attempted to mask its total lack of evidentiary support by arguing that the jury should not believe Leader's evidence that the 2002 version of Leader2Leader did not contain the patented technology. But even if the jury disbelieved and therefore disregarded Leader's evidence, that would only mean that there is *no* evidence on point. Because Facebook failed to carry its own, affirmative burden of proof by clear and convincing evidence, and instead relied only on unsupported conjecture, this is a paradigmatic case for judgment as a matter of law.

Facebook also failed to satisfy its burden of proof on other elements of the on-sale and public use defenses. For example, Facebook offered no proof that the invention was ready for patenting more than one year before the patent application. Nor did Facebook refute the undisputed evidence that Leader had nondisclosure agreements in place before it demonstrated any of its experimental technology, and never made a definite, commercial offer for sale of the patented technology during the relevant time period. For the reasons stated herein, the interest of justice requires judgment as a matter of law or a new trial on these issues.

## II.     STATEMENT OF THE CASE AND OF THE FACTS

Founded in 1997, Plaintiff Leader Technologies, Inc. ("Leader") aimed "to use the internet as a platform for doing large-scale communications and collaboration." Tr. 372:23-373:3. [1] The technology of U.S. Patent No. 7,139,761 (the "'761 Patent") represented one part of that goal. PTX 1. First conceived in 1999 (Tr. 387:6-8), the patented invention relates to a data management tool for online collaboration. PTX 1, Abstract. Online collaboration tools allow a large number of users to share a variety of information—files, pictures, documents, messages, videos, data, or any other digital content—with each other. Leader invested 145,000 man-hours and over $10 million to develop the initial concept and build a working embodiment of the technology. Tr. 392:22-393:6. Within a day or two of implementing the technology in software code, Leader filed a provisional patent application on December 11, 2002. *See* PTX 3; Tr. 452:12-24; Tr. 1361:8-12. On December 10, 2003, Leader filed an application that eventually resulted in the issuance of the '761 Patent on November 21, 2006. *See* PTX 1.

Leader filed its complaint on November 19, 2008, alleging that Defendant Facebook, Inc.'s ("Facebook") website, available at www.facebook.com, infringes claims 1, 4, 7, 9, 11, 16, 21, 23, 25, 31, and 32 of the '761 Patent. D.I. 1. On July 28, 2010, a jury found that Facebook literally infringed each and every asserted claim of the '761 Patent, though it concluded that Facebook did not control or direct either its employees or its end users. D.I. 610, at 1-2. The jury also rejected Facebook's prior art anticipation and obviousness defenses, but found the '761 Patent invalid under the on-sale and public use bars of 35 U.S.C. § 102(b). *Id.* at 3-5.

### III.     ARGUMENT

#### A.     STANDARDS OF REVIEW

Judgment as a matter of law is required when a party has been fully heard on an issue and, viewing the evidence in the light most favorable to the nonmovant, "there is no legally

---

[1] All documents cited herein, including citations to PTX trial exhibits, DTX trial exhibits, and trial transcripts, are attached to the Declaration of Paul Andre in Support of Plaintiff Leader Technologies, Inc.'s Renewed Motion for Judgment as a Matter of Law or a New Trial Pursuant to Rules 50(b) and 59 of the Fed. R. Civ. P.

sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Bullen v. Chaffinch*, 336 F. Supp. 2d 342, 346 (D. Del. 2004)(citations omitted). "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)(citation omitted).

Because patents issued by the Patent and Trademark Office are presumed to be valid, 35 U.S.C. § 282, the jury could properly find the patent invalid only if Facebook carried the "heavy burden" of proving invalidity by "clear and convincing evidence." *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1145 (Fed. Cir. 2004); *see also Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1378 (Fed. Cir. 2005)(citation omitted). To be clear and convincing, evidence must produce "a firm belief and conviction that it is highly probable that the matter sought to be established is true." D.I. 601 at 15. Such evidence must be based on "hard facts." *See Colorado v. New Mexico*, 467 U.S. 310, 320-21 (1984). As the Supreme Court and Federal Circuit have repeatedly cautioned, "[t]here is no room for speculation, inference or surmise" where, as here, the clear and convincing evidence standard applies. *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009)(quotation omitted); *accord Helvering v. Leonard*, 310 U.S. 80, 86 (1940); *Innovation Techs., Inc. v. Splash! Med. Devices, LLC*, 528 F.3d 1348, 1350-51 (Fed. Cir. 2008). Under those standards, Leader is entitled to judgment as a matter of law because Facebook did not present sufficient hard facts, above the level of inference, to permit the jury to find the '761 Patent invalid by clear and convincing evidence.

Even if judgment as a matter of law were inappropriate, this Court would still have considerable discretion to grant a new trial. *See Roebuck v. Drexel Univ.*, 852 F.2d 715, 735 (3d Cir. 1988). A district court may order a new trial if, in the court's view, "there is insufficient evidence to support the verdict or . . . the verdict was against the weight of the evidence." *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 364-65 (3d Cir. 1999)(citations omitted). For this purpose, the Court need *not* view the evidence in the light most favorable to the verdict. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Lucent Techs., Inc. v. Newbridge*

3

*Networks Corp.*, 168 F. Supp. 2d 181, 251 (D. Del. 2001); *see also* Fed. R. Civ. P. 59(a)(1)(A). Because this Court is expected to rely in part on its own observation of the witnesses and other evidence, "[t]he authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." *Roebuck*, 852 F.2d at 735 (quotation omitted).

**B.   LEADER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE FACEBOOK DID NOT PROVE AN INVALIDATING PUBLIC USE OR OFFER FOR SALE BY CLEAR AND CONVINCING EVIDENCE**

Under the Patent Act, "[a] person shall be entitled to a patent unless . . . the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). "Whether a patent is invalid due to public use under § 102(b) is a question of law based on underlying questions of fact." *Invitrogen*, 424 F.3d at 1378 (citation omitted).

The jury determined that Leader's December 11, 2002, provisional application did not disclose all of the elements of the patented invention. D.I. 610, at 3. Under that finding, the '761 Patent claims priority from the subsequent filing of the non-provisional patent application on December 10, 2003, making December 10, 2002, the critical date for this purpose. *See* PTX 1; D.I. 601, at 33. As discussed below, Facebook had to establish several different elements in order to carry its burden of proving a relevant public use or offer for sale more than one year before the priority date. It did not do so.

**1.   Leader Did Not Offer For Sale Or Publicly Use *The Patented Invention* More Than One Year Before Filing The Patent Application.**

At the outset, the public use and on-sale bars apply only to embodiments of the claimed invention; using or selling a different product or invention does not affect the patentability of the claimed one. "Hence, the *first* determination in the § 102(b) analysis must be whether the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention." *Scaltech Inc. v. Retec/Tetra, L.L.C.*, 178 F.3d 1378, 1383 (Fed. Cir. 1999) (emphasis added); *see also Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1355 (Fed. Cir. 2002) (requiring district courts to "make specific findings linking

elements of the" asserted claims to the prior activity); *Gemmy Indus. Corp. v. Chrisha Creations Ltd.*, 452 F.3d 1353, 1359-60 (Fed. Cir. 2006); *Helifix Ltd. v. Block-Lok, Ltd.*, 208 F.3d 1339, 1350 (Fed. Cir. 2000). Thus, as this Court instructed the jury, Facebook had to prove "by clear and convincing evidence" that Leader publicly used or offered for sale "a product that met *all the limitations* of the asserted claims." D.I. 601, at 41 (emphasis added); *see also id.* at 39 (likewise requiring proof of "a product that meets all the elements of [the asserted] claim"). In that respect, public uses and offers for sale are no different from other prior art. *See id.* at 32. Just as a prior art reference can only anticipate a patented invention if it includes each and every claim limitation (*see id.* at 37), a public demonstration or offer for sale likewise must include each and every claim limitation, and be evaluated the same way as a prior art reference -- namely on an element-by-element basis. *Id.* at 39, 41.

While Facebook failed to prove anticipation with any prior art reference, it at least attempted to prove such alleged anticipation on an element-by-element basis of each asserted claim through expert testimony. *See, e.g.*, Tr. 1463:12-1491:15, 1505:17-1516:1, 1518:22-1535:4, 1544:14-1561:23. Facebook was required to perform a similar analysis for public use and offers for sale. However, Facebook presented *no* evidence, let alone clear and convincing evidence, that the alleged public uses and offers for sale satisfied all of the claim limitations. Facebook asserted that Leader publicly used and offered for sale its Leader2Leader platform, which is a suite that includes a series of products including LeaderPhone, Smart Camera, and other technologies. *See* Tr. 1316:15-1320:12. But Facebook produced no evidence that the *2002* version of Leader2Leader included the patented invention, and thus met each and every limitation of the asserted claims. In fact, all of the evidence shows that the 2002 version of Leader2Leader did not include the patented invention. In *CIF Licensing, LLC v. Agere Sys. Inc.*, C.A. No. 07-170-JJF, 2010 WL 3001775, at *20 (D. Del. July 30, 2010), this Court granted plaintiff's motion for judgment as a matter of law that a patent was not invalid due to anticipation, despite the jury's finding otherwise, because the defendant's expert witness failed to

5

provide an explanation "of how or why each of the claim elements were disclosed" in the alleged prior art. Leader's motion should be granted for the same reason.

**a)**      **Facebook did not offer any evidence that the purported public demonstrations or offers for sale met the claim limitations.**

A defendant must prove that a prior product met each of the limitations of the claimed invention through evidence "'such as memoranda, drawings, correspondence, and testimony of witnesses.'" *Sonoscan, Inc. v. Sonotek, Inc.*, 936 F.2d 1261, 1263 (Fed. Cir. 1991)(quoting *RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056, 1060 (Fed. Cir. 1989)). At trial, Facebook offered no such evidence -- no technical documents; no memoranda or correspondence from the time period in question; no Leader source code (which Facebook had because the Court compelled Leader to produce it); and no testimony, expert or otherwise,[2] that supported its position that the 2002 version of Leader2Leader satisfied all of the limitations for all of the asserted claims.

Facebook was required to prove by clear and convincing evidence that the 2002 version of the Leader2Leader product suite contained each and every limitation of the independent and dependent claims in order to successfully invalidate the '761 Patent. This burden is impossible to achieve without reference to the Leader2Leader source code and/or other technical documents, because the claims are directed to the back-end components of the system. For example, for Claim 1, Facebook would have to prove that the Leader2Leader product captured context information using a context component and tracking information using a tracking component and stored that data in metadata. Without seeing the technical documents and/or source code, one cannot determine how the data is handled, which back-end components are utilized, and where the data is stored. Similarly, Claim 9 requires the dynamic update of metadata with an association of data, the application and the user environment. Facebook was required to prove Leader2Leader actually stored this specific data in this manner. Without analyzing the source

---

[2] The only witnesses that provided any testimony at trial regarding Leader2Leader were Michael McKibben and Jeff Lamb. Both of these witnesses consistently testified that the '761 Patented technology was not incorporated in the Leader2Leader product suite in 2002. Tr. 445:9-19; 468:8-21;1324:23-1325:17.

6

code, it is merely a guess as to which types of data are stored and how the functions are accomplished. The other independent claims contain additional backend components, such as code for indexing (Claim 21) and components that dynamically store context data as metadata on a web-based server (Claim 23). The best and possibly only source to ascertain these technical details is the source code, and Facebook's failure to even mention the Leader2Leader source code is dispositive of their claims of public use and offer for sale.

Facebook's failure to offer Leader2Leader's source code is particularly fatal to proving whether the product met the limitations of the dependent claims. The dependent claims call out specific types of data which must be stored in metadata and how that data is related to each other. It is simply impossible to ascertain how the system collects and associates this data without highly specific technical documents, such as the source code. For example, Claim 4 requires the context information to contain relationship information between the user and at least the application, application data and user environment. To ascertain whether a product meets this limitation, one must analyze the data structure that is used to capture and store data, and further analyze whether and how the data is associated in the back-end. Another example is Claim 32 which requires the storage of metadata in a storage component that facilitates many-to-many functionality. Without looking at the particular source code modules and examining how they handle the data, it cannot be determined if this claim element is met because it is not clear if the metadata, or something else, is responsible for the ability to share data among users. These are only a few examples of the types of information that Facebook was required to show, but wholly failed to do so at trial.

Indeed, Facebook's only purported evidence on this point consisted of two of Leader's interrogatory responses *from 2009* concerning products offered for sale *in 2009. See* DTX 963, DTX 969. But Leader's undisputed offers for sale of the patented invention in 2009 as part of the 2009 version of Leader2Leader is hardly clear and convincing evidence that Leader made commercial offers for sale of the patented invention in 2002. Facebook's interrogatory stated: "For each claim of the '761 Patent that [Leader] contends *is* practiced by any product(s) and/or

service(s) of [Leader], identify all such product(s) and/or service(s) and provide a chart identifying specifically where each limitation of each claim *is* found within such product(s) and/or service(s)." DTX 969, at 45 (emphasis added). Because that interrogatory is phrased in the present tense and does not specify any other timeframe, Leader responded by naming the products that embody the '761 Patent claims *as of the date of the interrogatory*. In relevant part, Leader answered, in the present tense, that "Leader2Leader® powered by Digital Leaderboard® engine *is* the only product or service provided by Leader which *embodies*, either literally or under the doctrine of equivalents, any of the asserted claims of the '761 Patent." DTX 969, at 46 (emphasis added). Nothing in Leader's response can be construed to refer to the Leader products available in 2002.

Moreover, Michael McKibben -- who verified the responses -- confirmed that he understood the interrogatory to refer only to products and services that "practice the '761 Patent today." Tr. 1329:17-1331:18. Mr. McKibben further testified that the Leader2Leader platform presently embodies the '761 Patent's technology (Tr. 1332:6-14), but did not embody that technology before December 2002 and, indeed, *could not* have because the technology "did not exist at that time." Tr. 1332:15-19; *accord* Tr. 1374:17-22; Tr. 1343:8-15. The '761 Patent's other inventor, Jeffrey Lamb, confirmed that he and Mr. McKibben waited until December 10, 2002, to file the provisional application because they did not complete "the code that was the embodiment of that invention/concept" until then. Tr. 452:12-453:8.

Especially considering that the only testimony on point makes clear that Leader2Leader did not embody the '761 Patented technology before December 10, 2002, and that the technology did not even exist before then, the interrogatory responses about the *2009* product cannot rise to the level of clear and convincing evidence about the *2002* product. The Federal Circuit has held that even "conflicting testimony as to what [a] quotation actually included" prevents a finding by clear and convincing evidence. *Sonoscan*, 936 F.2d at 1263. Here, there is no conflict; the interrogatory response itself and all of the testimony about it consistently refute Facebook's position.

8

Furthermore, a company's continued use of a brand name has never been sufficient to establish by clear and convincing evidence that an earlier version embodied the patented invention. *See Combined Sys., Inc. v. Defense Tech. Corp. of Am.*, 230 F. Supp. 2d 544, 550 (S.D.N.Y. 2002)(holding that product sold before and after critical date with the same model number "does not by itself prove that the product sold included every limitation of the claim") (citing *Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1359 (Fed. Cir. 1999)). Simply pointing to the same brand name does not prove anything, and is certainly no substitute for the required element-by-element comparison of the underlying technology with the claims. *See, e.g., Cordance Corp. v. Amazon.com, Inc.*, 687 F. Supp. 2d 449, 477-78 (D. Del. 2010) (granting judgment as a matter of law of no invalidity even where, unlike here, the accused infringer had provided expert testimony on a limitation-by-limitation basis). Especially in the ever-changing computer age, there is no basis for assuming that a product like Leader2Leader, which combines a number of technologies into a suite, contained the same features seven years earlier.

In the absence of any affirmative evidence, Facebook's counsel suggested during closing argument that it was *Mr. McKibben*'s burden to prove that the claimed invention was absent from Leader2Leader before December 10, 2002. Tr. 2046:18-21 ("Mr. McKibben was on the stand twice, and twice he did not put before you the versions of the product. He never showed you the product, did he?"). That improper attempt to shift the burden of proof to Leader only confirms Facebook's fundamental failure to carry its own burden. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007)("Since we must presume a patent valid, the patent challenger bears the burden of proving the factual elements of invalidity by clear and convincing evidence. That burden of proof never shifts to the patentee to prove validity.")(citation omitted); *see also Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 737 (Fed. Cir. 2002)(accused has burden of proving prior public use and must show that "the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention.")(quotation omitted).

**b)**     **Facebook's attacks on Mr. McKibben's credibility do not fill the evidentiary gap in its case.**

In addition to attempting to shift the burden of proof, Facebook repeatedly questioned Mr. McKibben's credibility. Facebook's counsel told the jury that the public use and on-sale bars were "really a classical jury issue because you have to believe somebody on this one." Tr. 2038:9-12; *see also* Tr. 2012:12-18. Throughout closing argument, Facebook's counsel did not point to documentary evidence or any evidence that analyzed the alleged uses and offers on an element-by-element basis, but rather relied solely upon unadorned innuendo. *See, e.g.,* Tr. 2049:23-2050:1. Counsel even specifically highlighted the jury instruction regarding credibility. Tr. 2062:11-18.

But even if the jury found Mr. McKibben's testimony not credible, that would not remedy Facebook's failure to present clear and convincing evidence of its own. This Court instructed the jury that it could "disregard any testimony that, in your judgment, is not believable." D.I. 601, at 10. If the jury disregarded Mr. McKibben's testimony, or his co-inventor's testimony,[3] that would leave *no* evidence on point. And the absence of *any* evidence would hardly support the jury verdict. *See CIF Licensing*, 2010 WL 3001775, at *17 (holding that if expert testimony does not provide a legally sufficient basis for finding a patent invalid, then the jury's verdict cannot be upheld even though that testimony was unrebutted).

As the Supreme Court has held, and this Court instructed the jury, "[w]hen the testimony of a witness is not believed, the trier of fact may simply disregard it." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984). But "[n]ormally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion." *Id.* (citing *Moore v. Chesapeake & Ohio Ry. Co.*, 340 U.S. 573, 575 (1951)). Although "in strict theory a party having the affirmative [burden] might succeed in convincing a jury of the truth of his allegations in spite of the fact that all of the witnesses denied them, . . . a verdict would nevertheless have to

---

[3] Mr. Lamb confirmed the testimony of Mr. McKibben. Tr. 468:8-21. Accordingly, if both inventors' testimony was disregarded by the jury, then there would be no testimony whatsoever regarding the 2002 version of Leader2Leader, because Facebook did not provide any expert or fact testimony on this point.

be directed against him." *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952) (Hand, J.). Thus, "even if the jury thoroughly disbelieved [Mr. McKibben], that disbelief is insufficient to support a verdict for [Facebook] in the absence of affirmative evidence" that the purported offers and public demonstrations embodied the '761 Patented technology. *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 109 (2d Cir. 1997)(citing 9A Charles A. Wright & Arthur A. Miller, *Federal Practice & Procedure* § 2257, at 288 (2d ed.)).  That would be true in the normal case, and it is especially true here, where Facebook must prove invalidity by clear and convincing evidence, not by inference or supposition. *See supra* p. 3.  Because without Mr. McKibben's testimony, "the record completely fails to show whether" Leader2Leader met "all the limitations recited in the claims," judgment as a matter of law is required. *Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 606 (D. Del. 2004).

### 2.    The Patented Technology Was Not Ready For Patenting More Than One Year Before The Filing Of The Patent Application.

Facebook also had to prove that the invention was "ready for patenting" before the critical date. *See Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998); *see also Invitrogen*, 424 F.3d at 1379; D.I. 601 at 39-42.  There is no basis for simply assuming that anything that was offered for sale or demonstrated before December 10, 2002, was ready for patenting, in part because it was not necessarily a working, functional, fully operational embodiment of the patented technology. *See, e.g., Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 996-97 (Fed. Cir. 2007); *see also Polypro, Inc. v. Addison*, 222 Fed. Appx. 960, 961-62, 2007 WL 788345, at *1-2 (Fed. Cir. Mar. 13, 2007)(unpublished).  Instead, a defendant can prove that an invention was ready for patenting "in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67-68.  Facebook made no effort to address this requirement, and thus failed to carry its burden by clear and convincing evidence.

11

Indeed, Facebook effectively conceded that the invention was not ready for patenting by December 10, 2002 when it argued that the provisional application, which contained the actual source code, filed on December 11, 2002, did not provide support for each claim of the '761 Patent. PTX 3; D.I. 610, at 3; *see also* Tr. 392:18-394:10; 452:12-24; 1320:20-23, 1324:23-1326:1. Facebook cannot have its cake and eat it, too. If the provisional application does not support the claims of the '761 Patent, then the invention was not ready for patenting on December 10, 2002. At the very least, Facebook did not establish by clear and convincing evidence that an invention that was not disclosed in the provisional application was nonetheless ready for patenting before then.

### 3.     The Experimental Use Doctrine Negates Any Public Use Or Offer For Sale.

If any "public use or offer for sale was an experimental use performed in order to bring the invention to perfection or to determine if the invention was capable of performing its intended purpose, then such a use does not invalidate the claim." D.I. 601, at 43; *see also Invitrogen*, 424 F.3d at 1379-80. That was the case here. Leader's grant proposal in early 2002 for funding to implement a Leader2Leader system at Wright Patterson Air Force Base explained that the base would "become a classical beta customer for the full Leader2Leader® platform." DTX 179 at LTI 048199. Beta testing is an essential stage of software development that involves real-world, experimental testing outside of laboratory conditions. *See* Tr. 1327:16-1328:19. The White Paper that Leader submitted in support of its grant application explained, for example, that Leader2Leader had "not yet been tested for large numbers of concurrent users" and needed a "stress testing phase." DTX 179 at LTI 048203. Leader planned to implement a beta installation (*id.* at LTI 048204), and the whole point of the project was to jointly *develop* solutions to allow intelligence agencies to share data more easily. Tr. 1345:9-19. Combined with the fact that the funding would not have created a buyer-seller relationship under the rules governing the grant application (*see* PTX 1234 at 17), Leader's proposal was clearly intended primarily for experimentation.

12

Indeed, the proposal fit within Leader's overall plan, as Leader explained to shareholders in 2001, to "engage major beta users in testing." DTX 178 at LTI 014125. The company carried through on that effort by seeking support from The Limited and Boston Scientific for beta testing commitments. *See, e.g.*, Tr. 1359:7-1361:7, 1365:13-1367:24. Leader and The Limited were still negotiating a beta testing agreement in early 2003. PTX 773; Tr. 1363:6-19. Facebook's own trial exhibits regarding Leader's activities also consistently refer to beta testing. *See, e.g.*, DTX 181, at LTI 145931; DTX 184, at LTI 105611; DTX 776, at LTI 111342; DTX 1348; *see also* Tr. 1359:7-22.

Moreover, as discussed above, the relevant activities in 2002 preceded the development of the '761 Patented technology. *See supra* p. 8; Tr. 1327:2-1328:19. Leader executed its first beta testing agreement for the '761 Patented technology with Boston Scientific in 2003 for a mere ten user licenses. *See* DTX 679 at LTI 006441, LTI 006447; *see also* Tr. 1365:13-1367:24. That agreement for a small beta test, *after* the patent application, confirms that Leader's earlier discussions with Boston Scientific and other companies related, at most, to an unfinished, experimental product that Leader still needed to beta test. And because of its very small size, the beta-testing agreement was necessarily experimental, with any commercial aspect being at best incidental.

Finally, although Facebook had to prove public use or offer for sale by clear and convincing evidence, Leader needed only to prove by a preponderance of the evidence that any purported demonstrations or offers were experimental uses. D.I. 601, at 44. If Facebook's exhibits provide clear and convincing evidence that Leader demonstrated or offered for sale the claimed invention, then surely the same exhibits, with frequent references to beta testing, prove experimental use by a preponderance of the evidence. Any other result would be a perversion of the parties' respective burdens of proof.

13

**4.     Leader's Purported Public Demonstrations Were Covered By Nondisclosure Agreements.**

Facebook also failed to carry its burden of proving that any uses of the patented technology were *public* uses, as required for the public-use bar to apply. "[T]o qualify as 'public,' a use must occur without any 'limitation or restriction, or injunction of secrecy.'" *Invitrogen*, 424 F.3d at 1381 (quoting *Egbert v. Lippman*, 104 U.S. 333, 336 (1881))(citation omitted). Thus, this Court instructed the jury that Facebook had to prove, by clear and convincing evidence, that Leader disclosed the patented invention to a person "who [was] under no limitation, restriction or obligation of secrecy to the inventor." D.I. 601, at 39. Facebook proved no such thing. Instead, all of the evidence showed that the purported public demonstrations of Leader2Leader were covered by non-disclosure agreements ("NDAs").

Leader provided a "very limited" demonstration of some features[4] of Leader2Leader to Vincent Russo, a representative of Wright-Patterson Air Force Base, on April 2, 2001. DTX 1348; *see also* Tr. 1340:23-1342:3, 1343:16-18. Documentary evidence shows that Mr. Russo signed a NDA with Leader on the same day. DTX 725 at LTI 153001-03; *see also* Tr. 1261:21-1262:1. Facebook never rebutted that evidence. Rather, Facebook presented evidence that an additional person, Douglas Fleser, signed an additional NDA after April 2, 2001. PTX 1058; *see also* Tr. 1260:7-1262:1. But Mr. Fleser was not present at the April 2 meeting, and thus had no need to sign a NDA on that date. Tr. 1260:10-15, 1261:16-1262:1, 1341:16-18. In any event, additional and overlapping NDAs hardly evidence a *lack* of confidentiality.

Facebook also claimed that a November 25, 2002, demonstration to Boston Scientific constituted a public use. But Leader had a NDA in place for that demonstration, too. Tr. 1363:20-1364:7. Again, Facebook's only evidence was that Leader and Boston Scientific later entered into an additional, mutual NDA. *See* DTX 182; Tr. 1301:22-1303:20. As with the presentation to Mr. Russo, therefore, the demonstration for Boston Scientific was not a public

---

[4] Leader demonstrated its security camera system, Smart Camera, to Mr. Russo. Tr. 1257:18-1258:8. The '761 Patented technology had not been developed at this time, and thus could not have been demonstrated. Nonetheless, an NDA was entered between the parties because the Smart Camera technology was proprietary information. DTX 725 at LTI 153001-03.

use. *See, e.g., Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1325 (Fed. Cir. 2009); *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1385 (Fed. Cir. 2007). Moreover, Facebook did not introduce *any* evidence that the demonstrations to Wright-Patterson Air Force Base or Boston Scientific involved the '761 Patent technology.

Other evidence at trial confirmed that Leader consistently sought confidentiality agreements before demonstrating any technology. Tr. 1337:3-8. Leader had executed approximately 2,400 NDAs with various companies and individuals, including Mr. McKibben's own children. Tr. 1334:6-14. Mr. McKibben testified that it was Leader's frequent practice to enter into a NDA before demonstrating Leader products and also to execute additional NDAs after such meetings to ensure the protection of trade secrets. Tr. 1300:5-11. In many cases, Leader separately executed NDAs with company representatives in addition to confidentiality agreements with the companies themselves. Tr. 1356:18-1357:3; *see also* Tr. 1300:20-1301:12. There is no evidence, much less clear and convincing evidence, that the demonstrations to Wright-Patterson Air Force Base, Mr. Russo or Boston Scientific were out of line with Leader's settled practice.

### 5. Leader Did Not Make Any Commercial Offers For Sale Of The Patented Invention.

The on-sale bar requires proof of a "commercial offer for sale." *Pfaff*, 525 U.S. at 67. In other words, Facebook had to show that each alleged offer for sale was "one which the other party could make into a binding contract by simple acceptance." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001). Whether an "offer" satisfies that standard turns on traditional principles of contract law. *Honeywell Int'l, Inc. v. Nikon Corp.*, 672 F. Supp. 2d 638, 642-45 (D. Del. 2009). Significantly, "a communication that fails to constitute a definite offer to sell the product and to include material terms is not an 'offer' in the contract sense." *Elan Corp. v. Andrx Pharms., Inc.*, 366 F.3d 1336, 1341 (Fed. Cir. 2004) (citing *Restatement (Second) of Contracts* § 33(3) (1981)). Facebook did not show that any of the three purported

offers for sale included the material terms of a definite contract, and thus constituted a contractual "offer."

A single email from October 2002 stated that Leader had "verbally committed to selling a system" to Boston Scientific. DTX 184 at LTI 105611. That email says nothing about any terms for a sale or even what "system" was to be sold. Indeed, nearly two months later, following another meeting with Boston Scientific, Leader was suppose "to put together a plan (proposal) over the next two weeks that lays out how/when they would bring L2L into BSC." DTX 776 at LTI 111341. Far from having an actual offer on the table, the parties were merely engaged in preliminary discussions and negotiations. "The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer." *Elan*, 366 F.3d at 1341 (quoting *Restatement (Second) of Contracts* § 33(3) (1981)).

Facebook also makes much of Leader's grant application to the federal government for funding to implement and test aspects of the Leader2Leader platform at Wright Patterson Air Force Base. *See* DTX 179, DTX 852. Leader's Broad Agency Announcement ("BAA") proposal, however, did not constitute a commercial offer for sale. The BAA industry guide gives clear guidelines showing that the funding proposal does not result in a buyer-seller relationship. *See* PTX 1234, at 17. And Leader's use of the word "offeror" in the White Paper it submitted as part of its application was a function of the terminology used in those guidelines -- not an indication of a commercial offer for sale. PTX 1234 at 2, 8 (The offeror "defines the Statement of Work...."); *see also Group One*, 254 F.3d at 1048 (use of word "offer" is not controlling, and requires looking closely at the language of the proposal).

Finally, Facebook relied on a November 21, 2002, email from Mr. McKibben to Len Schlesinger of The Limited. DTX 185. On November 21, 2002, in an effort to secure The Limited's support for additional venture capital funding, Mr. McKibben approached Mr. Schlesinger about LeaderPhone and Leader2Leader. *Id.* Although the email uses the word "offer" and proposes some terms, such as quantity and price, it also states that Leader would be

"flexible" on crucial terms, including "adding Limited-requested features to the system." *Id.*

That makes clear that even the functions to be included in the products were still an open term.[5]

In *MLMC, Ltd. v. Airtouch Commcns., Inc.*, 215 F. Supp. 2d 464 (D. Del. 2002), this Court

granted judgment as a matter of law that there had been no commercial offer because, although

the alleged offer "included prices, quantities, and very brief equipment descriptions," it was

"missing other terms typically included in a commercial contract" and "the record contain[ed] no

testimony or documents from the recipients" of the purported offer. *Id.* at 480. So too here,

because the email does not specify essential terms such as product functionality and time and

place of delivery, it is not sufficiently definite to constitute a contractual "offer." *Id.; see also*

*Rhenalu v. Alcoa Inc.*, 224 F. Supp. 2d 773, 804 (D. Del. 2002).

### 6.     The '761 Patent Is Entitled To The Provisional Application's Priority Date.

The priority date for the '761 Patent is beside the point because Facebook has not carried

its burden of proof on the public use and on-sale bars even under its preferred critical date of

December 10, 2002.   Nevertheless, the correct critical date is December 11, 2001, one year

before the filing date of the provisional application, because that application fully supports the

claims of the '761 Patent.   That priority date provides an additional ground for judgment as a

matter of law, because none of the alleged public uses or offers occurred more than one year

before December 11, 2002.

Facebook elicited testimony from its expert that essentially consisted of hunting for

specific words in the provisional application and attached code. *See, e.g.*, Tr. 1411:5-7, 1416:9-

19, 1424:3-6, 1429:2-5, 1431:3-6.   In addition, Facebook focused on superficial differences

---

[5] In addition, The Limited's executed NDA contained a "non-reliance" clause that made it clear that any Leader information exchanged between the parties prior to a formal written agreement shall have no "legal effect."   DTX 725 at LTI 151130, ¶ 5; *see also Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir. 2001)("such communications cannot be considered offers, because they do not indicate LTC's intent to be bound, as required for a valid offer")(citing *Restatement (Second) of Contracts* § 26 (1981)("A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.")).

between the patent and the provisional application, such as the absence of figures in the provisional application. Tr. 1413:18-1415:13. That kind of analysis does not rise to the level of clear and convincing evidence, especially considering that Leader offered detailed evidence from its expert, Dr. James Herbsleb, that every element of each of the asserted claims was supported by the provisional application. Tr. 1739:10-1787:13; *Purdue Pharma Prods. L.P. v. Par Pharm., Inc.,* 642 F. Supp. 2d 329, 367 (D. Del. 2009)("the trial court has the responsibility to determine whether the challenger has met its burden of proof by clear and convincing evidence by considering the totality of the evidence, 'including any rebuttal evidence presented by the patentee'")(quoting *Pfizer*, 480 F.3d at 1360). Moreover, Leader provided evidence that one of Dr. Herbsleb's students built an implementation of an actual embodiment of the '761 Patented technology based only on the provisional application. Tr. 1743:23-1746:2. The resulting embodiment demonstrates that the provisional application supports the claims of the '761 Patent and enables one of skill in the art to practice the invention. *See* PTX 1125. Accordingly, Leader is entitled to judgment as a matter of law that the '761 Patent is entitled to claim priority based on the provisional application.

## C.   LEADER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW THAT FACEBOOK DIRECTS OR CONTROLS ITS EMPLOYEES AND USERS.

Though the jury found that Facebook *directly* infringed all of the asserted claims, including method claims 9, 11, and 16,[6] it found that Facebook did not control or direct the actions of either its employees or its end users. *See* D.I. 610, at 2. Under the joint infringement doctrine, a party is liable if it performed some of the steps of a patented method and controlled or directed another's performance of the remainder of the steps. *See, e.g., BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379 (Fed. Cir. 2007).

---

[6] Leader put forth substantial evidence that the asserted methods claims of the '761 Patent are directed to the execution of the components on the back end. Therefore, Facebook directly infringes these claims because their systems perform the steps of the method. The steps are not executed by the user, but rather by the PHP code (which is a scripting language that generates HTML code that is sent to the user). Alternatively, Leader put forward a joint infringement theory based on Facebook's defense to infringement that the claims require actions by the users and the system -- a defense rejected by the jury.

18

At a bare minimum, Leader proved that Facebook controls or directs the actions of its own employees using the Facebook website. *See* PTX 145; *see also* Tr. 677:7-678:4. The jury instruction stated that the jury "may consider" evidence such as "whether there is a contractual relationship between Facebook and the third parties; whether users of Facebook are agents of Facebook; and whether Facebook supplies the instrumentalities, tools, and the website for the person using the website." D.I. 601, at 28. Leader proved all of those points. Facebook's employees inherently have a contractual relationship and indeed are agents of the company, and there is no question that Facebook provides the "instrumentalities, tools, and the website" for its own employees to use the infringing website. *See* PTX 145; *see also* Tr. 677:7-678:4.

Moreover, the "control or direction" test is satisfied as a matter of law where, as here, "the law would traditionally hold the accused direct infringer vicariously liable for the acts committed by another party that are required to complete performance of a claimed method." *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1330 (Fed. Cir. 2008)(citations omitted). An employer's responsibility for its employees acting within the scope of their employment is the paradigmatic example of vicarious liability. *Restatement (Third) of Agency* § 7.07(1)(2006). As a matter of law, Facebook controls or directs its employees, and no reasonable jury could find otherwise. For that reason alone, this Court should grant judgment as a matter of law that Facebook controls or directs its employees.

In addition, no reasonable jury could find that Facebook does not direct its users on how to use its website. *See, e.g.*, PTX 628, PTX 886, PTX 920, PTX 1000. For example, the Statement of Rights and Responsibilities for Facebook "tells the user what they can and cannot do." Tr. 678:21-679:14 (discussing PTX 1000). According to the Statement of Rights and Responsibilities, if a user violates the terms, the user's account will be terminated by Facebook. PTX 1000. If a user fails "to keep [his] contact information accurate and up-to-date," the user will not be allowed to use Facebook. *Id.* Simply put, Facebook's users must follow Facebook's rules, or they cannot use the website -- the very definition of direction or control.

19

**D.    IN THE ALTERNATIVE, LEADER IS ENTITLED TO A NEW TRIAL.**

If the Court were to deny judgment as a matter of law, it should grant a new trial. While this Court must view the evidence in the light most favorable to the verdict when deciding whether to grant judgment as a matter of law, it need not do so when determining whether to grant a new trial. *See supra* pp. 3-4. Instead, based on its own observation of the trial, this Court may grant a new trial "where there is insufficient evidence to support the verdict or where the verdict was against the weight of the evidence." *Greenleaf*, 174 F.3d at 365 (citations omitted).

In this case, the jury's verdict on some of Facebook's defenses is not only against the great weight, if not all, of the evidence, it rests entirely on speculative inferences—as opposed to testimonial or documentary evidence -- about what was supposedly demonstrated or offered for sale before December 10, 2002. Even if such inferences could overcome the actual evidence in this case (and they cannot, as explained above), Facebook's heavy reliance on inferences in the face of consistently contrary evidence would make this a classic case for a new trial. *See, e.g.*, *Roebuck*, 852 F.2d at 735-36 (reversing grant of judgment as a matter of law but affirming alternative grant of new trial because of "extraordinary number of inferences that the jury must have drawn in order to reach the verdict that it did"); *see also Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 211-12 (3d Cir. 1992) ("highly inferential case" warranted new trial); *American Bearing Co., v. Litton Indus., Inc.*, 729 F.3d 943, 952-53 (3d Cir. 1984). At a bare minimum, therefore, this Court should grant a new trial on the public use and on-sale bars for the same reasons described above.

## IV.    CONCLUSION

For the foregoing reasons, this Court should grant Leader's motion for judgment as a matter of law that the '761 Patent is not invalid, that the provisional application supports the claims of the '761 Patent, and that Facebook directs or controls its employees and users. In the alternative, this Court should grant a new trial on those issues.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: */s/ Philip A. Rovner*

Paul J. André
Lisa Kobialka
King & Spalding, LLP
333 Twin Dolphin Drive
Suite 400
Redwood Shores, California  94065-6109
(650) 590-7100

    Philip A. Rovner (#3215)
    Jonathan A. Choa (#5319)
    Hercules Plaza
    P.O. Box 951
    Wilmington, DE  19899
    (302) 984-6000
    provner@potteranderson.com
    jchoa@potteranderson.com

Dated:  August 25, 2010
979903

*Attorneys for Plaintiff and Counterdefendant
Leader Technologies, Inc.*

21

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on August 25, 2010, the within document

was filed with the Clerk of the Court using CM/ECF which will send notification of such

filing(s) to the following; that the document was served on the following counsel as indicated;

and that the document is available for viewing and downloading from CM/ECF.

### BY CM-ECF AND E-MAIL

Thomas P. Preston, Esq.
Steven L. Caponi, Esq.
Blank Rome LLP
1201 Market Street
Wilmington, DE 19801
Preston-T@blankrome.com
caponi@blankrome.com

I hereby certify that on August 25, 2010 I have sent by E-mail the foregoing

document to the following non-registered participants:

Heidi L. Keefe, Esq.
Mark R. Weinstein, Esq.
Jeffrey Norberg, Esq.
Melissa H. Keyes, Esq.
Cooley LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
hkeefe@cooley.com
mweinstein@cooley.com
jnorberg@cooley.com
mkeyes@cooley.com

/s/ Philip A. Rovner
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com