IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LEADER TECHNOLOGIES, INC., a Delaware corporation, | : | |
| | : | |
| | : | |
| Plaintiff and Counterdefendant, | : | |
| | : | |
| | : | |
| v. | : | Civil Action No. 08-862-LPS |
| | : | |
| FACEBOOK, INC., a Delaware corporation, | : | |
| | : | |
| | : | |
| Defendants and Counterclaimant. | : | |

Paul J. André, Esquire and Lisa Kobialka, Esquire of KING & SPALDING LLP, Redwood Shores, California.
Philip A. Rovner, Esquire and Jonathan A. Choa, Esquire of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware.

Attorneys for Plaintiff and Counterdefendant, Leader Technologies, Inc.

Michael G. Rhodes, Esquire; Heidi L. Keefe, Esquire; Mark R. Weinstein, Esquire and Jeffrey T. Norberg, Esquire of COOLEY LLP, Palo Alto, California.
Steven L. Caponi, Esquire of BLANK ROME LLP, Wilmington, Delaware.

Attorneys for Defendant and Counterclaimant, Facebook, Inc.

March 14, 2011
Wilmington, Delaware

Stark, District Judge:

This action was brought by Plaintiff Leader Technologies, Inc. ("Leader") against

Defendant Facebook, Inc. ("Facebook") alleging that Facebook's website, available at

www.facebook.com, infringes claims 1, 4, 7, 9, 11, 16, 21, 23, 25, 31, and 32 of U.S. Patent No.

7,139,761 (the "'761 patent"). A seven-day jury trial was held, and the jury returned a verdict

finding that Facebook literally infringed each asserted claim of the '761 patent, but did not

control or direct either its employees or its end users. The jury also concluded that the '761

patent was not invalid based on anticipation and obviousness, but was invalid based on the on

sale bar and public use bar. Following the jury's verdict, Facebook filed four Renewed Motions

For Judgment As A Matter Of Law (D.I. 628, 629, 630, 631) and completed briefing on a Motion

For Summary Judgment Of Invalidity Of Claims 1, 4, 7, 21, 23, 25, 31 And 32 Of U.S. Patent

No. 7,139,761 [Summary Judgment Motion No. 1] (D.I. 382) in accordance with the Court's

instructions. In addition, Leader filed one Renewed Motion For Judgment As A Matter Of Law

Or A New Trial (D.I. 626).

For the reasons discussed, Facebook's Renewed Motion For Judgment As A Matter Of

Law Of No Indirect Infringement (D.I. 630) will be granted and Facebook's remaining Motions

will be denied to the extent they seek judgment as a matter of law and denied as moot to the

extent they seek a new trial. In addition, Leader's Renewed Motion For Judgment As A Matter

Of Law Or A New Trial (D.I. 626) will be denied.

## LEGAL STANDARDS

### I.    Motion For Judgment As A Matter Of Law

To prevail on a renewed motion for judgment as a matter of law following a jury trial, the

moving party "'must show that the jury's findings, presumed or express, are not supported by

substantial evidence or, if they were, that the legal conclusions implied [by] the jury's verdict cannot in law be supported by those findings.'" *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (quoting *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984)); *accord Price v. Delaware Department of Correction*, 40 F. Supp. 2d 544, 549 (D. Del. 1999). In assessing the sufficiency of the evidence, the court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor, and in general, view the record in the light most favorable to him." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir.), *reh'g en banc denied*, 1991 U.S. App. LEXIS 16758 (3d Cir. 1991); *see also Perkin-Elmer Corp.*, 732 F.2d at 893. The court may not evaluate the credibility of the witnesses, may not weigh the evidence, and may not substitute its view of the evidence for the jury's view. *See Price*, 40 F. Supp. 2d at 550. Rather, the court must determine whether the evidence reasonably supports the jury's verdict. *See Dawn Equip. Co. v. Kentucky Farms, Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998); *Gomez v. Allegheny Health Servs. Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995) (describing standard as "whether there is evidence upon which a reasonable jury could properly have found its verdict"); 9A Wright & Miller, *Federal Practice & Procedure* § 2524 at 249-66 (3d ed. 1995) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury properly could find a verdict for that party.").

## II.    Motion For A New Trial

In pertinent part, Federal Rule of Civil Procedure 59(a) provides:

2

> A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

Among the most common reasons for granting a new trial are: (1) the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) newly discovered evidence exists that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent. *See Zarow-Smith v. New Jersey Transit Rail Operations*, 953 F. Supp. 581, 584 (D.N.J. 1997).

The decision to grant or deny a new trial is committed to the sound discretion of the district court. *See Allied Chemical Corp. v. Darflon, Inc.*, 449 U.S. 33, 36 (1980); *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282 (1993) (reviewing district court's grant or denial of new trial motion under deferential "abuse of discretion" standard). However, where the ground for a new trial is that the jury's verdict was against the great weight of the evidence, the court should proceed cautiously, because such a ruling would necessarily substitute the court's judgment for that of the jury. *See Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993). Although the standard for grant of a new trial is less rigorous than the standard for grant of judgment as a matter of law in that the court need not view the evidence in the light most favorable to the verdict winner, a new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand," the verdict "cries out to be overturned," or where the verdict "shocks [the] conscience." *Williamson*, 926 F.2d at 1352; *see also Price*, 40 F. Supp. 2d at 550.

3

## DISCUSSION

I.  **Facebook's Renewed Motion For Judgment As A Matter Of Law Of No Direct Infringement (D.I. 628) [Motion No. 1 of 4]**

A.  **Parties' Contentions**

By its Motion, Facebook contends that the asserted claims of the '761 patent can only be infringed by Facebook through the combination of actions by Facebook and its end users. At trial, the jury concluded that Leader did not establish, by a preponderance of the evidence, that Facebook "controls or directs the actions of Facebook end users and/or Facebook employees." (D.I. 610, Question #3) As a result of the jury's finding on this specific question and in light of Federal Circuit case law, Facebook contends that it is entitled to judgment as a matter of law on the issue of direct infringement.

In response, Leader contends that Facebook's Motion rests on the erroneous application of the standard for joint infringement. According to Leader, it asserted joint infringement as an alternative theory of liability with respect to only the method claims (claims 9, 11, and 16) of the '761 patent. Because sufficient evidence supports the jury's verdict that Facebook directly infringed the method claims of the patent on its own accord, without regard to the actions of its end users or employees, Leader maintains that application of the joint infringement theory is not relevant to support the jury's verdict on the method claims. As for the system and computer-readable media claims (claims 1, 4, 7, 21, 23, 25, 31, and 32), Leader contends that it never advanced a joint theory of infringement, because that theory only applies to method claims. Leader maintains that the system and computer-readable media claims are product claims and, therefore, do not require user performance.

4

Accordingly, Leader contends that the jury's verdict that Facebook directly infringes the '761 patent should be upheld, and Facebook's Motion should be denied.

### B.      Legal Principles For Direct Infringement

"[D]irect infringement requires a single party to perform every step of a claimed method." *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 2010 WL 5151337 (Fed. Cir. Dec. 20, 2010). Liability for direct infringement cannot be avoided by having someone else carry out one or more of the claimed steps. *See BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378-79 (Fed. Cir. 2007). Thus, liability for direct infringement may be established under a joint infringement theory. As the Federal Circuit has explained:

> [W]here the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed only if one party exercises "control or direction" over the entire process such that every step is attributable to the controlling party, i.e., the "mastermind." . . . At the other end of this multi-party spectrum, mere "arms-length cooperation" will not give rise to direct infringement by any party.

*Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008) (internal citations omitted).

### C.      Whether Facebook Is Entitled To Judgment
As A Matter Of Law Of No Direct Infringement

Reviewing the jury's verdict in the light most favorable to Leader, as the verdict winner, the Court concludes that sufficient evidence exists to support the jury's verdict that Facebook alone performed each and every element of the asserted method claims (claims 9, 11 and 16) for purposes of establishing direct infringement. In full, independent claim 9 recites:

A computer-implemented method of managing data, comprising computer-executable acts of:

creating data within a user environment of a web-based computing platform via user interaction with the user environment by a user using an application, the data in the form of at least files and documents;

dynamically associating metadata with the data, the data and metadata stored on a storage component of the web-based computing platform, the metadata includes information related to the user, the data, the application, and the user environment;

tracking movement of the user from the user environment of the web-based computing platform to a second user environment of the web-based computing platform; and

dynamically updating the stored metadata with an association of the data, the application, and the second user environment wherein the user employs at least one of the application and the data from the second environment.

(emphasis added)

According to Facebook, the underlined elements require user interaction, while the remaining elements describe operations performed by a "web-based computing platform." Thus, Facebook maintains that at least two actors are required to infringe claim 9. In the Court's view, however, Facebook's reading of the claim fails to consider its full context. As recited in the preamble, the method asserted in claim 9 is comprised of "computer-executable acts." Thus, there is no requirement of user interaction recited in the claim. Rather, claim 9 claims the back-end process performed by the source code. *See Fantasy Sports Props., Inc. v. Sportline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002) ("[A]lthough a user must activate the function programmed into a piece of software by selecting those options, the user is only activating means that are already present in the underlying software.").

6

At trial, Leader presented sufficient evidence to demonstrate that Facebook's source code performs each element of the claimed method. As to the "creating data" step highlighted by Facebook, Leader presented substantial evidence that the system creates a data file containing a copy of the data being uploaded. Similarly, Leader presented substantial evidence that the source code performs the dynamically updating step. Leader's expert, Dr. Vigna, testified extensively regarding these issues and engaged in a detailed step-by-step analysis of the manner in which the source code carries out the claimed methods. The jury was free to credit Dr. Vigna's testimony over the contrary testimony of Facebook's expert. Accordingly, the Court concludes that sufficient evidence was presented to sustain the jury's verdict that Facebook directly infringes claim 9, the independent method claim and, therefore, that Facebook also directly infringes dependent method claims 11 and 16.

As for the remaining system and computer-readable media claims (claims 1, 4, 7, 21, 23, 25, 31, and 32), the Court concludes that Facebook's joint infringement argument is irrelevant. The Court instructed the jury on the alternate theory of joint infringement only with respect to the asserted method claims of the '761 patent. (Tr. 1923:21-1924:2 ("For Facebook to be liable for the acts of third parties, Leader must have proven, by a preponderance of the evidence, that Facebook controls or directs the activity of those parties who perform the steps *of the method claims*.") (emphasis added); D.I. 601 (Final Jury Instructions) at 28 (same)) Consistent with this instruction, the verdict sheet framed the question of direction or control as applying only to method claims 9, 11 and 16. (D.I. 610 (Verdict) at 2)

Facebook points out that it objected to limiting the control or direction question to claims 9, 11, and 16, and contends that Federal Circuit case law applies the control or direction

requirement to both method and system claims.  In support of its argument, Facebook directs the

Court to *Golden Hour Data Sys., Inc. v. emsCharts, Inc.,* 614 F.3d 1367 (Fed. Cir. 2010), for the

proposition that "the Federal Circuit in *Golden Hour* recently affirmed judgment as a matter of

law in favor of an accused infringer as to both method *and* system claims when, as here, the

plaintiff failed to show 'control or direction.'" (D.I. 632 at 5)  In the Court's view, however,

*Golden Hour* does not support Facebook's position.  As the Federal Circuit explained in *Golden

Hour*, the parties agreed to submit the asserted claims to the jury "only on a joint infringement

theory." 614 F.3d at 1381.  As a result, the Federal Circuit recognized that the jury's finding of

infringement could be sustained only if there was control or direction.  In this case, Leader

limited application of its joint theory of infringement to the asserted method claims as an

alternative argument.  Moreover, Federal Circuit case law suggests that the expansion of liability

arising from joint infringement more often applies to method claims, rather than system claims.

*See Muniauction, Inc.,* 532 F.3d at 1329 (holding that "where the actions of multiple parties

combine to perform every step *of a claimed method,* the claim is directly infringed only if one

party exercises 'control or direction' over the entire process") (emphasis added); *Akamai

Technologies, Inc.,* 2010 WL 5151337, at * 5 (discussing joint infringement in context of method

claims and stating that "the 'control or direction' test of *BMC Resources* established a

foundational basis on which to determine liability for *direct infringement of method claims by

joint parties*") (emphasis added).

     At trial, Leader presented evidence in the form of Facebook's documents, source code,

and testimony from Facebook's employees to establish that the Facebook system meets each

element of the asserted system and computer-readable media claims.  (Tr. 587:9-19; 588:2-8;

8

655:17-656:4; 666:17-667:7; 670:17-22; 674:6-12; 817:10-818:20; 819:1-12; *see also* Hopkins

Decl. Ex. 29 at 1-96; 150-322) The Court concludes that the evidence presented by Leader is

sufficient to sustain the jury's verdict that Facebook directly infringes the system and computer

readable media claims.[1]  To the extent Facebook suggests that the system and computer-readable

media claims require user interaction to create data, the Court does not understand these claims

to require user interaction and instead concludes that they pertain to the functionality of the back-

end of the claimed systems.[2]  Accordingly, the Court will deny Facebook's Renewed Motion For

Judgment As A Matter Of Law Of No Direct Infringement.[3]

## II.   Facebook's Renewed Motion For Judgment As A Matter Of Law Of No Literal Infringement And No Infringement Under The Doctrine of Equivalents (D.I. 629) [Motion No. 2 of 4]

### A.   Literal Infringement

#### 1.   Parties' Contentions

By its Motion, Facebook contends that it is entitled to judgment as a matter of law on

Leader's claim of literal infringement, because the Facebook website lacks at least two elements

of each of the asserted claims of the '761 patent. Using claim 1 of the '761 patent as an

---

[1] *See infra* Section II.A of this Memorandum Opinion addressing Facebook's Motion For Judgment As A Matter Of Law Of No Literal Infringement (D.I. 629).

[2] Facebook has filed a separate motion for judgment as a matter of law seeking to invalidate the system and computer-readable media claims on the basis that the claims improperly merge both an apparatus and a method. The Court will provide additional discussion concerning this issue in the context of adjudicating that motion. *See infra* Section V of this Memorandum Opinion.

[3] In its opposition brief, Leader also raises an argument for judgment as a matter of law on the issue of whether Facebook directs or controls its employees and end users. This argument is reiterated in Leader's Renewed Motion For Judgment As A Matter Of Law, and the Court will discuss it fully in that context. *See infra* Section VI.B of this Memorandum Opinion.

example,[4] Facebook contends that its website does not perform the elements requiring:
(1) "storage of metadata in a first context, environment or workspace, followed by updating of
*that same metadata* in a second context, environment or workspace," and (2) "that this same
metadata be updated 'dynamically,' which the Court construed to mean automatically and in
response to the user's movement to a second context, environment or workspace." (D.I. 633 at
1) Facebook contends that "[b]ecause Leader could not establish that Facebook satisfied either
of these elements at trial, it made improper legal arguments to the jury that contradicted the
Court's claim construction." (*Id.* at 2)

In response, Leader contends that Facebook's arguments are an attempt to revisit and
distort the Court's claim construction. Leader contends that Facebook's argument regarding
"updating the stored metadata" is an attempt to recapture the narrow definition of "metadata"
proposed by Facebook during claim construction and rejected by the Court. Leader also contends
that the Court adopted Facebook's proposed definition for the term "dynamically" and, therefore,

---

[4]In full, Claim 1 of the '761 patent provides:

A computer-implemented network-based system that facilitates
management of data, comprising:

a computer-implemented context component of the network-based system
for capturing context information associated with user-defined data created by
user interaction of a user in a first context of the network-based system, the
context component dynamically storing the context information in metadata
associated with the user-defined data, the user-defined data and metadata stored
on a storage component of the network-based system; and

a computer implemented tracking component of the network-based system
for tracking a change of the user from the first context to a second context of the
network-based system and dynamically updating the stored metadata based on the
change, wherein the user accessed the data from the second context.

10

Facebook cannot now seek modification of that term.  Apart from already decided claim

construction issues, Leader contends that Facebook's motion rests on a factual challenge to the

credibility of Leader's expert, Dr. Vigna, and the manner in which Dr. Vigna applied the Court's

claim constructions to the Facebook website.  Because Leader presented substantial evidence to

support the jury's verdict that Facebook infringes the '761 patent, Leader contends that Facebook

is not entitled to judgment as a matter of law.

### 2.    Legal Principles For Literal Infringement

Infringement is a two step inquiry.  Step one requires the Court to construe the disputed

terms of the patent as a matter of law.  *See Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d

1241, 1247 (Fed. Cir. 2000).  Step two is a factual inquiry that requires the properly construed

claims to be compared to the accused device.  *See Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353

(Fed. Cir. 1998).  "Literal infringement of a claim exists when every limitation recited in the

claim is found in the accused device, i.e., when the properly construed claim reads on the accused

device exactly."  *Amhill Enters., Ltd. v. Wawa,* 81 F.3d 1554, 1564 (Fed. Cir. 1996).  This

determination requires an element-by-element basis; if an element of the claim is not present in

the accused device, then the device does not literally infringe the claim.  *See Cross Med. Prods.,*

*Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005).  The party

asserting infringement has the burden of proof and must meet its burden by a preponderance of

the evidence.  *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed.

Cir. 1988).

11

### 3. Whether Facebook Is Entitled To Judgment As A Matter Of Law Of No Literal Infringement

After reviewing the evidence presented to the jury in the light most favorable to Leader,

as the verdict winner, the Court concludes that substantial evidence supports the jury's verdict

that Facebook literally infringes the asserted claims of the '761 patent. Facebook contends that

the phrase "stored metadata" used throughout claim 1 of the '761 patent refers back to the same

metadata that was stored in the first context. In support of its argument, Facebook directs the

Court to claim construction principles concerning the meaning of the definite article, "the."

Facebook contends that the claim does not differentiate between "the stored metadata" in each of

the two contexts described by the claim, e.g., the first context and the second context, and,

therefore, the reference to "the stored metadata" must refer back to the "metadata stored on a

storage component." Thus, Facebook maintains that Leader was required to prove two things to

establish literal infringement: "(1) that metadata is stored in the first context, environment or

workspace, and that (2) this *same* stored metadata is then updated in the second context,

environment or workspace." (D.I. 633 at 5)

Although Facebook denies that its argument is an attempt to reargue claim construction

and contends that its position is consistent with the Court's definition of the term "metadata," the

Court disagrees. During claim construction, Facebook sought to define "metadata" by reference

to the user context as "a stored item of information associated with the user's data that identifies

at least the context, user workspace or user environment in which the user and the data currently

reside." (D.I. 191 at 15) The Court rejected this definition and concluded that "metadata" should

be construed in accordance with its plain and ordinary meaning. The Court will not allow

12

Facebook to recapture post-trial what it lost during claim construction.

At trial, Dr. Vigna testified that the Facebook website captures context information about an uploaded file and stores this information in metadata. (Tr. 785:19-786:1) Dr. Vigna was unequivocal that the "context information" of the Facebook website is part of the metadata stored on the storage component. (Tr. 788:19-789:9; *see also* Tr. 776:20-21; 779:3-5; 781:24-782:4; 784:6-9) Dr. Vigna went on to explain several examples of the manner in which the Facebook website updates the metadata by adding entries to tables or other data components within the metadata as a user accesses data provided in a first context from a second context. For example, Dr. Vigna explained that a user can access his own profile picture by writing on the wall of another user or can access his profile picture by joining a group or fanning a page. (Tr. 593:10-604:8, 605:14-607:21, 631:9-634:11, 644:2-16) In both instances, the Facebook website updates metadata by adding entries to the Minitable of the user, the wall table of the target, and/or the table of the group or page that the user is joining.

Facebook contends that Dr. Vigna's testimony, at most, demonstrates features of the Facebook website that result "in the generation of new and unrelated metadata." (D.I. 633 at 5) In this regard, Facebook maintains that Dr. Vigna never identified any instance in which the same metadata was ever modified or changed after it was stored. For example, if a user uploads a photo to Facebook and moves to another page, such as a user profile, and writes on another user's wall, this is a change from the first context to a second context which results in the creation of new metadata. However, Facebook contends that this new metadata has nothing to do with the originally uploaded photo. According to Facebook, the context information about the photo was never modified or changed in any way after it was stored. (*Id.*)

In the Court's view, Facebook's argument is deficient for two reasons. First, the term "updating" was never construed to mean "modifying or changing" existing data, as is required to support Facebook's current argument. Although Facebook initially requested the Court to construe the term "updating" to mean "modifying existing data to make current," Facebook withdrew that proposed construction and agreed to the ordinary meaning of the term "updating." (D.I. 191 at 40; D.I. 219) Moreover, Facebook never proposed that the Court construe the entire term "updating the stored metadata." Thus, Facebook's arguments rest on claim construction arguments which have been waived[5] and, therefore, they cannot be used to overturn the jury's verdict. Second, the claims of the '761 patent do not require the context information to be updated as Facebook contends. Rather, the claims only require that the metadata be updated, and Dr. Vigna's testimony more than amply supports a finding that this claim element is met in the accused Facebook website.

Facebook also contends that Leader failed to prove, by a preponderance of the evidence, that the Facebook website has a tracking component that dynamically updates stored metadata based on the user's movement. In making this argument, Facebook recognizes that the Court construed the term "dynamically" to mean "automatically and in response to the preceding event," but contends that Leader improperly argued to the jury that the term "preceding event" could be a preceding event in the accused system, rather than the preceding event described in the claim. (D.I. 633 at 7) Facebook contends that Leader's argument – that the "preceding event"

---

[5] *See Envosys LLC v. Nextel Comm., Inc.,* 614 F.3d 1333, 1334 (Fed. Cir. Aug. 3, 2010) (holding that claim construction arguments raised for first time post-trial are considered waived); *see also Broadcom Corp. v. Qualcomm, Inc.,* 543 F.3d 683, 694 (Fed. Cir. 2008); *Eli Lilly & Co. v. Aradigm Corp.,* 376 F.3d 1352, 1360 (Fed. Cir. 2004).

14

may be any event in the system – was precluded by Judge Farnan's claim construction order. (*Id.* at 8) According to Facebook, "[f]or purposes of the 'dynamically updating' element of each asserted claim, the only 'identified action by the user' that could correspond to 'the preceding event' was the user's movement from a first context to a second." (*Id.*) If the phrase "preceding event" referred to some event taken at a later time by the user of the accused system, Facebook contends that Judge Farnan would have construed the term "dynamically" to mean "automatically and in response to any preceding event, or any event in the system, rather than us[ing] the term 'the preceding event,' with the only frame of reference being the language of the claims." (*Id.*)

In the Court's view, Facebook's argument is an attempt to further limit the Court's construction of the term "dynamically" to include limitations that were not proposed by Facebook during claim construction. As Leader points out, Facebook's argument rests on construing the term "dynamically" to mean "automatically and in response to the change of the user from the first context to a second context." (D.I. 643 at 11) However, the Court adopted the construction of the term "dynamically" proposed by Facebook and, therefore, the Court is persuaded that Facebook is estopped from seeking modifications of a construction the Court adopted at Facebook's insistence. *See Interactive Gift Express, Inc. v. CompuServe Inc.*, 256 F.3d 1323, 1347-48 (Fed. Cir. 2001) (holding that party is precluded from offering claim construction not previously raised that broadens or narrows scope of claim); *see also Loral Fairchild Corp. v. Victor Co.*, 911 F. Supp. 76, 80-81 (E.D.N.Y. 1996) (holding that party is estopped from proposing alternative claim construction that broadens scope of claim after close of discovery).

At trial, Dr. Vigna applied the Court's construction of the term dynamically and

explained, through numerous examples, that the Facebook website infringed the tracking component of the claims. According to Dr. Vigna, "the moment the users share in the how are you message in response to that event, automatically a story is created in the metadata. Now this story is based on the fact that you change from one profile to another." (Tr. 664:12-19) He went on to explain:

> [T]his is an important aspect of the system, the fact that what you do is based on how you change your access in the system. You go to one profile to another, the fact that you found the Giants' page and not the Philadelphia Eagles is taken into account. So the metadata is based on this particular change in access.

(Tr. 665:6-13) Dr. Vigna explained that the Facebook website tracks user movement from one environment to another. As the user performs an action in the second environment, the Facebook website then updates the metadata with the tracking information based on the user's change to the second context. (Tr. 665:14-666:16) Dr. Vigna's testimony is supported by the source code. (Tr. 594:14-19; 637:18-640:12) To the extent Facebook disagrees with Dr. Vigna's application of the Court's claim construction to its website, that disagreement amounts to a factual dispute which was within the province of the jury to resolve.

In sum, the Court concludes that the jury's verdict of literal infringement is supported by substantial evidence. Accordingly, the Court will deny Facebook's Motion to the extent it seeks judgment as a matter of law on the issue of literal infringement of the asserted claims of the '761 patent.

## B.     Doctrine Of Equivalents

Facebook next contends that it is entitled to judgment as a matter of law on infringement

under the doctrine of equivalents, if the Court determines that a new trial on infringement is appropriate. The jury found that Facebook literally infringed the '761 patent and, therefore, concluded that Facebook could not be liable for infringement under the doctrine of equivalents. The Court has concluded that this verdict is supported by substantial evidence and, for the reasons discussed below, a new trial is not warranted. Accordingly, the Court will deny as moot Facebook's Motion to the extent it seeks judgment as a matter of law on the doctrine of equivalents.

### C.    New Trial On Infringement

In the alternative, Facebook requests the Court to order a new trial on infringement. Specifically, Facebook contends that: (1) Dr. Vigna's trial testimony exceeded the scope of his expert report; (2) the jury was improperly presented with the claim construction dispute concerning the meaning of the term "preceding event," which should have been clarified by the Court in the first instance; and (3) the jury's verdict was against the clear weight of the evidence.

As Facebook recognizes, an invalid patent cannot be infringed. *See, e.g. Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1580 (Fed. Cir. 1983). Thus, Facebook's argument for a new trial on infringement is only relevant "[i]f the Court were nonetheless to enter judgment in favor of Leader, or grant Leader a new trial on any issue on which Facebook prevailed" at trial. (D.I. 633 at 14) For the reasons discussed *infra*, the jury's verdict on invalidity based on the application of the on sale bar and public use bar will not be disturbed. Accordingly, the Court will deny as moot Facebook's Motion to the extent it seeks a new trial on infringement.

III.   **Facebook's Renewed Motion For Judgment As A**
       **Matter Of Law Of No Indirect Infringement (D.I. 630)**
       **[Motion No. 3 of 4]**

   A.   **Parties' Contentions**

By its Motion, Facebook requests judgment as a matter of law with respect to Leader's

claims for indirect infringement based on alleged inducement of infringement and contributory

infringement.  In support of its request, Facebook points out that the Court refused to instruct the

jury on either inducement or contributory infringement.

In response, Leader contends that Facebook's motion for judgment as a matter of law is

procedurally improper precisely because the Court never allowed the jury to consider the issue.

Because there is no verdict to challenge, Leader contends that Facebook cannot maintain its

motion.  Although Leader recognizes that the Court decided the issue of indirect infringement in

favor of Facebook, Leader clarifies that it "has not abandoned its indirect infringement claim"

and maintains that "[t]he trial record includes sufficient evidence that Facebook indirectly

infringes the '761 patent."  (D.I. 644 at 2)

   B.   **Whether Facebook Is Entitled To Judgment**
        **As A Matter Of Law Of No Indirect Infringement**

Following the conclusion of the parties' presentation of the evidence before the jury, the

Court held a prayer conference with the parties.  With respect to the issue of indirect

infringement, the Court stated:

> . . . I'm not going to be instructing the jury on theories of indirect infringement.
> I'm only instructing on direct infringement, so I'm not including any instruction
> on induced infringement or contributory infringement.
>
> I don't believe there has been evidence from which the jury could find that

any third party other than Facebook is the direct infringer, nor do I think there is any evidence of Facebook's knowledge of the '761 patent at this trial.

(Tr. 1884:13-24)

Following the Court's comments and prior to submitting the case to the jury, Facebook filed a Motion For Judgment As A Matter Of Law Under Federal Rule of Civil Procedure 50(a) seeking, among other things, judgment as a matter of law on Leader's indirect infringement claims. Rule 50(a)(1) provides:

(1) *In General.* If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

(A) resolve the issue against the party; and

(B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

(2) *Motion.* A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

The Court's comments at the prayer conference were intended to be a finding that a reasonable jury would not have a legally sufficient basis to find in favor of Leader on its indirect infringement claims. Accordingly, the Court concludes that Facebook is entitled to judgment as a matter of law on Leader's claims of contributory infringement and induced infringement and, therefore, the Court will grant Facebook's Motion For Judgment As A Matter Of Law Of No Indirect Infringement.

19

IV.   **Facebook's Renewed Motion For Judgment
      As A Matter Of Law Of Invalidity (D.I. 631)[6]
      [Motion No. 4 of 4]**

A.   **Anticipation**

1.   **Parties' Contentions**

By its Motion, Facebook contends that it is entitled to judgment as a matter of law that

the '761 patent is invalid as anticipated by three prior art references: U.S. Patent No. 6,236,994

("Swartz"), iManage Desk Site 6.0 User Reference Manual ("iManage"), and/or European Patent

Application No. EP 1 087 306A2 ("Hubert"). Facebook contends that it provided clear and

convincing evidence from its expert, Dr. Greenberg, that each of these prior art references

discloses each limitation of the '761 patent. Facebook contends that Leader's expert, Dr.

Herbsleb, offered unsupported opinions that the references lack the "context component" and

"tracking component" set forth in the '761 patent and, therefore, Leader failed to rebut

Facebook's proof of invalidity.

In response, Leader contends that the parties' arguments rest on the respective opinions of

their expert witnesses, and the jury was entitled to credit the testimony of Leader's expert.

Because the Court may not re-weigh the jury's factual determinations, Leader requests that the

Court deny Facebook's Motion.

---

[6]Facebook also seeks judgment as a matter of law that the apparatus claims of the '761 patent are invalid based on the Federal Circuit's decision in *IPXL Holdings, L.L.C. v. Amazon.com*, 430 F.3d 1377 (Fed. Cir. 2005). This issue has been fully briefed by the parties in Facebook's Motion For Summary Judgment Of Invalidity Of Claims 1, 4, 7, 21, 23, 25, 31 And 32 Of U.S. Patent No. 7,139,761 [Summary Judgment Motion No. 1] (D.I. 382), and will be addressed by the Court in the context of that Motion. *See infra* Section V of this Memorandum Opinion.

## 2.    Legal Principles For Anticipation

"Anticipation is a factual determination that is reviewed for substantial evidence when decided by a jury." *Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC,* 381 F.3d 1142, 1149 (Fed. Cir. 2004).  An invention is anticipated under 35 U.S.C. § 102(b) if it "was patented or described in a printed publication in this or a foreign country . . . more than one year prior to the date of the application for patent in the United States."  "A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp. v. Geneva Pharm.,* 339 F.3d 1373, 1377 (Fed. Cir. 2003).  Such disclosure can be explicit or inherent in the prior art. *See Continental Can Co. v. Monsanto Co.,* 948 F.2d 1264, 1268 (Fed. Cir. 1991).  However, mere disclosure of each and every limitation of a claim is not enough for anticipation.  "An anticipating reference must enable that which it is asserted to anticipate." *Abbott Labs. v. Sandoz, Inc.,* 544 F.3d 1341, 1345 (Fed. Cir. 2008).  Furthermore, a single prior art reference must also disclose the limitations as arranged in the claim. *See Net Moneyin, Inc. v. Verisign, Inc.,* 545 F.3d 1359, 1371 (Fed. Cir. 2008) ("[U]nless a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102.").  As with all challenges to the validity of a patent, the party seeking to invalidate a patent bears the burden of proving anticipation by clear and convincing evidence. *See Hybritech Inc., v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1375 (Fed. Cir. 1986).

### 3. Whether Facebook Is Entitled To Judgment As A Matter Of Law That The '761 Patent Is Invalid As Anticipated

After reviewing the evidence presented at trial, the Court concludes that substantial evidence supports the jury's verdict in favor of Leader on the issue of anticipation. The parties' arguments rested on a classic "battle of the experts." Dr. Greenberg, on behalf of Facebook, and Dr. Herbsleb, on behalf of Leader, both offered testimony regarding the prior art and whether it disclosed each element of the '761 patent. In particular, Dr. Herbsleb testified that each of the prior art references discloses a document centric system which tracks the movement of and/or changes made to a document, but does not track the movements of a user from different contexts or environments. For example, in the case of the iManage prior art,[7] Dr. Herbsleb testified that the iManage User Manual discloses a system that keeps a history of what happens to the document. (Tr. 1796:6-1800:6)  Although Dr. Greenberg relied on Figure 3.26 of the User Manual to support his argument that it tracks user movement, Dr. Herbsleb countered this testimony by explaining that, in his opinion, Figure 3.26 shows a history of a particular document and tracks the changes to the document, not the movements of a user. (Tr. 1797:8-15, 19-20; DTX 1010 at 83, Fig. 3.26)  Directing the jury's attention to Figure 3.26, Dr. Herbsleb stated, "as you can see here, these are all entries [sic] of documents.  So it doesn't track users at all." (Tr. 1797:3-20)

Similarly, regarding the Hubert reference, Dr. Herbsleb testified that Hubert lacks any user movement. (Tr. 1814:1-5)  The Hubert reference explains that it discloses a metadocument

---

[7]Leader also contends that the iManage User Manual is not enabling prior art. Given the Court's conclusion that the iManage reference does not disclose each element of the '761 patent, the Court need not address the adequacy of the evidence concerning the enablement issue.

22

that tracks actions performed on the document and its location, not user movement. (DTX 922, ¶ 0011) In this regard, Dr. Herbsleb testified that Hubert "doesn't have any sense of users doing anything except it's recorded in history of a document. So again it's just sort of keeping a document history." (Tr. 1809:10-19; 1814:14-22) Dr. Greenberg directed the jury to Figure 2 in Hubert to support his contention that Hubert tracks a user, but Dr. Herbsleb countered Dr. Greenberg's testimony, explaining that in Dr. Herbsleb's opinion Figure 2 shows the transfer of a metadocument from one user (source) to another over the Internet.[8] (Tr. 1812:16-1813:24) As Dr. Herbsleb explained, Figure 2 shows no user movement, let alone tracking of the movement, because "it's just a document being sent from one user to the next." (Tr. 1813:23-24)

Lastly, regarding Swartz, Dr. Herbsleb testified that Swartz does not disclose user movement but instead tracks the steps that go into creating a report. (Tr. 1824:23-1825:4) Dr. Greenberg relied on portions of Swartz directed to the steps used to create the reports to support his opinion that user movement is tracked. (DTX 919, col. 6:22-25; Tr. 1452:9-1459:22) However, Dr. Herbsleb explained that, in his opinion

> [Swartz is] talking about tracking what's going on in this regulatory compliance scheme, what's being done to the documents, what's being done to the data. There's no sense at all of it tracking people, or tracking users or having even workspaces for users. So this is a completely different type of thing.

(Tr. 1829:16-23) As succinctly stated by Dr. Herbsleb, Swartz "doesn't care about users." (Tr.

---

[8]Indeed, a close examination of Dr. Greenberg's testimony reveals that, what he describes as "tracking the movement" is actually a record of the movement of the document not, of the user. (Tr. 1548:12-16 ("And it says a record of the fact that the meta-document 20 was received at Source 32 is stored as processing information and processing information is part of the metadata. So this is tracking movement."))

23

1824:19-20, 1825:7-8)

In addition to his testimony concerning the lack of user tracking, Dr. Herbsleb further testified that each of the prior art references offered by Facebook also lacks the context, user environment, or user workspace element claimed in the '761 patent. (Tr. 1811:7-11 (Hubert); 1797:24-1799:13 (iManage); Tr. 1829:4-21 (Swartz)) Although Dr. Greenberg offered contrary testimony, the jury was free to credit Dr. Herblseb's testimony over Dr. Greenberg's testimony.

In sum, the Court concludes that the record contains ample evidence to support the jury's finding that Swartz, iManage, and Hubert lack the user tracking and context elements of the '761 patent. The jury was entitled to weigh the credibility of the parties' competing experts on anticipation and conclude that Dr. Herbsleb's testimony was more reliable. Accordingly, the Court finds no reason to disturb the jury's verdict, which is supported by substantial evidence, and, therefore, the Court will deny Facebook's Motion to the extent that it seeks judgment as a matter of law with regard to invalidity based on anticipation.

## B.    Obviousness

### 1.    Parties' Contentions

By its Motion, Facebook also contends that the '761 patent is obvious in light of U.S. Patent No. 5,434,403 ("Ausems") and the Swartz, iManage, and/or Hubert references, taken alone or in combination. Facebook contends that these references disclose the use of a portable wireless device in connection with the disclosed systems and methods. Facebook further maintains that Dr. Greenberg's testimony was sufficient to establish, by clear and convincing evidence, that the invention claimed in the '761 patent would have been obvious to one skilled in the art.

24

In response, Leader contends that because the asserted references lack the tracking and context elements, for the reasons already discussed in connection with anticipation, they cannot render the '761 patent obvious. Leader also contends that Facebook failed to engage in an element-by-element analysis of the prior art and, as a result, Facebook's evidence was insufficient to allow a determination of which elements would be obvious to combine from which prior art reference. Leader further maintains that Facebook offered only conclusory testimony from Dr. Greenberg that it would have been obvious to combine the Ausems reference with iManage, Hubert, or Swartz. In addition, Leader maintains that the secondary considerations of non-obviousness fully support the jury's verdict.

###### 2.    Legal Principles For Obviousness

A patent is invalid for obviousness "if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). "Obviousness is a question of law based on underlying findings of fact." *In re Kubin,* 561 F.3d 1351, 1355 (Fed. Cir. 2009). The relevant factual inquires are derived from the Supreme Court's decision in *Graham v. John Deere Co.,* 383 U.S. 1 (1966), and are referred to as the *Graham* factors. The *Graham* factors include: (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) secondary considerations of non-obviousness, such as commercial success, long felt but unresolved need, failure of others, acquiescence of others in the industry that the patent is valid, and unexpected results. "An obviousness determination [under § 103] is not the result of a rigid formula disassociated from

the consideration of the facts of a case. Indeed, the common sense of those skilled in the art

demonstrates why some combinations would have been obvious where others would not."

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.,* 485 F.3d 1157, 1161 (Fed. Cir. 2007). The party

challenging a patent's validity based on obviousness must demonstrate by clear and convincing

evidence that the invention described in the patent would have been obvious to a person of

ordinary skill in the art at the time the invention was made. *See Pfizer, Inc. v. Apotex, Inc.,* 480

F.3d 1348, 1359-60 (Fed. Cir. 2007).

### 3. Whether Facebook Is Entitled To Judgment As A Matter Of Law That The '761 Patent Is Invalid As Obvious

As discussed in the context of anticipation, the Court concludes that sufficient evidence

exists to support a finding that the prior art references lack the tracking and context elements of

the '761 patent. Without these elements, the prior art patents identified by Facebook cannot

render the claimed invention obvious.[9]   Moreover, the Court finds ample evidence of non-

obviousness which supports the jury's verdict, including that the Facebook website is a

commercial success, as stipulated by Facebook. (D.I. 601 at 47)  Dr. Herblseb further testified

that the '761 patent addressed a long felt need in the industry. (Tr. 1847:4-1848:20)  Although

Dr. Greenberg testified to the contrary, the jury was free to reject his testimony and credit the

testimony of Dr. Herbsleb regarding the secondary considerations of non-obviousness, as well as

---

[9]Facebook adds the Ausems reference to support its obviousness argument with respect to claim 16.  Leader contends that there is no reason to combine Ausems with the other references. Motivation to combine is not an absolute requirement to establish obviousness. *See KSR Intern. Co. v. Teleflex,* 550 U.S. 398, 402 (2007). Nevertheless, claim 16 is a dependent claim, stemming from claim 9 and, according to Facebook, Ausems must still be combined with either Hubert or Swartz, which are both lacking essential elements required by claim 9. Thus, the addition of the Ausems reference does not assist Facebook's obviousness argument.

the absence of the context and tracking elements in the prior art as already discussed.

Accordingly, the Court will deny Facebook's Motion to the extent that it seeks judgment as a

matter of law with regard to invalidity based on obviousness.

### C.      New Trial On Invalidity

In the alternative, Facebook requests the Court to order a new trial on invalidity.

Specifically, Facebook contends that a new trial on anticipation and/or obviousness in light of the

Swartz reference is warranted, because Leader's counsel improperly and prejudicially implied,

and then stated to the jury, the false contention that the Swartz reference was considered by the

PTO during the prosecution of the '761 patent.

Facebook's argument regarding a new trial on invalidity is only relevant "[i]f the Court

were . . . inclined to enter judgment in favor of Leader for any reason or grant any request by

Leader for a new trial on the prior use and on sale bar defenses." (D.I. 635 at 17)  Because the

jury's verdict of invalidity based upon the prior use and on sale bar defenses will not be

disturbed, *see infra*, the Court need not address Facebook's alternative argument for a new trial.

Accordingly, the Court will deny as moot Facebook's Motion to the extent it seeks a new trial on

invalidity based on anticipation and/or obviousness in light of Swartz.

### V.      Facebook's Motion For Summary Judgment Of Invalidity Of Claims 1, 4, 7, 21, 23, 25, 31, And 32 Of U.S. Patent No. 7,139,761 (D.I. 382) [Summary Judgment Motion No. 1]

### A.      Parties' Contentions

By its Motion, Facebook contends that claims 1, 21, and 23 of the '761 patent are invalid

as indefinite under the Federal Circuit's decision in *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,

430 F.3d 1377 (Fed. Cir. 2005).  According to Facebook, these claims are indefinite, because

they impermissibly claim both an apparatus and a method of using that apparatus. Specifically, Facebook contends that claims 1 and 23 cover an apparatus or system for facilitating data management and a method for using that system through which "the user accesses the data from the second" context or workspace. Facebook also contends that claim 21 covers both a computer readable medium, such as a DVD, and a method of using that medium in which "the user employs the application and data from the second user workspace." Because, in Facebook's view, independent claims 1, 21, and 23 are invalid, Facebook further contends that dependent claims 4, 7, 25, 31, and 32 are also invalid.

In response, Leader contends that Facebook waived its indefiniteness argument under *IPXL* by offering a claim construction for each of the disputed terms that supports its indefiniteness argument. Leader further contends that both parties' experts fully understood the disputed claims and, therefore, the claims cannot be indefinite as a matter of law.[10]

### B.    Applicable Legal Principles

An issued patent is presumed valid and, therefore, invalidity must be proven by clear and convincing evidence. 35 U.S.C. § 282; *Metabolite Labs, Inc. v. Laboratory Corp. of America Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004). "A claim is considered indefinite if it does not reasonably apprise those skilled in the art of its scope." *IPXL*, 430 F.3d at 1384. The Federal Circuit has taken a narrow approach to indefiniteness:

> We have not insisted that claims be plain on their face in order to avoid

---

[10]Leader, as well, contends that genuine issues of material fact preclude summary judgment on the question of indefiniteness. Because this case has been tried to a jury and the issue of indefiniteness has been renewed in the context of Facebook's Motion For Judgment As A Matter Of Law, the question of indefiniteness is ripe for determination by the Court.

condemnation for indefiniteness; rather, what we have asked is that the claims be amenable to construction, however difficult that task may be. If a claim is insolubly ambiguous, and no narrowing construction can properly be adopted, we have held the claim indefinite. If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.

*Exxon Research & Engineering Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

Because a method and an apparatus represent two different statutory classes of invention, the

combination of the two classes into a single claim creates ambiguity. *See id.* For example, when

the two claims are combined, "a manufacturer or seller of the claimed apparatus would not know

from the claim whether it might also be liable for contributory infringement because a buyer or

user of the apparatus later performs the claimed method of using the apparatus." *Id.* Thus, this

type of hybrid claim "is not sufficiently precise to provide competitors with an accurate

determination of the 'metes and bounds' of protection involved" and, therefore, such claims are

invalid as indefinite under 35 U.S.C. § 112, ¶ 2. The determination that a claim is indefinite is "a

legal conclusion that is drawn from the court's performance of its duty as the construer of patent

claims." *Exxon Research,* 265 F.3d at 1376.

### C. Whether Facebook Is Entitled To Judgment As A Matter Of Law That The '761 Patent Is Invalid As Indefinite

As a threshold matter, Leader contends that Facebook waived its indefiniteness argument

by proposing claim constructions for the claim terms that support its argument; specifically, the

terms: (1) "wherein the user accesses the data from the second context" (claim 1); (2) "the user

employs the application and data from the second user workspace" (claim 21); and (3) "wherein

the user accesses the data from the second user workspace" (claim 23). Because Facebook

provided proposed claim constructions for these terms, Leader contends that Facebook cannot now argue that the same terms are indefinite.

In support of its argument, Leader cites to the Federal Circuit's decision in *Microprocessor Enhancement Corp. v. Texas Instruments, Inc.*, 520 F.3d 1367 (Fed. Cir. 2008). That case, however, did not address the question of waiver. Rather, as Leader recognizes in its parenthetical explanation of the case, *Microprocessor Enhancement* stands for the well-settled principle that "a claim that is amenable to construction is not invalid on the ground of indefiniteness." *Id.* Leader offers no case law supporting its waiver argument, and the Court is aware of none. Indeed, the case law supports Facebook's position that the submission of a proposed construction for a claim term does not amount to a waiver of a later indefiniteness challenge. *See, e.g., Harrah's Entertainment, Inc. v. Station Casinos, Inc.*, 321 F. Supp. 2d 1173, 1176 (D. Nev. 2004). Accordingly, the Court concludes that Facebook did not waive its indefiniteness argument.

With respect to the substance of Facebook's indefiniteness argument, the sole issue for the Court's determination is whether claims 1, 21, and 23 incorporate a method step directed to using the claimed apparatus or structure. In full, the disputed claims provide:

> 1. A computer-implemented network-based system that facilitates management of data, comprising:
>
> a computer-implemented context component of the network-based system for capturing context information associated with user-defined data created by user interaction of a user in a first context of the network-based system, the context component dynamically storing the context information in metadata associated with the user-defined data, the user-defined data and metadata stored on a storage component of the network-based system; and

a computer-implemented tracking component of the network-based system for tracking a change of the user from the first context to a second context of the network-based system and dynamically updating the stored metadata based on the change, <u>wherein the user accesses the data from the second context</u>.

* * *

21. A computer-readable medium for storing computer-executable instructions for a method of managing data, the method comprising:

creating data related to user interaction of a user within a user workspace of a web-based computing platform using an application;

dynamically associating metadata with the data, the data and metadata stored on the web-based computing platform, the metadata includes information related to the user of the user workspace, to the data, to the application and to the user workspace;

tracking movement of the user from the user workspace to a second user workspace of the web-based computing platform;

dynamically associating the data and the application with the second user workspace in the metadata <u>such that the user employs the application and data from the second user workspace</u>; and

indexing the data created in the user workspace such that a plurality of different users can access the data via the metadata from a corresponding plurality of different user workspaces.

* * *

23. A computer-implemented system that facilitates management of data, comprising:

a computer-implemented context component of a web-based server for defining a first user workspace of the web-based server, assigning one or more applications to the first user workspace, capturing context data associated with user interaction of a user while in the first user workspace, and for dynamically storing the context data as metadata on a storage component of the web-based server, which metadata is dynamically associated with data created in the first user workspace; and

a computer-implemented tracking component of the web-based server for tracking change information associated with a change in access of the user from the first

31

user workspace to a second user workspace, and dynamically storing the change information on the storage component as part of the metadata, <u>wherein the user accesses the data from the second user workspace</u>.

(emphasis added)

Claim 1 recites an apparatus described as a "computer-implemented network-based system," and claim 23 recites an apparatus described as a "computer-implemented system." Both the apparatus of claim 1 and the apparatus of claim 23 further comprise two components: a context component and a tracking component. The parties' dispute centers on the language "wherein the user accesses the data from the second context." With respect to claim 21, the claim recites an apparatus described as a "computer-readable medium for storing computer-executable instructions." The disputed language in claim 21 is similar to that contained in claims 1 and claim 23 and provides, "such that the user employs the application and data from the second user workspace."

Facebook contends that the "user accesses the data" step in claims 1 and 23 and the "user employs the application and data" step in claim 21 are steps that must be performed by the user of the earlier claimed apparatuses. Thus, Facebook maintains that the claims commingle an apparatus and a method, rendering the claims invalid.

Leader contends that the language referenced by Facebook is not language describing a method. Rather, in Leader's view, the disputed language is functional language that describes the features of the apparatuses claimed.

Reviewing the disputed claim language in the context of the claim, the Court is not persuaded that the claims impermissibly mix an apparatus and a method. A "patent applicant is free to recite features of an apparatus either structurally or functionally." *In re Schreiber*, 128

32

F.3d 1473, 1478 (Fed. Cir. 1997). Functional language describes something by means of what it

does, not by means of what it is. *See id.*; *see also Ricoh Co. v. Katun Corp.*, 486 F. Supp. 2d

395, 402 (D.N.J. 2007). In the Court's view, the disputed language is functional in nature,

because there is nothing in the claims that requires the user to perform certain steps or take

certain actions for the claim elements to be satisfied. Rather, the disputed language only

describes the type of tracking components claimed and the type of computer instructions claimed.

With respect to claims 1 and 23, both claims are directed toward back-end components of a

network-based system and neither claim requires the user to use the system described. For

example, Claim 1 of the '761 patent describes a tracking component that "dynamically updat[es]

the stored metadata based on the change, wherein the user accesses the data from the second

context." (Col. 21, ll. 10-12) Similarly, claim 23 describes a tracking component that

"dynamically stor[es] the change information on the storage component as part of the metadata,

wherein the user accesses the data from the second user workspace." Thus, the Court

understands these claims to provide functional language describing the tracking components

without the requirement of any actual user action and, therefore, the Court does not understand

the claims to combine a method with the described apparatus.

Although claim 21 recites a different apparatus, the same analysis applies. Claim 21

describes computer instruction for a computer program. These instructions include "dynamically

associating the data and the application with the second user workspace in the metadata such that

the user employs the application and data from the second user workspace." ('761 patent, col.

22, ll. 60-63) Thus, so long as a component in the system contains the functionality described,

the component satisfies this claim element. Again, user action is not required to establish

infringement of these claims. Accordingly, the Court concludes that claim 21 does not combine a method with the described apparatus.

In sum, the Court concludes that claims 1, 21, and 23 are purely functional in nature and do not impermissibly combine an apparatus with a method.[11] Accordingly, the Court concludes that *IPXL* does not apply to invalidate the claims as indefinite and, therefore, the Court will deny Facebook's Motion For Summary Judgment.

## VI.     Leader's Motion For Judgment As A Matter Of Law Or A New Trial (D.I. 626)

### A.     Public Use And On Sale Bars

#### 1.     Parties' Contentions

By its Motion, Leader contends that the jury's verdict that the '761 patent is invalid based on the on sale bar and public use bar is not supported by substantial evidence. As a threshold matter, Leader contends that the jury improperly determined that the critical date for purposes of these bars was December 10, 2002. Instead, Leader maintains that the correct critical date is December 11, 2001, one year prior to the filing of the provisional application, because the provisional application fully supported the claims of the '761 patent. In addition, Leader contends that Facebook failed to establish that the claimed invention was ready for patenting and publicly used or subject to an offer for commercial sale more than one year before the filing of the earliest patent application. To the extent that Facebook demonstrated an offer for sale or public use, Leader contends that any such public use or offer for sale of its Leader2Leader

_____

[11]The Court is aware of the Federal Circuit's recent decision in *In re Katz Interactive Call Processing Patent Litigation,* 2009-1450, -1451, -1452, -1468, -1469, 2010-1017 (Fed. Cir. Feb. 18, 2011), applying *IPXL.* (*See* D.I. 681 (Notice of Supplemental Authority); D.I. 682 (Leader's response)) While *Katz* lends additional support to Facebook's argument, the Court is not persuaded, in the circumstances of this case, that *Katz* mandates a conclusion of invalidity.

product was for experimental purposes, and all public demonstrations were covered by non-disclosure agreements.

In response, Facebook contends that Leader's Motion is procedurally barred because Leader failed to make an adequate pre-verdict motion to preserve the grounds asserted in its Motion. In addition, Facebook contends that it presented sufficient evidence to establish each of the elements required for both the on sale bar and the public use bar. Facebook further contends that much of the evidence related to the on sale bar and public use bar turned on the credibility of Mr. McKibben. Facebook maintains that Mr. McKibben's trial testimony was contradictory to his deposition testimony, and the jury was entitled to discount his contradictory trial testimony.

### 2.    Legal Principles For The On Sale Bar And Public Use Bar

In pertinent part, 35 U.S.C. § 102(b) states that "[a] person shall be entitled to a patent unless . . . the invention was in the public use or on sale in this country, more than one year prior to the date of application for patent in the United States." Both the on sale bar and the public use bar are derived from the same policy considerations. Both are meant to discourage the removal of existing knowledge from the public. *See Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 64 (2005). Whether a patent is invalid based on the on sale bar or the public use bar is a question of law based on underlying factual findings. *See Netscape Communications Corp. v. Konrad*, 295 F.3d 1315, 1320 (Fed. Cir. 2002).

Both the on sale bar and public use bar require the invalidating device to "fully anticipate[] the claimed invention or . . . render[] the claimed invention obvious by its addition to the prior art." *Allen Engineering Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1352 (Fed. Cir. 2002) (discussing on sale bar); *Netscape*, 295 F.3d at 1321 (discussing public use bar and stating

35

that "Section 102(b) may bar patentability by anticipation if the device used in public includes

every limitation of the later claimed invention, or by obviousness if the differences between the

claimed invention and the device used would have been obvious to one of ordinary skill in the

art"). Therefore, an accused infringer must show that the product offered for sale "embodied all

of the limitations of that claim or would have rendered that claim obvious." *Allen Engineering*,

299 F.3d at 1352.

With respect to the public use prong of Section 102(b), a bar to patentability arises if,

more than one year before the filing of the earliest patent application (the "critical date"), the

invention is ready for patenting and was publicly used "by a person other than the inventor who

is under no limitation, restriction or obligation of secrecy to the inventor." *New Railhead Mfg.,*

*LLC v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1297 (Fed. Cir. 2002). The test for application of the

public use bar requires the Court to consider "whether the purported use: (1) was accessible to

the public; or (2) was commercially exploited." *Invitrogen Corporation v. Biocrest*

*Manufacturing, L.P.*, 424 F.3d 1374, 1380 (Fed. Cir. 2005). As the Federal Circuit has

explained, "[c]ommercial exploitation is a clear indication of public use, but it likely requires

more than, for example, a secret offer for sale." *Id.* In determining whether a use is public, the

Court must consider "evidence relevant to experimentation, as well as *inter alia*, the nature of the

activity that occurred in public; public access to the use; confidentiality obligations imposed on

members of the public who observed the use; and commercial exploitation." *Id.* This evidence

is distinct from the evidence required to establish the "ready for patenting" requirement of the

public use bar. *Id.* The "ready for patenting" requirement "may be satisfied in at least two ways:

by proof of reduction to practice before the critical date; or by proof that prior to the critical date

36

the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67-68.

With respect to the on sale bar prong of Section 102(b), a bar to patentability arises if, before the critical date, (1) the product was the subject of a commercial offer for sale, and (2) the invention was ready for patenting. *See id.* at 67. To determine if the product was the subject of a commercial offer for sale, the Court must apply traditional contract law principles. *See Allen Engineering*, 299 F.3d at 1352. As with the public use bar, an invention is ready for patenting if it is reduced to practice before the critical date, or the inventor prepared drawings or other descriptions of the invention that were specific enough to enable a person skilled in the art to practice the invention. *See Pfaff*, 525 U.S. at 67-68.

Evidence that the public use or sale of the patented device was for experimentation purposes can negate both the public use bar and the on sale bar. *See id.* at 64; *EZ Dock, Inc.,* 276 F.3d at 1352 ("In *Pfaff,* the Supreme Court expressly preserves the experimental use or sale negation of the section 102 bars."). "[A]n inventor who seeks to perfect his discovery may conduct extensive testing without losing his right to obtain a patent for his invention-even if such testing occurs in the public eye. The law has long recognized the distinction between inventions put to experimental use and products sold commercially." *Pfaff*, 525 U.S. at 64. Evidence of experimentation includes "tests needed to convince [the inventor] that the invention is capable of performing its intended purpose in its intended environment." *Gould Inc. v. United States,* 198 USPQ 156, 167 (1978). In determining whether a use or sale is for experimental purposes rather than commercial gain, the Court must consider several factors, including: (a) the need for public testing; (b) the degree of control over the experiment retained by the inventor; (c) the nature of

37

the invention; (d) the length of the testing period; (e) whether payment was made; (f) whether a secrecy obligation existed; (g) whether records of the experiment were retained; (h) the identity of the person conducting the experiment; (i) the degree of commercial exploitation during testing; (j) whether the invention reasonably requires evaluation under actual conditions of use; (k) whether testing was performed systematically; (l) whether the inventor continually monitored the invention during the testing period; and (m) the nature of the contacts made with potential customers. *See Electromotive Div. of General Motors Corp. v. Transportation Systems Div. of General Elec., Co.*, 417 F.3d 1203, 1213 (Fed. Cir. 2005).

Once a defendant demonstrates a *prima facie* case of invalidity based on the public use or the on sale bar, the patent holder must "come forward with convincing evidence to counter that showing." *TP Laboratories, Inc. v. Professional Positioners, Inc.*, 724 F.2d 965, 971 (Fed. Cir. 1984). However, the ultimate burden of persuasion regarding patent invalidity always rests on the party challenging validity. *See Hycor Corp. v. Schlueter Co.*, 740 F.2d 1529, 1536 (Fed. Cir. 1984).

### 3.    Whether Leader's Motion Is Procedurally Barred

As a threshold matter, Facebook contends that Leader's Motion is procedurally barred because Leader's pre-verdict Rule 50(a) oral motion was inadequate to preserve the grounds raised in the current Motion. Although Facebook acknowledges that Leader subsequently filed a written submission under Rule 50(a) asserting specific grounds for relief, Facebook contends that this subsequent motion was improper because it was filed after the jury rendered its verdict.

Rule 50(a) provides, in pertinent part: "A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment

38

sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. Proc. 50(a)(2). Pursuant to Rule 50(b), "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the [Rule 50(a)] motion." Fed. R. Civ. Proc. 50(b). Rule 50(b) then provides that a renewed motion for judgment as a matter of law may be made following a jury verdict (and such renewed motion may include an alternative or joint request for a new trial under Rule 59). *See id.*

Four conditions must be satisfied, then, in order for Leader's Rule 50(b) motion to be procedurally proper: (i) Leader must have filed a Rule 50(a) motion for judgment as a matter of law before the case was submitted to the jury; (ii) Leader's Rule 50(a) motion must have "specif[ied] the judgment sought and the law and facts that entitle [Leader] to the judgment;" (iii) the Court must not have granted Leader's Rule 50(a) motion; and (iv) Leader must have renewed its motion for judgment as a matter of law in a timely fashion following the verdict or discharge of the jury.

The only one of these four conditions that Facebook challenges is condition (ii). There is no dispute that Leader made a motion for judgment as a matter of law, on the issues of on sale bar and public use bar, before the case was submitted to the jury. In particular, after the Court indicated to the parties that judgment would be reserved on all motions (Tr. 1711:10-11), Leader orally moved for judgment as a matter of law, stating:

> Number three, judgment as a matter of law that the invention covered by any of the asserted claims of U.S. Patent Number 7,139,761 was not in public use or on sale by Leader Technologies more than one year prior to the effective filing date and the asserted claims of U.S. Patent Number 7,139,761 are therefore not

invalid for that reason.

(Tr. 1714:3-10)[12] As already noted, the Court reserved judgment on Leader's motion, so the motion has not been granted. Following trial, Leader renewed its motion in a timely manner.

Under the circumstances presented here, the Court concludes that Leader's Rule 50(a) also satisfied the specificity condition. "A motion for judgment as a matter of law pursuant to Rule 50(b) must be preceded by a Rule 50(a) motion *sufficiently specific* to afford the party against whom the motion is directed with an opportunity to cure possible defects in proof which might otherwise make its case legally insufficient." *Lightning Lube*, 4 F.3d at 1173; *see also Williams v. Runyon*, 130 F.3d 568, 571-72 (3d Cir. 1997) ("[F]ailure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the [other party] on notice waives the [moving party's] right to raise the issue in their Rule 50(b) motion."). As the Third Circuit has expressly stated in connection with motions for judgment as a matter of law, "the communicative content, specificity and notice-giving function of an assertion should be judged in context." *Acosta v. Honda Motors Co., Ltd.*, 717 F.2d 828, 832 (3d Cir. 1983) (internal quotation marks omitted).

In context, Leader's oral motion was sufficiently specific to afford Facebook an opportunity to cure any possible defects in proof which might otherwise have made its invalidity case on the public use and on sale bars legally insufficient. As will be described in detail below in connection with analyzing the merits of Leader's motion, it is clear (from the arguments counsel made to the jury as well as to the Court), that both parties well understood that the

---

[12]Leader made oral Rule 50(a) motions with respect to other issues in the case, but the quoted portion of the transcript is the only pre-verdict Rule 50(a) statement Leader made concerning the public use and on sale bars.

adequacy of Facebook's showing relating to the public use and on sale bars turned largely on the combination of Leader's interrogatory responses and Mr. McKibben's credibility. That remains the essence of the parties' dispute on the merits in connection with Leader's Rule 50(b) Motion.

In assessing the sufficiency of the specificity of Leader's oral Rule 50(a) motion, it is also important to understand that Leader proceeded in a manner explicitly approved of by the Court. After Leader made its oral Rule 50(a) motions, Facebook orally moved for judgment as a matter of law as well. Facebook also requested the Court to allow the filing of "a written submission that would be submitted at the close of all evidence." (Tr. 1720:8-11) The Court indicated that this procedure was "preferable to making the jury wait." (Tr. 1720:13-14) Thereafter, Facebook filed its written submission prior to the jury returning a verdict, but Leader did not. Instead, counsel for Leader addressed the Court, stating:

> Just real quick, Your Honor. I'm a little paranoid. I saw that Facebook made a filing this morning on Rule [50(a)[13]]. Some objections. I just want to make sure our objections to the jury are noted and the Rule [50(a)] motion can come in sometime after the jury verdict, perhaps within ten days. Is that acceptable, Your Honor?

(Tr. 1898:10-17) The Court responded that this procedure was acceptable. (Tr. 1898:18-19) Subsequently, six days after the jury verdict was entered, Leader filed a written Rule 50(a) motion, which contained greater specificity as to the basis for Leader's public use and on sale bar contentions. (D.I. 612 at 2-3)[14]

---

[13]Although the copy of the transcript provided to the Court says "Rule 58," the Court understands the parties' discussion, in context, to have referred to Rule 50(a).

[14]To the extent Facebook is contending that the Court's acquiescence in this procedure was improper, the Court views such contention to have been waived by Facebook's failure to

Under these circumstances, to the extent there is any doubt as to whether Leader's oral pre-verdict Rule 50(a) motion was sufficiently specific, those doubts are erased by Leader's subsequent filing of its written Rule 50(a) motion, which was filed consistent with the timing allowed by the Court. Facebook presented no objection to this procedure when the Court approved it. Nor has Facebook identified any evidence that it would have sought to introduce if only Leader had filed its written Rule 50(a) motion prior to the submission of the case to the jury. "Rule 50(b) is essentially a notice provision," *Acosta*, 717 F.2d at 831, and Facebook had sufficient notice of the bases for Leader's public use and on sale bar contentions.

Additionally, the Court is unable to discern any prejudice to Facebook from the Court permitting Leader to proceed in the manner it did. This is particularly so given that, as explained below, the Court is denying Leader's Rule 50(b) Motion on the merits. By upholding the jury's verdict, there is no risk of the Court "substituting itself for the trier of fact and of preventing the adverse party from employing evidentiary cure, if necessary." *Lowenstein v. Pepsi-Bottling Co.*, 536 F.2d 9, 12 n.6 (3d Cir. 1976). Furthermore, and for the same reason, the Court's ruling does nothing to offend Facebook's constitutional rights to a jury trial. *See generally Mallick v. Int'l Bhd. of Elec. Workers*, 644 F.2d 228, 233 (3d Cir. 1981).

Accordingly, the Court will proceed to consider the merits of Leader's Motion with respect to the public use and on sale bars.

---

object at the time the Court agreed to it. Such an objection would have put Leader on notice that it needed to be more specific in its presentation prior to submission of the case to the jury. Even if Facebook's objection were viewed as non-waived and meritorious, the Court would still permit Leader's Rule 50(b) Motion, as any other result would be manifestly unfair to Leader, given Leader's careful compliance with the procedures approved by the Court.

4.      **Whether Leader Is Entitled To Judgment As A
Matter Of Law That The '761 Patent Is Not Invalid
Based On The On Sale Bar Or Public Use Bar**

Reviewing the evidence in the light most favorable to Facebook, as the verdict winner on

the issue of invalidity based on the on sale bar and public use bar, the Court concludes that the

jury's verdict is supported by substantial evidence. In reaching this conclusion, the Court finds

that substantial evidence supports the jury's determination that the '761 patent is not entitled to

the priority date of the provisional application. The Court further finds that substantial evidence

supports each of the requirements of the on sale bar and public use bar, including that the

Leader2Leader product subject to the bars embodied all the elements of the claimed invention

and was ready for patenting; that the Leader2Leader product was offered for commercial sale and

publicly demonstrated to a third party without an obligation for secrecy; and that the offer for sale

and public use of the Leader2Leader product were not intended for experimental purposes.

a.      **Priority Date**

With respect to the threshold issue of priority date, claims are entitled to the earlier filing

date of the provisional application only if the prior application describes the invention in

sufficient detail so that one skilled in the art can clearly conclude that the inventor invented the

claimed invention as of the filing date sought. *See Lockwood v. Am. Airlines*, 107 F.3d 1565,

1572 (Fed. Cir. 1997). The patentee bears the burden of proof on this issue by a preponderance

of the evidence. *See Power Oasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304-06 (Fed. Cir.

2008).

In this case, Leader contends that its expert, Dr. Herbsleb, demonstrated that each element

of the asserted claims was supported by the provisional application. However, Dr. Herbsleb also

43

admitted at trial that the source code in the provisional application on which he relied to support

the presence of numerous claim elements was only a "pseudo code." According to Dr. Herbsleb,

"pseudo code" is not a real programming language and cannot function if compiled into an

executable program. (Tr. 1855:1-1863:15) Leader contends that one of Dr. Herbsleb's students,

Dr. Cataldo, built an implementation of an embodiment of the '761 patent based on the

provisional application; however, Dr. Herbsleb testified this embodiment did not actually work

and, in any event, it did not rely on the code disclosed in the provisional application because that

code, again, was incomplete pseudo code. (Tr. 1868:11-1869:3) Moreover, the co-inventor of

the '761 patent, Jeff Lamb, testified that certain elements were missing from the provisional

application, such as the tracking movement of users and the associating metadata with user

created content elements. (Tr. 1182:1-1183:14)

   Accordingly, the Court concludes that the evidence was sufficient to support the jury's

conclusion that the asserted claims of the '761 patent are not entitled to the priority date of the

provisional application. Consequently, the appropriate critical date for purposes of applying the

on sale bar and public use bar is December 10, 2002, which is one year prior to the filing date of

the '761 patent.

### b.    Embodiment of the Asserted Claims

   Leader next contends that Facebook did not establish that the Leader2Leader product

subject to the public use and on sale bars embodied the asserted claims of the patent.

Specifically, Leader contends that Facebook failed to engage in an element by element analysis

of the product compared with the claims of the '761 patent.

   "'That the offered product is in fact the claimed invention may be established by any

relevant evidence, such as memoranda, drawings, correspondence, and testimony of witnesses.'"
*Sonoscan, Inc. v. Sonotek, Inc.*, 936 F.2d 1261, 1263 (Fed. Cir. 1991) (quoting *RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056, 1060 (Fed. Cir. 1989)). An admission by the patentee that a particular product practices the claimed invention is sufficient to satisfy the defendant's burden that the product anticipates the claim for purpose of applying the on sale bar and public use bar. *See e.g. Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000) ("Although [defendants] bore the burden of proving that the cartridges that were the subject of the pre-critical date sales anticipated [the patent], that burden was satisfied by the patentee's allegation that the accused cartridges infringe [the patent].").

At trial, Facebook presented Leader's interrogatory responses, in which Leader admitted that "Leader2Leader® powered by the Digital Leaderboard® engine is covered by the '761 Patent." (Ex. B (DTX0963-R) at 4; Ex. C (DTX0969-R) at 46) Leader contends that its interrogatory responses, given in 2009, were limited to products offered for sale in 2009, and that earlier versions of the product, including those that were the subject of the contested offers for sale prior to the December 10, 2002 critical date, did not embody the claimed invention. Notably, however, Leader stated no such qualifications in its actual interrogatory responses. *See generally Cummings v. Adidas*, 716 F. Supp. 2d 323, 332 (S.D.N.Y. 2010) (rejecting argument by plaintiff that defendant's requests for admissions did not specify model of product being accused of infringement where plaintiff's interrogatory admission did not qualify response).

Leader's interrogatory responses received substantial attention at trial. *(See, e.g.,* Tr. 1236-42) The specific interrogatory at issue, and the two responses to it that were admitted into evidence, read as follows:

45

**INTERROGATORY NO. 9:**

For each claim of the '761 Patent that [Leader] contends is practiced by any product(s) and/or services of [Leader], identify all such product(s) and/or service(s) and provide a chart identifying specifically where each limitation of each claim is found within such product(s) and/or service(s).

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

Leader2Leader® powered by the Digital Leaderboard® engine is covered by the '761 patent.

**THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

Leader2Leader® powered by the Digital Leaderboard® engine is the only product or service provided by Leader which embodies, either literally or under the doctrine of equivalents, any of the asserted claims of the '761 Patent. Leader2Leader® powered by the Digital Leaderboard® engine embodies the following asserted claims of the '761 Patent: 1-17, 21, 23-26, 29, and 31-34.[15]

At trial, under examination by Facebook, counsel directed Mr. McKibben to this

Interrogatory No. 9 and Leader's First Supplemental Response to it, which had been verified by

Mr. McKibben.  (Tr. 1237:17-24, 1238:5-1240:11)  Mr. McKibben gave the following testimony:

Q.     The statement says Leader2Leader powered by the digital Leader board engine is covered by the '761 patent.  Do you see that?

A.     I do see that.

---

[15](DTX0963) (Leader Technologies, Inc.'s First Supplemental Responses to Facebook, Inc.'s Interrogatories Nos. 3 and 9 (Apr. 17, 2009) at 4); (DTX0969) (Leader Technologies, Inc.'s Second Supplemental Response to Facebook, Inc.'s Interrogatory No. 1, First Supplemental Responses to Facebook's Interrogatory Nos. 4, 11-17 and Third Supplemental Response to Facebook's Interrogatory No. 9 (Oct. 28, 2009) at 46)  The portions of the interrogatory and responses quoted above are the entirety of the interrogatories and responses that were presented to the jury.  The remainder of what appeared in the interrogatories and responses as the parties actually served them on one another was redacted and never seen by the jury.

Q.    And that was a true and correct statement; correct?

A.    In answer to Interrogatory Number 9, yes.

(Tr. 1240:4-11)

Mr. McKibben was then asked, similarly, about Leader's Third Supplemental Response

to Interrogatory No. 9. Mr. McKibben testified as follows:

Q.    And it says Leader2Leader powered by the digital Leader board engine embodies
the following asserted claims of the '761 patent. Do you see that?

A.    I do.

Q.    And do you understand that was a statement that was made from your side to our
side during the conduct of the litigation?

A.    Based on what you just asked me, is that –

Q.    Yes.

A.    Okay. I understand that.

(Tr. 1239:22-24, 1240:1-9)

Unsurprisingly, counsel for Leader returned to the interrogatories in her examination of

Mr. McKibben. Mr. McKibben was asked the following questions and gave the following

responses (with objections and rulings on them omitted):

Q.    . . . So, Mr. McKibben, is it correct to say you were asked, "For
each claim of the '761 patent that LTI contends is practiced by any
products and/or services of LTI, identify all such products and/or
services and provide a chart specifying where each limitation of
each claim is found within the product." Is that correct?

A.    That's what I read.

47

Q.      And what did you understand you were being asked with respect to that interrogatory?

* * *

A.      I recall. It's being asked what aspects of our products and/or services today practice the '761 patent today.

Q.      Today. So what do you mean by today?

A.      Well, I mean, the question had to have occurred – they're asking about the '761 patent, which did not issue until November 23, 2006. So this question had to refer to whatever our products and services were after November 23, 2006, and so that was the answer I gave.

Q.      If we go down to the response where it says "Leader2Leader powered by Digital Leaderboard engine is covered by the '761 patent." Do you see that?

A.      I do.

Q.      Was that an accurate statement when you answered that response?

A.      It is because we did do Leader2Leader powered by Digital Leaderboard, and we did use the technology after December 23, 2006.

Q.      Is that a true statement today in 2010?

A.      Yes, it is.

Q.      And is that a true statement in 2008?

A.      Yes, it was.

Q.      And would it have been a true statement in 2007?

A.      Yes, I believe so.

Q.      Would that have been a true statement prior to December of 2002?

A.      No, it could not have because that technology of the '761 patent

48

did not exist at that time.

(Tr. 1330:4-16, 1331:5-24, 1332:1-19)

When counsel for Facebook again questioned Mr. McKibben, he began with questions

about the interrogatory responses and the topic of whether, and when, Leader2Leader became an

embodiment of the '761 patent. (Tr. 1373:19-1374:22) Mr. McKibben reiterated his testimony

that "[a]ny time before December 11, 2002," Leader2Leader "couldn't have" been an

embodiment of the '761 patent, because the technology of the '761 patent "didn't exist." (Tr.

1374:17-24) Immediately after this testimony, counsel for Facebook played a portion of Mr.

McKibben's videotaped deposition, showing that at the time of his deposition, Mr. McKibben

could not remember when Leader2Leader came to embody the '761 patent:

> Q:  Did you have any technique for identifying differences
>      between various iterations of Leader2Leader product?
>
> A:  As I'm speaking here today, I believe that our developers
>      kept track of that. But the name they gave to it, I don't
>      remember.
>
> Q:  Can you identify any iteration of the Leader2Leader product
>      that, in your opinion, did not implement what's claimed in
>      the '761 patent?
>
> A.  That was a long time ago. I – I can't point back to a
>      specific point.

(Tr. 1377:8-19)

Much of Facebook's argument in response to Leader's post-trial Motion, just like much

of its argument to the jury, relies on the contrast between Mr. McKibben's failure at his

49

deposition to recall when Leader2Leader embodied the '761 invention and his crystal clear

recollection at trial that the date in question was right around December 11, 2002. At trial, Mr.

McKibben's testimony was as follows:

> Q.      . . . So prior to December 11, 2002, was there any
> technology in Leader2Leader that could permit someone to
> move from one work space to another work space?
>
> A.      No, it wasn't done yet.
>
> Q.      Or move from board to board within the system?
>
> A.      No, that technology was not done until a few days
> before December 11, 2002.
>
> Q.      You couldn't track any movement obviously since
> you didn't have that movement; right?
>
> A.      It was not finished until right before 2002. That is correct.
>
> Q.      At some point, you had a version of the software; right? Is
> that correct?
>
> A.      Yeah, right around that time December 11th.

(Tr. 1327:7-10; *see also* Tr. 1382:18-22 (Mr. McKibben reiterating that "the '761 technology . . .

didn't exist until a few days before . . . December 11, 2002")

If believed, Mr. McKibben's trial testimony supports Leader's argument that any offers

for sale or public uses by Leader of the Leader2Leader product prior to December 11, 2002 could

not invalidate the patent, because the product did not at that time embody the claimed invention.

However, even if the jury disbelieved Mr. McKibben, Leader contends that his discredited

testimony does not amount to affirmative proof that early versions of the Leader2Leader product

embodied the claims of the '761 patent. (D.I. 626) (citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984), which recognized that jury may disregard testimony that is not believed, but noted that "*[n]ormally* discredited testimony is not a *sufficient* basis for drawing a contrary conclusion") (emphasis added)

The Court does not agree with Leader. Even on its face, the legal proposition stated in *Bose* is not a hard and fast rule. The circumstances here are not "normal" – the issue of when Leader2Leader embodied the patent claims is an issue particularly within the knowledge of Mr. McKibben, who is not only a named inventor, but also the founder and CEO of Leader Technologies. Nor is this an ambiguous situation, in which the evidence permitted the jury multifaceted options. Here, the options for the jury were only two: if the jury believed Mr. McKibben when he testified that the invention was not ready for patenting before December 2002, then Leader did not make an impermissible offer for sale; if, however, the jury disbelieved Mr. McKibben when he testified that the invention was not ready for patenting before December 2002, the only logical conclusion that can follow from such a finding is that the invention *was* ready for patenting before December 2002. In this respect, the Court believes that the jury's evident finding that Mr. McKibben was not testifying credibly does, under the circumstances of this case, constitute affirmative evidence that the invention was ready for patenting prior to the critical date.

Another reason *Bose* does not carry the day for Leader is that neither the jury, the Court, nor Facebook is treating Mr. McKibben's testimony, alone, as "sufficient" to draw this conclusion. Rather, it is the combination of Mr. McKibben's trial testimony (which the jury found non-credible), plus his seemingly conflicting deposition testimony (presented to the jury at

51

trial), plus the interrogatory responses (which can reasonably be interpreted as an admission that the invention was ready for patenting prior to the critical date) that, together, are "sufficient" to satisfy Facebook's evidentiary burden. There is nothing impermissible about such an analysis. *See generally United States v. Urban*, 404 F.3d 754, 782 (3d Cir. 2005) (stating, in criminal context, there is no question that factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt"); *Wilson v. United States*, 162 U.S. 613, 620-21 (1896) (stating that there could be no "question that, if the jury were satisfied, from the evidence, that false statements in the case were made by defendant, or on his behalf, at his instigation, they had the right, not only to take such statements into consideration, in connection with all the other circumstances of the case, in determining whether or not defendant's conduct had been satisfactorily explained by him upon the theory of his innocence, but also to regard false statements in explanation or defense, made or procured to be made, as in themselves tending to show guilt"); *United States v. Jocic*, 207 F.3d 889, 893 (7th Cir. 2000) ("When a defendant decides to testify and deny the charges against him and the finder of fact thinks he is lying, his untruthful testimony becomes evidence of guilt to add to the other evidence.").

This conclusion is bolstered, in the instant case, when one looks at how the case was argued, by both sides, to the jury. Although lawyer argument, of course, is not evidence, it helps elucidate how the jury could have reasonably reached the factual conclusions it did based on the evidentiary record that was put before it. Leader's interrogatory responses, and the credibility of Mr. McKibben's testimony relating to the on sale and public use bars, was a primary focus of the closing arguments of both parties.

Counsel for Leader, in his initial closing argument to the jury, made plain that, in

Leader's view, the interrogatory response was in no way evidence of Leader2Leader embodying

the invention of the '761 patent before the critical date:

> They have to show that Leader2Leader contained that technology of the '761 patent prior to December 2002. That would be a neat trick. It wasn't invented until December 2002.

> . . . .

> What evidence did Facebook [use to] try to prove [this]? That Leader2Leader had the patented technology. This is the sole piece of evidence they showed you in this litigation, written by the lawyers. They asked us for each claim of the '761 patent, identify the product that is covered by the patent. We identified Leader2Leader, powered by Digital LeaderBoard is covered by the '761 patent. That is their sole piece of evidence.

> What is the date of this? April 17, 2009. April 17, 2009. The '761 technology was in Leader2Leader, powered by the Digital LeaderBoard. It wasn't there in December 2002, and they didn't try to prove it. That's their sole piece of evidence. Nothing else.

> . . .

> . . . When you're talking about the Leader2Leader before December 2002, it didn't have the '761 in it. They didn't try to prove it. They didn't take the engineers' testimony. They didn't show you documents or anything other than the interrogatory response from 2009.

(Tr. 1988:10-14, 19-24; 1989: 1-11; 1990: 19-24)

In response, Facebook's counsel discussed the interrogatory responses in his closing:

> . . . [Y]es, I asked them before trial, did Leader2Leader practice the invention, and they said, yes.

> But now what they say is, you didn't ask the question correctly. You didn't ask me about the version in 2002, even though the purpose of asking the question is to figure out whether it did, so now they're dancing. Now they're dancing. This is 2009. Why? Because that's when I asked them the question, in

53

2009, and he swore to it under penalty of perjury.

> Mr. McKibben, when he comes to court, he has a really good recollection, doesn't he? At some point, you had it, I had it, on the December 11. At his deposition before trial, we asked him a real simple question: Can you think of any iteration of Leader2Leader, the product, that did not practice the patent? He's the inventor. Can you think of any one that does not practice the patent? Did they also practice it? This year's version. Simple question. Can you think of any iteration that didn't practice the patent?

(Tr. 2052:7-24; 2053:1-5) Counsel then read the deposition question quoted earlier in this opinion, and Mr. McKibben's answer, "'That was a long time ago. I can't point back to a specific point.'" (Tr. 2053:7-12) Then counsel observed, "He can point . . . to [a] specific point now though in court." (Tr. 2053:13-14)

In his rebuttal argument, Leader's counsel returned to the topic, placing the jury's focus in connection with the on sale bar squarely on Mr. McKibben's credibility:

> They propose to call Mr. McKibben a liar because they show a videotape under two solid days of his deposition. They spent almost all their time on this on-sale issue because they have nothing else. They can't beat the technology. There's no evidence of it.

> Mr. McKibben was on the stand. You saw him live. You judge the credibility of the man.

> It's their burden of proof to show that there were these sales. What did they show? They didn't try. They didn't even try to show that the '761 patented technology was in Leader2Leader.

(Tr. 2063:24; 2064:1-13) Later, as his final point before ending his argument, Leader's counsel chose again to address the interrogatory responses:

> On Facebook's burden of proof about invalidity, which is much heavier,

it's clear and convincing, they didn't give you anything. They give you innuendo. They said since Leader2Leader has '761 in it in 2009, it was there. Come on. We know, don't we?

Not true. There's no evidence. This is about truth, finding out what the truth is, and that's based on evidence. They didn't give you any.

(Tr. 2070:13-22)

Contrary to Leader's argument to the jury, there was evidence to support a finding of patent invalidity due to the on sale bar. This is what the jury found happened. There is no basis to disturb the jury's finding.[16]

### c.     Ready for patenting

With respect to the "ready for patenting" requirement of both the on sale bar and the

---

[16]While the parties focus on the evidentiary weight of Leader's interrogatory responses and the portions of Mr. McKibben's testimony excerpted above, the trial record contains additional evidence to support the jury's finding, by clear and convincing evidence, that Leader offered for sale a version of Leader2Leader that embodied the '761 patent prior to the critical date of December 10, 2002. This evidence includes: Mr. McKibben's testimony that he and co-inventor Mr. Lamb conceived of the '761 invention in 1999 (Tr. 1382:3-5); Mr. Lamb's deposition testimony and Mr. McKibben's testimony that Leader2Leader was demonstrable in August 2002 (Tr. 1168:4-16; 1222:13-1223:4); Leader's offering document submitted to Wright-Patterson Air Force Base in January 2002 describing Leader2Leader as "operational" (D.I. 627, Exh. 13 (DTX0179) at LTI_048198, 203); and a November 2002 communication to shareholders indicating that Mr. McKibben "was demo'ing the [Leader2Leader] functionality" and the "demo was flawless" (Tr. 2055:7-9; D.I. 627, Exh. 21 (DTX0776). Mr. McKibben testified several times at trial that "the '761 technology that's a plug-in to Leader2Leader" "wasn't done until days before the December 11, 2002, filing" of the provisional patent application. (Tr. 1325:1-5; *see also* Tr. 1361:8-12) However, even if the jury accepted Mr. McKibben's testimony, the jury could still have found the claims invalid based upon the offers for sale discussed during that brief window of time in December 2002. Specifically, Facebook introduced an e-mail dated December 8, 2002, in which Mr. McKibben was following up on what he called "numerous developments on the sales front." (D.I. 651, Exh. F (DTX0766); Tr. 1304:1-1306:21) In this e-mail, Mr. McKibben referenced the Limited offer for sale stating that "[w]e have confirmation *now* from both the COO, Len Schlessinger, and the CIO, Jon Ricker [of the Limited], that we will acquire a significant contract in January for their implementation of Leader2Leader®" (D.I. 651, Exh. F (DTX0766)) Thus, the jury could have reasonably concluded that Leader offered to sell the patented technology in the few days preceding December 11, 2002, a time at which Mr. McKibben acknowledged that the '761 technology was first incorporated into Leader2Leader.

public use bar, Leader contends that Facebook failed to elicit any evidence that the invention was

reduced to practice before the critical date or that prior to the critical date the inventor prepared

drawings or descriptions of the invention that were sufficiently specific to enable one skilled in

the art to practice the invention.  At trial, Leader presented evidence that the invention claimed in

the '761 patent was conceived before January 1, 2000.  From this baseline, Facebook then

presented evidence in the form of testimony and Leader documents demonstrating that the

Leader2Leader product was reduced to practice and operational prior to the critical date.

For example, Mr. McKibben testified at his deposition that the technology claimed in the

patent was implemented as early as 2001:

> Q.      At some point there came a time when you had a
> product implemented; correct?
>
> A.      Well, as was – software is never finished, so even
> version one of a product is not implemented in the
> sense that it's perfect.  But we                were
> confident of a fairly stable design by '98 and then
> we starting              coding and – now these are
> rough time frames, but I would say we          were
> coding – well, we haven't stopped coding, *so a*
> *fairly stable collaborative environment was working*
> *by I'm going to say 2001/2002 time frame.*

(Tr. 1200:6-17) (emphasis added)  Mr. McKibben's testimony is confirmed by Leader's January

9, 2002 proposal to Wright-Patterson Air Force Base ("Wright-Patterson"), which states that "the

Leader2Leader™ platform is ***operational now*** with low user volumes."  (D.I. 651, Exh. D

(DTX0179) at LTI_048203) (emphasis added))  In this same document, Leader acknowledges

that the Digital Leaderboard system of the Leader2Leader product was "***[f]ully developed*** at

private expense." (*Id.* at LTI_048200) (emphasis added)  Further, Facebook introduced substantial evidence that Leader demonstrated the functionality of the Leader2Leader product to third parties as early as December 8, 2001, and throughout 2002.

In the Court's view, this evidence is sufficient to clearly and convincingly establish that the product was reduced to practice before the critical date and, therefore, the Court concludes that the jury's finding in this regard is supported by substantial evidence.[17]

### d.    Commercial offer for sale

With respect to the on sale bar, Leader contends that Facebook failed to establish by clear and convincing evidence that Leader commercially offered the Leader2Leader product for sale.  To be considered a commercial offer for sale, "the offer must meet the level of an offer for sale in the contract sense, one that would be understood as such in the commercial community." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1046 (Fed. Cir. 2001).  "Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under 102(b)." *Id.* at 1048.  The Federal Circuit has instructed courts to look to the language used by the parties to determine whether an offer was intended:

In any given circumstance, who is the offeror, and what constitutes a definite

---

[17]Leader contends that Facebook "effectively conceded that the invention was not ready for patenting by December 10, 2002, when it argued that the provisional application, which contained the actual source code, filed on December 11, 2002, did not provide support for each claim of the '761 patent." (D.I. 626 at 12)  As the Court noted in discussing the priority date issue, the testimony and evidence supports Facebook's position that the source code contained in the provisional application was incomplete pseudo code.  That Leader may have chosen to file an incomplete provisional application does not mean the Leader2Leader software was not ready for patenting at that time.

57

offer, requires closely looking at the language of the proposal itself. Language suggesting a legal offer, such as "I offer" or "I promise" can be contrasted with language suggesting more preliminary negotiations, such as "I quote" or "are you interested." Differing phrases are evidence of differing intent, but no one phrase is necessarily controlling.

*Id.*

In addition to the language used by the parties, it is also appropriate to consider the circumstances surrounding the making of the offer, including the context of any prior communications or course of dealing between the parties; whether the communication was private or made to the general public; whether the communication comes in reply to a specific request for an offer; and whether the communication contains detailed terms. *See, e.g., Fisher-Price, Inc. v. Safety 1st, Inc.,* 109 Fed. Appx. 387, 392 (Fed. Cir. 2004) (citing 1 *Corbin on Contracts* § 2.2 at pp. 1-2 (Joseph M. Perillo, Rev. ed. 1993) and *Restatement (Second) of Contracts* § 26, cmt. c (1981)). Actual acceptance of the offer is not required to implicate the on sale bar. *See Scaltech,* 269 F.3d at 1328. That the offer, even if accepted, might not have ultimately led to an actual sale of the invention is also irrelevant. *See id.* at 1329.

In this case, Facebook offered evidence of three offers for sale of the Leader2Leader product: one to Wright-Patterson, one to The Limited, and one to Boston Scientific. Leader contends that none of these offers contained material terms constituting a definite contract and, therefore, they are insufficient to establish an offer.

Viewing the evidence in the light most favorable to Facebook, as the verdict winner, the Court concludes that substantial evidence supports the jury's finding that the Leader2Leader product was the subject of at least one commercial offer for sale. In particular, the Court

concludes that the written submissions to Wright-Patterson and The Limited are sufficiently detailed so as to constitute offers for sale in the commercial contract sense.[18] In the case of the Wright-Patterson proposal, Leader is identified as the offeror, and the proposal outlines the number of licences to be sold, the price for the licenses, and the timeframe for implementation. (D.I. 651, Exh. D (DTX0179) at LTI_048202, 204-205) The Limited written offer contains similar language, including the use of the word "offer" and detailed descriptions of the number of licenses to be provided, the terms of the licenses, and the price. (*Id.*, Ex. G (DTX0185)) That further negotiations might be needed or further refinement of the features of the device might be needed to tailor the device to the specific requirements of Wright-Patterson or The Limited does not preclude these events from being considered valid, commercial offers for sale. *See Honeywell Intern., Inc. v. Nikon Corp.*, 672 F. Supp. 2d 638, 643-644 (D. Del. 2009) (holding that Bidder's Offer – which included, among other things price and delivery terms – constituted commercial offer for sale, despite possible need for further negotiations and or refinement of the system to meet the demands of the consumer), *aff'd without opinion*, 2010 WL 4386966 (Fed. Cir. Nov. 1, 2010).

Leader suggests that these written proposals do not demonstrate its intent to enter into a contract for sale of the Leader2Leader product; however, Mr. McKibben's contemporaneous e-mails suggest the opposite. For example, in a November 3, 2002 e-mail, Mr. McKibben wrote: "We had a phenomenal selling week last week. The Limited www.limited.com just committed

---

[18]The evidence offered by Facebook on the Boston Scientific "offer" is an October 2002 e-mail stating that Leader "verbally committed to selling a system" to Boston Scientific. (Exh. H (DTX0184)) The Court need not determine whether this constitutes an "offer" in the contract sense. In any event, the jury was free to accept this e-mail as further evidence that Leader intended to commercially sell its product and was, in fact, engaged in commercial sales.

to contracting with Leader for Leader Phone® and Leader2Leader(tm)." (D.I. 651, Exh. I (DTX0186))

Accordingly, the Court concludes that substantial evidence supports the jury's conclusion that Leader intended to make, and made, a commercial offer for sale of the patented invention.

### e. Public use without a secrecy obligation

With respect to the public use bar, Leader contends that all of its demonstrations of the Leader2Leader device were covered by nondisclosure agreements ("NDAs"). Thus, Leader maintains that none of these demonstrations are sufficient to establish a public use.

Even a single disclosure to a third party may constitute a public use if the third party was not under a legal obligation to maintain the secrecy of the disclosure. (D.I. 601 at 39; *see also, e.g., Egbert v. Lippmann,* 104 U.S. 333, 336 (1881); *A. Schrader's Sons, Inc. v. Wein Sales Corporation,* 9 F.2d 306, 308 (2d Cir. 1925)) At trial, Facebook presented evidence that Mr. McKibben provided a demonstration of the Leader2Leader device to Boston Scientific on November 25, 2002, but did not have a signed NDA from Boston Scientific until the next day. (Tr. 1297:6-1299:19; D.I. 651, Exh. M (DTX0736); Exh. N (DTX0776)) Importantly, the NDA that was executed did not reference the demonstration conducted the day before. (D.I. 651, Exh. M (DTX0736)) Mr. McKibben testified that other individuals at Boston Scientific had signed earlier NDAs; however, those early NDAs were never identified nor introduced into evidence during trial. (Tr. 1300:2-11; 1363:20-1364:7)

In addition, Mr. McKibben testified that he had more than a thousand meetings with third parties discussing the Leader2Leader device. (Tr. 1289:3-1291:17) Although Mr. McKibben testified that he was "paranoid" about getting NDAs signed (Tr. 1334:1-5), that he had over

60

2,400 signed NDAs (Tr.1334:6-14), and that he always had NDAs signed before disclosing any business or trade secrets (Tr. 1290:5-16), the jury was free to find that his testimony lacked credibility, particularly in light of: (1) the Boston Scientific NDA, which was executed subsequent to Mr. McKibben's demonstration of the Leader2Leader product and made no reference to protecting the previous day's disclosures; and (2) the absence of any previous NDA entered into evidence pertaining to Boston Scientific.

Accordingly, the Court concludes that substantial evidence was presented to support the jury's finding that Leader publicly demonstrated the Leader2Leader device to third parties without legal obligation on those parties to maintain the secrecy of the presentation.

### f.     Experimentation

Leader contends that it negated the public use and on sale bars with evidence that its offers for sale and public disclosures were experimental uses. In support of its argument, Leader contends that its contacts with Wright-Patterson, The Limited, and Boston Scientific were for the purpose of beta testing, an essential stage of software development.

"Experimentation conducted to determine whether [a product] would suit a particular customer's purposes does not fall within the experimental use exception." *Allen Engineering Corp.*, 299 F.3d at 1355. In the case of the Wright-Patterson offer, Leader acknowledges that "the whole point of the project was to jointly ***develop*** solutions to allow intelligence agencies to share data more easily." (D.I. 626 at 12 (citing Tr. 1345:9-19)) It was not unreasonable for the jury to consider this evidence to be consistent with tailoring the product to meet the needs of Wright-Patterson. Further, Facebook demonstrated that Leader's offers for sale to Wright-Patterson and The Limited were for commercial gain, in that they included payment provisions

61

for substantial sums, including $8.4 million for Leader2Leader licenses in the case of the Wright-Patterson offer and $1.5 million in the case of The Limited offer. (D.I. 651, Exh. D (DTX0179) at LTI048204; Exh. G (DTX0185); *see also Allen Engineering Corp.*, 299 F.3d at 1355 (holding that amounts to be paid are relevant in considering whether transaction is purely commercial)) Indeed, even Leader's employees recognized the commercial nature of these offers and its transactions with Boston Scientific in their communications, stating that they had committed to "selling" Leader2Leader. Likewise, Mr. McKibben, as has already been noted, wrote an email stating Leader has had a "phenomenal selling week." (D.I. 651, Exh. H (DTX0184), Exh. I (DTX0186)) Taken in the light most favorable to Facebook, the Court concludes that this evidence is sufficient to support the jury's conclusion that Leader's public use and offers for sale were undertaken for commercial exploitation and not for an experimental purpose.

### g.    Summary

In sum, the Court concludes that substantial evidence supports the jury's verdict that Leader publicly used and offered for sale a product embodying the invention claimed in the '761 patent prior to the critical date for commercial purposes and not for the purpose of experimentation, such that the '761 patent is invalid based on the on sale bar and public use bar. Accordingly, the Court will deny Leader's Motion to the extent it seeks judgment as a matter of law on the validity of the '761 patent.

### B.    Direction And Control Of Employees And Users

Leader next contends that it is entitled to judgment as a matter of law that Facebook directs or controls its employees and users. In support of its argument, Leader contends that "Facebook's employees inherently have a contractual relationship and indeed are agents of the

company, and there is no question that Facebook provides the 'instrumentalities, tools and the website' for its own employees to use the infringing website." (D.I. 626 at 19) In this regard, Leader contends that direction and control is established as a matter of law by the testing of the Facebook website by Facebook employees. Leader further contends that Facebook directs its users on how to use its website in the Statement of Rights and Responsibilities for Facebook, which explains what users can and cannot do on the website and prohibits users from using the Facebook website if they fail to keep their contact information accurate and current. Thus, Leader contends that "Facebook's users must follow Facebook's rules, or they cannot use the website – the very definition of direction or control." *Id.*

Although Facebook provides rules for user conduct and postings, Facebook also presented evidence that it cannot guarantee adherence with these rules and, ultimately, does not control and is not responsible for what users post, transmit, or share on its website. (PTX-628, PTX1000) As the Federal Circuit has explained, "that a [defendant] controls access to its system is not sufficient to incur liability for direct infringement." *Muniauction, Inc.*, 532 F.3d at 1330. With respect to Facebook's employees, Leader offered evidence that Facebook employees occasionally test the website's functionality, but this evidence did not go so far as to demonstrate that Facebook employees actually perform the precise method steps of the claims or that Facebook requires its employees to perform these steps.

Accordingly, the Court concludes that the jury's conclusion that Facebook does not direct or control the actions of its users and employees is supported by substantial evidence and, therefore, the Court will deny Leader's Motion to the extent it seeks judgment as a matter of law on the question of direction and control.

C.    **New Trial**

In the alternative, Leader requests a new trial on the grounds that the verdict is against the great weight of the evidence.  Leader points out that consideration of whether a new trial is warranted does not require the Court to view the evidence in the light most favorable to the verdict winner.

Even without drawing inferences favorable to Facebook, the Court cannot conclude that the jury's verdict of invalidity based on the on sale bar and public use bar is against the weight of the evidence.  At trial, Facebook offered sufficient evidence that Leader disclosed the claimed invention to Boston Scientific without the benefit of a non-disclosure agreement for the purposes of commercially selling the product, and that Leader made other commercial offers for sale of the claimed invention to Wright-Patterson and The Limited more than one year prior to the critical date.  To the extent that Mr. McKibben's trial testimony contradicted this evidence, the jury was free to disregard his testimony, and the Court cannot substitute its judgment for that of the jury, particularly on issues of credibility.  Given the evidence presented at trial and the jury's reasonable determination to decline to credit Mr. McKibben's testimony, the Court concludes that the jury's verdict does not shock the conscience or result in a miscarriage of justice.

Accordingly, the Court will deny Leader's Motion to the extent it seeks a new trial.

## CONCLUSION

For the reasons discussed, the Court will grant Facebook's Renewed Motion For Judgment As A Matter Of Law Of No Indirect Infringement (D.I. 630) and deny Facebook's Renewed Motion For Judgment As A Matter Of Law Of No Direct Infringement (D.I. 628), Facebook's Renewed Motion For Judgment As A Matter Of Law Of No Literal Infringement

And No Infringement Under The Doctrine Of Equivalents (D.I. 629), Facebook's Renewed Motion For Judgment As A Matter Of Law Of Invalidity (D.I. 631), and Facebook's Summary Judgment Motion No. 1 (D.I. 382).  To the extent Facebook seeks a new trial in its Motion For Judgment As A Matter Of Law Of Invalidity and Motion For Judgment As A Matter Of Law of No Literal Infringement, the Court will deny the request as moot.  In addition, the Court will deny Leader's Motion For Judgment As A Matter Of Law Or A New Trial (D.I. 626).  An appropriate Order will be entered.